# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA,

v.

SHELLEY M. RICHMOND JOSEPH,

Defendant.

Crim. No. 19-10141-LTS

*Leave To File Granted*
*September 6, 2019*

## MEMORANDUM OF LAW IN SUPPORT OF
## DEFENDANT SHELLEY M. RICHMOND JOSEPH'S MOTION TO DISMISS THE
## INDICTMENT UNDER FEDERAL RULE OF CRIMINAL PROCEDURE 12(B)

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................................... ii

INTRODUCTION ..................................................................................................................... 1

BACKGROUND ....................................................................................................................... 3

    A.    Legal Framework ................................................................................................ 3

    B.    Factual Background ............................................................................................ 6

LEGAL STANDARD ............................................................................................................... 8

ARGUMENT ............................................................................................................................ 8

I.    THE PROSECUTION OF JUDGE JOSEPH VIOLATES PRINCIPLES OF
JUDICIAL IMMUNITY .............................................................................................. 9

    A.    Judge Joseph's Alleged Conduct Was Judicial In Nature And So Is Protected
By Judicial Immunity ...................................................................................... 10

    B.    Judicial Immunity Applies In A Criminal Case ............................................... 12

II.    THE INDICTMENT DOES NOT STATE AN OFFENSE UNDER SECTION 1505
OR SECTION 1512 .................................................................................................... 15

    A.    Judge Joseph Did Not Act "Corruptly" For The Purposes Of Sections 1505
and 1512(c)(2) ................................................................................................. 16

    B.    Judge Joseph's Alleged Actions Did Not Obstruct Or Interfere With A
"Proceeding" For The Purposes Of Sections 1505 and 1512(c)(2) ..................... 18

    C.    Section 1512(c)(2) Is Limited To Crimes Relating To Acts of Evidence
Impairment ...................................................................................................... 21

III.    THE APPLICATION OF THE FEDERAL OBSTRUCTION STATUTES TO
JUDGE JOSEPH WOULD VIOLATE THE CONSTITUTION ..................................... 23

    A.    Multiple Canons of Statutory Construction Require The Court To Construe
The Obstruction Statutes In A Manner Consistent With The Constitution .......... 23

    B.    The Prosecution of Judge Joseph Violates The Tenth Amendment .................... 25

    C.    As Applied Here, The Obstruction Statutes Are Unconstitutionally Vague ........ 29

CONCLUSION ....................................................................................................................... 30

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

## CASES

Page(s)

*Arizona v. United States*,
567 U.S. 387 (2012) ............................................................................................3, 4

*Arthur Andersen LLP v. United States*,
544 U.S. 696 (2005) ...................................................................................17, 18, 25

*Begay v. United States*,
553 U.S. 137 (2008) .................................................................................................22

*Braatelien v. United States*,
147 F.2d 888 (8th Cir. 1945) ..................................................................................14

*Chief Administrative Justice of the Trial Court v. Labor Relations Comm'n*,
404 Mass. 53 (1989) ................................................................................................11

*City & Cty. of San Francisco v. Sessions*,
349 F. Supp. 3d 924 (N.D. Cal. 2018) ...................................................................28

*City of Chicago v. Sessions*,
321 F. Supp. 3d 855 (N.D. Ill. 2019) .....................................................................28

*City of Philadelphia v. Att'y Gen.*,
916 F.3d 276 (3d Cir. 2019) .....................................................................................4

*Clark v. Martinez*,
543 U.S. 371 (2005) ...........................................................................................23, 24

*Ex parte Virginia*,
100 U.S. 339 (1879) .................................................................................12, 13, 14, 24

*First Justice of the Bristol Division of the Juvenile Court Dep't v. Clerk-Magistrate the Bristol Division of the Juvenile Court Dep't*,
438 Mass. 387 (2003) ..............................................................................................11

*Gebardi v. United States*,
287 U.S. 112 (1932) .................................................................................................16

*Goldstein v. Galvin*,
719 F.3d 16 (1st Cir. 2013) .....................................................................................10

*Gregory v. Ashcroft*,
501 U.S. 452 (1991) ...........................................................................................13, 24

*In re Joseph*,
   No. OE-140 (Mass. Aug. 13, 2019) ...................................................................1, 9

*In re Kendall*,
   712 F.3d 814 (3d Cir. 2013) ...........................................................................14, 15

*In re Petition of Dwyer*,
   486 Pa. 585 (1979) ...............................................................................................15

*Kolender v. Lawson*,
   461 U.S. 352 (1983) ..............................................................................................30

*Lunn v. Commonwealth*,
   477 Mass. 517 (2017) ..............................................................................4, 5, 7, 26

*Marinello v. United States*,
   138 S. Ct. 1101 (2018) ..........................................................................................25

*McDonnell v. United States*,
   136 S. Ct. 2355 (2016) ..........................................................................................30

*McNally v. United States*,
   483 U.S. 350 (1987) ..............................................................................................30

*Michigan v. Long*,
   463 U.S. 1032 (1983) ............................................................................................29

*Mireles v. Waco*,
   502 U.S. 9 (1991) (per curiam) ........................................................10, 11, 12, 13

*Montana v. Connor*,
   817 F. Supp. 2d 440 (D.N.J. 2011) ......................................................................12

*Murphy v. NCAA*,
   138 S. Ct. 1461 (2018) ......................................................................................2, 27

*Nat'l Fed'n of Indep. Bus. v. Sebelius*,
   567 U.S. 519 (2012) ..............................................................................................27

*New York v. United States*,
   505 U.S. 144 (1992) .......................................................................................*passim*

*Pereira v. Sessions*,
   138 S. Ct. 2105 (2018) ..........................................................................................19

*Pierson v. Ray*,
   386 U.S. 547 (1967) ..............................................................................................10

*Printz v. United States*,
  521 U.S. 898 (1997)...................................................................................4, 26, 27, 28

*Richman v. Sheahan*,
  512 F.3d 876 (7th Cir. 2008) ...............................................................................12

*Roma Construction Co. v. aRusso*,
  96 F. 3d 566 (1st Cir. 1996)..................................................................................17

*Ryan v. ICE*,
  382 F. Supp. 3d 142 (D. Mass. 2019) ...........................................................5, 26

*State v. Bush*,
  714 P.2d 818 (Ariz. 1986).....................................................................................12

*Stevens v. Osuna*,
  877 F.3d 1293 (11th Cir. 2017) ..........................................................................12

*Stump v. Sparkman*,
  435 U.S. 349 (1978)........................................................................................10, 11

*Tyler v. Cain*,
  533 U.S. 656 (2001)...............................................................................................13

*United States v. Aguilar*,
  515 U.S. 593 (1995)...............................................................................................17

*United States v. Binette*,
  828 F. Supp. 2d 402 (D. Mass. 2011) ......................................................20, 21, 25

*United States v. Brady*,
  168 F.3d 574 (1st Cir. 1999) ................................................................................18

*United States v. Brissette*,
  919 F.3d 670 (1st Cir. 2019) ..................................................................................8

*United States v. Chaplin*,
  54 F. Supp. 926 (S.D. Cal. 1944).........................................................................15

*United States v. Davis*,
  139 S. Ct. 2319 (2019)..............................................................................24, 25, 29, 30

*United States v. Ermoian*,
  752 F.3d 1165 (9th Cir. 2013) .............................................................................20

*United States v. Gordon*,
  710 F.3d 1124 (10th Cir. 2013) ...........................................................................17

*United States v. Hastings,*
    681 F.2d 706 (11th Cir. 1982) ...................................................................14

*United States v. Higgins,*
    511 F. Supp. 453 (W.D. Ky. 1981)...........................................................20

*United States v. Kelley,*
    36 F.3d 1118 (D.C. Cir. 1994)...................................................................20

*United States v. Lopez,*
    514 U.S. 549 (1995)......................................................................................3

*United States v. Mintmire,*
    507 F.3d 1273 (11th Cir. 2007) .................................................................17

*United States v. Murphy,*
    762 F.2d 1151 (1st Cir. 1985) ...................................................................17

*United States v. Musso,*
    914 F.3d 26 (1st Cir. 2019) .........................................................................8

*United States v. Ramos,*
    537 F.3d 439 (5th Cir. 2008) ........................................................20, 21, 25

*United States v. Stewart,*
    744 F.3d 17 (1st Cir. 2014) .........................................................................8

*United States v. Wiltberger,*
    18 U.S. (5 Wheat.) 76 (1820)....................................................................25

*Yates v. United States,*
    135 S. Ct. 1074 (2015)...............................................................................22

*Younger v. Harris,*
    401 U.S. 37 (1971).............................................................................15, 25

*Zenon v. Guzman,*
    924 F.3d 611 (1st Cir. 2019) ............................................................9, 10, 12

## CONSTITUTION

U.S. Const. amend. X......................................................................... *passim*

U.S. Const. amend. XIV ............................................................................13

## STATUTES

8 U.S.C. § 1103................................................................................................4

8 U.S.C. § 1229 ............................................................................................................19

8 U.S.C. § 1229a ..........................................................................................................19

8 U.S.C. § 1231 ............................................................................................................19

8 U.S.C. § 1357 ..........................................................................................................4, 6

18 U.S.C. § 1505 ................................................................................................ *passim*

18 U.S.C. § 1512 ................................................................................................ *passim*

18 U.S.C. § 1515 ......................................................................................................16, 20

Act of Mar. 1, 1875, ch. 114 .......................................................................................24

Mass. Gen. Laws ch. 221, § 69A ...................................................................................6

Sarbanes-Oxley Act of 2002, Pub. L. No. 107-204, 116 Stat. 745................................22

## RULES AND REGULATIONS

8 C.F.R. § 287.5 .............................................................................................................6

8 C.F.R. § 287.7 .............................................................................................................4

8 C.F.R. § 1003.14 .......................................................................................................19

Fed. R. Crim. P. 12(b).........................................................................................3, 8, 30

## LEGISLATIVE AND OTHER MATERIALS

148 Cong. Rec. S6545 (daily ed. July 10, 2002) (statement of Sen. Lott) ...................22

148 Cong. Rec. S6549-S6550 (daily ed. July 10, 2002) (statement of Sen. Hatch).....................22

Memorandum from Bill Barr to Deputy Attorney General Rod Rosenstein and
    Assistant Attorney General Steve Engel (July 8, 2018), *available at*
    https://bit.ly/2TQIWNq........................................................................................23

## INTRODUCTION

This case is unprecedented.  The Honorable Shelley M. Richmond Joseph, a duly appointed Massachusetts state court judge, is being subjected to a federal criminal prosecution for actions she took on the bench on April 2, 2018, regarding the management of her courtroom. According to the allegations of the indictment, these judicial actions enabled an undocumented person to evade a civil administrative detainer issued by U.S. Immigration and Customs Enforcement, and amount to obstruction of justice, obstruction of a federal proceeding, and conspiracy to obstruct justice.

There is a reason why this prosecution is unprecedented.  There is a reason why no judge has ever faced criminal charges for acts that did not involve personal financial gain, fraud, self-dealing, or civil-rights violations.  There is a reason why no *state* judge has ever been prosecuted for not facilitating the immigration policies of the *federal* government.  The reason is clear: This prosecution flies in the face of established common-law immunity principles, the plain language of the federal obstruction statutes, and the bedrock constitutional principles that underlie our federal system of dual sovereignty.

Judges are not above the law.  Judges who defraud, who are corrupt, or who act on the basis of self-interest are not protected by judicial immunity.  But judicial immunity does shield judges who act within their scope of authority—managing their courtroom, making discretionary decisions—even if they err in doing so.  To prosecute a judge in such a case deeply undermines the independence of the judiciary.  As several members of the Supreme Judicial Court noted last month—in reinstating Judge Joseph's salary pending the resolution of this unprecedented case— this prosecution "may have a chilling effect on a judge's willingness to challenge the conduct of a prosecutor and thereby diminish the over-all independence of the judiciary."  *In re Joseph*, No. OE-140 (Mass. Aug. 13, 2019) (slip op. at 9) (Gants, C.J., concurring).

This prosecution also violates due process protections against criminalizing conduct as to which no one—let alone a state court judge—could possibly have had fair notice. It would have been inconceivable—before this case—that a statute that prohibits "corruptly … obstruct[ing] … an[] official proceeding" could have been applied to the way in which a state judge decides to manage her courtroom or her constitutionally-protected decision whether to help enforce federal immigration law. For good reason: The statute plainly does not reach such conduct, whether on its face or as interpreted through the canon of constitutional avoidance and the rule of lenity.

This prosecution likewise offends core constitutional principles enshrined in the Tenth Amendment. Using federal criminal law to penalize a state judge's lawful and discretionary decision about how to manage courtroom proceedings is tantamount to conscripting her to enforce federal immigration law. It violates the Tenth Amendment's "anticommandeering" principle, recently reaffirmed by the Supreme Court in *Murphy v. NCAA*, 138 S. Ct. 1461 (2018). The federal government may well have hoped or expected that Judge Joseph would conduct her courtroom in a way that was consistent with its policies: where the noncitizen would be taken and through which courthouse door. But it may not *enforce* those expectations through the bludgeon of the federal criminal law. Having failed to obtain the Commonwealth of Massachusetts' voluntary compliance with federal immigration policies, the federal government cannot use this prosecution to intimidate Massachusetts judges. It cannot do indirectly—through this obstruction prosecution—what the Constitution plainly prohibits it from doing directly.

These federalism issues are exacerbated where the officer involved is not just any state official, but a state court *judge*, and where the acts are lawful and discretionary ones that she took while on the bench. A state judge may err in the decisions she makes, but in our system of

dual sovereignty, such errors are the exclusive province of state courts or state judicial disciplinary proceedings, not federal criminal proceedings.

Judge Joseph categorically denies the allegations in the indictment.  She brings this motion to dismiss pursuant to Federal Rule of Criminal Procedure 12(b) to raise legal challenges to the face of the indictment because even if the government could prove the acts alleged in the indictment, those acts do not constitute obstruction of justice within the meaning of 18 U.S.C. §§ 1505 and 1512(c)(2)—and if they did, her prosecution would violate the Constitution.

## BACKGROUND

### A.    Legal Framework

Under our federal system, "both the National and State Governments have elements of sovereignty the other is bound to respect."  *Arizona v. United States*, 567 U.S. 387, 398 (2012). While the federal government has "broad, undoubted power over the subject of immigration and the status of aliens," *id.* at 394, the states retain primary authority for "enforcing the criminal law," including the administration of their own criminal-justice systems, *United States v. Lopez*, 514 U.S. 549, 561 n.3 (1995).  Federal law defines the respective roles and responsibilities of the federal and state governments in contexts where these powers intersect.  Enforcement of the immigration laws has been delegated by Congress to the Department of Homeland Security ("DHS"); adjudication of removal proceedings to the Department of Justice.  *Arizona*, 567 U.S. at 397.  Thus, Congress delegated to DHS—specifically, Immigration and Customs Enforcement ("ICE"), an agency housed within it—the task of "conduct[ing] criminal investigations involving the enforcement of immigration-related statutes," *id.*, including the arrest of persons believed to be in the United States unlawfully.  By contrast, Congress delegated to the Justice Department responsibility for conducting removal proceedings; in these proceedings, a DHS attorney acts as

a prosecutor, arguing before an immigration judge employed by the Justice Department, with authority to issue final orders of removal.  *See* 8 U.S.C. § 1103(g).

In terms of the states' role in immigration enforcement, although ICE may seek the **voluntary** cooperation of state and local governments in enforcing federal immigration law, *see Arizona*, 567 U.S. at 408-409; 8 U.S.C. § 1357(g), it may not **command** state and city officers to provide such assistance, *Printz v. United States*, 521 U.S. 898, 935 (1997).  Consistent with the Tenth Amendment, states, cities, and their officers retain the option to "decline to administer" federal immigration law.  *New York v. United States*, 505 U.S. 144, 176-177 (1992).

That the federal government is limited to the voluntary cooperation of state officials in enforcing immigration law was recently reemphasized by the Massachusetts Supreme Judicial Court in *Lunn v. Commonwealth*, 477 Mass. 517 (2017).  *Lunn* concerned whether state judicial officers had the authority to hold persons who would otherwise be released from state custody on a "civil immigration detainer"—a request from the federal government to hold such a person for up to 48 hours to allow ICE to apprehend him.  *Id.* at 518; *see* 8 C.F.R. § 287.7(a).  The SJC held that state officers lacked that authority.  477 Mass. at 519.  "Federal immigration detainers," the SJC explained, "by their express terms[,] are simply requests.  They are not commands, and they impose no mandatory obligations on the State authorities to which they are directed."  *Id.* at 526.  That conclusion followed, the SJC continued, from the Tenth Amendment, which "prohibits the Federal Government from compelling States to employ their resources to administer and enforce Federal programs."  *Id.* at 526-527.  *Accord City of Philadelphia v. Att'y Gen.*, 916 F.3d 276, 281 (3d Cir. 2019).  The SJC further held that no other law, state or federal, permitted Massachusetts judicial officers to hold in custody people who are suspected only of violating federal civil immigration law.  *Lunn*, 477 Mass. at 537.  After *Lunn*, such officers may not hold such people

"beyond the time that [they] would otherwise be entitled to be released from State custody." *Id.*; *accord Ryan v. ICE*, 382 F. Supp. 3d 142, 150-152 (D. Mass. 2019).

In the wake of *Lunn*, the Massachusetts state courts adopted a policy generally declining to assist the federal government in enforcing federal immigration law. *See* Memorandum from Chief Justice Paula M. Carey, Policy and Procedures Regarding Interactions with the Department of Homeland Security (Nov. 10, 2017) (Exhibit A) ("Policy"). This policy memorandum binds all state-court employees, including judicial officers—and, more to the point, Judge Joseph. The memorandum implements *Lunn* by instructing employees not to "hold any individual who would otherwise be entitled to release based solely on a civil immigration detainer or civil immigration warrant." *Id.* at 1. It directs court employees to generally treat DHS officers "in the same manner" as members of the public, and states that a person who is brought into court in custody and then released shall be processed "in the normal course," even if he or she "is subject to a civil immigration detainer or warrant." *Id.* at 2. Although it sets out a procedure by which DHS officers may obtain access to the courthouse's "holding cell area in order to take custody of" a person pursuant to a detainer, such access is contingent on the DHS officer making such a request. *Id.* at 2-3. The policy provides, as a general matter, that DHS officials may enter and conduct activities in state courthouses only if "their conduct in no way disrupts or delays court operations[] or compromises court safety." *Id.* at 2. Pursuant to this policy, at the time of the events alleged in the indictment, the Newton District Court had established a policy excluding from state courtrooms DHS officers present to execute immigration detainers. *Cf. Ryan*, 382 F. Supp. 3d at 160-161 (describing evidence that DHS policies authorizing courtroom arrests have led to "victims and witnesses … avoid[ing] using the state courts, leading to a failure of state civil and criminal proceedings").

B.      **Factual Background**

Judge Joseph is a duly appointed officer of the judicial department of the Massachusetts

government.  Indictment ("Ind.")  ¶ 3.  *See* Mass. Gen. Laws ch. 221, § 69A.  As a judge, she had

"the authority to, among other things, arraign criminal defendants, set bail, detain or release

defendants, and *control other courtroom proceedings*."  Ind. ¶ 3 (emphasis added).  The crimes

of which she stands accused occurred in her courtroom on April 2, 2018, while she was on the

bench in her robes, when she took up a criminal case involving a person alleged to have been an

undocumented immigrant, whom the indictment refers to as "A.S." (for "alien subject").  The

nub of the offenses alleged in the indictment is that Judge Joseph supposedly "conspired" to

allow A.S. to exit the building from a door at the rear of the building, near the lockup, rather than

through the front doors of the courtroom where ICE could have more easily apprehended him.

Ind. ¶¶ 26-33.

A.S. appeared before Judge Joseph on April 2, 2018 on charges of narcotics possession

and being a fugitive from justice from the Commonwealth of Pennsylvania.  Ind. ¶ 6.  After his

arrest two days before, on March 30, 2018, A.S.'s fingerprints had been run through an ICE

database, and ICE had issued both a detainer and a civil immigration warrant for his arrest.  *Id.*

¶¶ 6-8.  An administrative arrest warrant issued for perceived violations of immigration law is

issued not by a magistrate or any judicial or impartial officer, *see* 8 U.S.C. § 1357(a); 8 C.F.R.

§ 287.5(e)(2), but rather can be issued by an ICE agent simply by checking a box on a form.  The

basis for the detainer and the administrative warrant was ICE's belief that A.S. had previously

been removed from the United States and re-entered.  *Id.* ¶ 7.[1]  Upon A.S.'s arrival in her

---

[1] According to the indictment, the detainer "*requested* that Newton Police (i) notify ICE
prior to any release of A.S.; (ii) relay the Detainer to any other law enforcement agency to whom
Newton Police transferred A.S.; and (iii) maintain custody of A.S. for up to 48 hours for ICE to
take custody."  *Id.* ¶ 8 (emphasis added).  Neither the detainer nor the warrant *instructed* state or

courtroom, the indictment alleges, Judge Joseph directed a court clerk to tell the ICE agent present in the courtroom to wait outside. *Id.* ¶ 19. The indictment alleges that this was "contrary to … DHS policy." *Id.* It was, however, entirely consistent with Massachusetts policy. *See supra* p. 5.[2]

According to the transcript, both the assistant district attorney ("ADA") and A.S.'s defense attorney raised serious questions about A.S.'s identity with respect to both the fugitive charge and the immigration detainer. *See* Ind. ¶¶ 20-22.[3] Specifically, the ADA and the defense attorney agreed that there was insufficient evidence to proceed with the Pennsylvania fugitive-from-justice charge, which would be dismissed. *Id.* ¶ 22. The Commonwealth also agreed that it would not seek pretrial confinement or bail on the drug possession charge. *Id.* ¶ 20.

Judge Joseph, still on the bench, then conferred with counsel about the prospect that ICE might detain A.S. Ind. ¶ 20. The courtroom recording system captured part of the conversation before, according to the indictment, Judge Joseph directed that the system be turned off for approximately 52 seconds. *Id.* ¶¶ 20-21. When it resumed, defense counsel asked to speak with A.S. in the lockup with an interpreter, while he retrieved his personal property, *id.* ¶ 22, consistent with ordinary practices and procedures in the courthouse.

---

local officers to take any action, nor could they have. *See supra* pp. 4-5; *Lunn*, 477 Mass. at 526 ("Federal immigration detainers … are simply requests.").

[2] Although the Massachusetts policy memorandum sets out a process by which, under certain circumstances, DHS officers may "seek[] admission into the courthouse's holding cell area in order to take custody" of certain people, Policy at 2, nothing in the policy requires a judge to permit such officers inside his or her courtroom. *See* Ind. ¶ 22.

[3] At a sidebar conference with Judge Joseph, the ADA said, "I don't think it's him." The defense attorney reported: "There's 13 FBI numbers connected to this social. So something's bad with [unintelligible]." When the parties returned from sidebar, the defense attorney stated on the record: "We don't believe that this gentleman is the same gentleman as on the fugitive-from-justice warrant." The ADA agreed: "Your Honor, with the information I have, I don't think there is enough tying him to the Pennsylvania warrant." *Id.* ¶¶ 20, 22.

The Indictment alleges that Judge Joseph's decision to return A.S. to the lockup was part of a criminal conspiracy with the court officer—defendant Wesley MacGregor—and the defense attorney (who has not been charged).  The alleged purpose of the charged conspiracy was to allow A.S. to evade ICE's apprehension by allowing him to exit through a rear door of the courthouse, rather than through the front door of the courtroom.  Ind. ¶¶ 23-24.  The indictment alleges that as a result of Judge Joseph's decision, ICE was "unable to take custody of A.S. pursuant to the Warrant."  *Id.* ¶ 24.

## LEGAL STANDARD

Under Federal Rule of Criminal Procedure 12(b)(3), a defendant may "raise[] by pretrial motion" any "defect in the indictment or information, including … failure to state an offense." Fed. R. Crim. P. 12(b)(3)(B)(v).  *See United States v. Brissette*, 919 F.3d 670, 675-76 (1st Cir. 2019); *United States v. Musso*, 914 F.3d 26, 29-30 (1st Cir. 2019).  Such a motion is the proper way to test the sufficiency of an indictment "as an issue of law."  *Id.* at 30; *see Brissette*, 919 F.3d at 676 ("[A] pretrial dismissal is essentially a determination that, *as a matter of law*, the government is incapable of proving its case beyond a reasonable doubt." (emphasis in original)). On a motion to dismiss an indictment under Rule 12(b), "[t]he indictment's allegations are assumed to be true," *United States v. Stewart*, 744 F.3d 17, 21 (1st Cir. 2014), and the court asks whether, "[o]n the facts presented," the indictment is sufficient to state an offense, *Musso*, 914 F.3d at 30.

## ARGUMENT

Resolution of this case at this stage is critical in light of the profound consequences that the charges against Judge Joseph have had on the administration of justice and core principles of separation of powers.  Judge Joseph vigorously denies the allegations in the indictment.  But even if the allegations were true, to bring federal criminal charges on the basis of such alleged

facts threatens essential principles of "[t]he judiciary's independence from other branches of government and from outside influences and extraneous concerns." *In re Joseph*, No. OE-140 (Mass. Aug. 13, 2019) (slip op. at 11) (Gants, C.J., concurring) (citation omitted).  It undermines the state bench's willingness to implement state policies that may be critical of federal policies, lest its members find themselves in the crosshairs of the federal government.  And it offends a core principle of federalism—that federal and state courts operate as equals in a system of dual sovereignty.  It is no exaggeration to suggest that those impacts continue every day that the charges against Judge Joseph are allowed to stand.

## I.      THE PROSECUTION OF JUDGE JOSEPH VIOLATES PRINCIPLES OF JUDICIAL IMMUNITY

At the outset, the indictment should be dismissed because this prosecution of Judge Joseph violates core principles of judicial immunity.  The "time-honored doctrine" of judicial immunity shields judges from all liability "when [they] carr[y] out traditional adjudicatory functions." *Zenon v. Guzman*, 924 F.3d 611, 616 (1st Cir. 2019).  The acts alleged by the indictment to constitute Judge Joseph's criminal conduct lie at the heart of the judicial task: The Supreme Court and lower courts alike have recognized that exercising control over courtroom proceedings and individuals in the court is a quintessentially judicial activity.  And while the Supreme Court's caselaw on the application of judicial immunity has arisen in the context of civil cases, where criminal charges against judges have been allowed to proceed, they have involved only nonjudicial acts—accusations related to bribery, fraud, or corruption—or charges under a civil rights statute, none of which is present here.  Even if the allegations in the indictment were true, the judicial actions described in the indictment are protected by judicial immunity, and the indictment should be dismissed on that ground.

### A.      Judge Joseph's Alleged Conduct Was Judicial In Nature

As the First Circuit has recently explained, the doctrine of judicial immunity has long

shielded judges from liability arising out of acts taken in their judicial role.  *See Zenon*, 924 F.3d

at 616.  "[I]ts purpose [is] not to buffer bad judges but 'for the benefit of the public, whose

interest it is that the judges should be at liberty to exercise their functions with independence and

without fear of consequences.'"  *Id.* (quoting *Pierson v. Ray*, 386 U.S. 547, 554 (1967)).  "The

breadth of the protection is fulsome," *id.*: "[W]hen a judge carries out traditional adjudicatory

functions, he or she has absolute immunity for those actions."  *Id.*; *see Goldstein v. Galvin*, 719

F.3d 16, 25 (1st Cir. 2013).  In order to determine whether judicial immunity applies, the First

Circuit has explained, a court asks whether "the judge's act was one normally performed by a

judge, and whether the parties were dealing with the judge in his or her judicial capacity."

*Zenon*, 924 F.3d at 617; *see Stump v. Sparkman*, 435 U.S. 349, 362 (1978).  Judicial immunity is

overcome "only in cases where a judge is carrying out a nonjudicial action, or … where a judge

takes an action, though seemingly 'judicial in nature,' that is 'in the complete absence of all

jurisdiction.'"  *Zenon*, 924 F.3d at 617 (quoting *Mireles v. Waco*, 502 U.S. 9, 11-12 (1991) (per

curiam)).

The actions alleged by the indictment are fundamentally judicial in nature.  The acts that

Judge Joseph is alleged to have taken are essential judicial functions, namely: (i) conversations

with a prosecutor and defense counsel at sidebar in the course of a proceeding pending before

her, (ii) directing that a person leave the courtroom during a matter pending before her, (iii) the

operation of a recording device in that courtroom during a criminal proceeding, and (iv) allowing

a defendant to leave the courtroom and proceed to lockup.  Each of these alleged acts involved

what the SJC has described as "inherent judicial authority"—the "judge's power 'to control [a

court's] own proceedings, the conduct of participants, the actions of officers of the court and the

environment of the court.'" *First Justice of Bristol Div. of Juvenile Court Dep't v. Clerk-Magistrate of Bristol Div. of Juvenile Court Dep't*, 438 Mass. 387, 397-398 (2003) (quoting *Chief Admin. Justice of the Trial Court v. Labor Relations Comm'n*, 404 Mass. 53, 57 (1989)). The entirety of the allegations in the indictment involve Judge Joseph's "physical control" of the courtroom, *Chief Admin. Justice*, 404 Mass. at 57. All of the actions alleged are thus quintessentially judicial acts.

*Mireles v. Waco*, 502 U.S. 9, is instructive. Mireles, a state trial court judge, allegedly ordered two police officers in his courtroom to forcibly bring a public defender who failed to appear for the initial call of Judge Mireles's calendar into his courtroom. *Id.* at 10. The lawyer claimed that the judge's directions to the officers indicated that they should use excessive force, and that, as a result, the officers intentionally slammed the lawyer into doors and gates on their way to the courtroom. *Id.* The Supreme Court concluded that Judge Mireles's alleged actions were taken in his judicial capacity. *Id.* at 12. Although the Court agreed that "a judge's direction to police officers to carry out a judicial order with excessive force is not a 'function normally performed by a judge,'" *id.* (quoting *Stump*, 435 U.S. at 362), it explained that "if only the *particular* act in question were to be scrutinized, then any mistake of a judge in excess of his authority would become a 'nonjudicial' act, because an improper or erroneous act cannot be said to be normally performed by a judge." *Id.* (emphasis added). Instead, the Court held, "we look to the particular act's relation to a general function normally performed by a judge, in this case the function of directing police officers to bring counsel in a pending case before the court." *Id.* at 13.

If the actions taken by Judge Mireles—the intentional harassment of, and the use of force against, a lawyer who was entering his courtroom—are shielded by judicial immunity, so too are

the actions alleged in the indictment.  Indeed, with respect to Judge Joseph's alleged instructions to remove the ICE officer from the courtroom, if summoning persons into a courtroom is a judicial act, per *Mireles*, so too is ejecting persons from a courtroom:  Both acts are central to the typically judicial function of managing or controlling the courtroom.  This is why many courts have recognized that a judge's order to remove or exclude individuals from her courtroom is a judicial act, especially when statutes or regulations provide an explicit grant of such authority.[4] At bottom, the allegations of the indictment depict a judge taking ordinary judicial actions—the direction of people within her courtroom—allegations that cannot support an argument that Judge Joseph acted in the clear absence of jurisdiction, as would be required to deny immunity. *See Zenon*, 924 F.3d at 617.  Judicial immunity thus bars the indictment in this case.

### B.      Judicial Immunity Applies In A Criminal Case

The fact that this is a criminal matter is no barrier to the invocation of judicial immunity. The Supreme Court has confronted the question whether judicial immunity can bar a federal criminal prosecution only once, in the 140-year-old *Ex parte Virginia*, 100 U.S. 339 (1879). Although the Supreme Court's decision in *Virginia* has been read by some courts to prohibit the assertion of judicial immunity in a criminal proceeding, that interpretation is incorrect.  In the years after *Ex parte Virginia* courts have not hesitated to rely on principles of judicial immunity

---

[4] *See, e.g.*, *Stevens v. Osuna*, 877 F.3d 1293, 1305 (11th Cir. 2017) ("If Judge Cassidy ordered Plaintiff removed from the court building, he was also engaged in performing a judicial function."); *Richman v. Sheahan*, 512 F.3d 876, 880 (7th Cir. 2008) (holding that judicial immunity shielded a state court judge's action in ordering the son of a defendant to leave the court building and ordering court officers to arrest him for contempt upon his refusal to leave); *State v. Bush*, 714 P.2d 818, 823 (Ariz. 1986) (trial judge "may clear the courtroom and the courthouse of those who may be intimidating witnesses or other court personnel"); *Montana v. Connor*, 817 F. Supp. 2d 440, 446 (D.N.J. 2011) (finding that a judge engaged in a judicial act when he barred a disruptive family court counselor from a hearing).

to dismiss indictments in cases in which the charges do not concern fraud, corruption, or the violation of civil rights laws.  This Court should do the same.

*Ex parte Virginia* concerned an indictment brought against a county judge for violating a newly enacted statute making it a federal misdemeanor for a state officer to discriminate on the basis of race in selecting jurors.  100 U.S. at 340.  The judge asserted judicial immunity, but the Court rejected his argument on multiple grounds.  For one, the Court held, the selection of jurors was not a "judicial act": Under the law of the era, "[t]he duty of selecting jurors might as well have been committed to a private person," and often was.  *Id.* at 348.  But even if the selection of jurors "could be considered … a judicial act," the Court went on, the judge "acted outside of his authority" by violating the federal law: After the enactment of the law, the exclusion of people of color "was not left within the limits of his discretion."  *Id.*  The Court relied heavily on the fact that the criminal statute there, which was enacted pursuant to Section 5 of the Fourteenth Amendment, *expressly* governed state officers and removed certain discriminatory actions from those officers' "discretion."  *See Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991) ("[I]f Congress intends to alter the 'usual constitutional balance between the States and the Federal Government,' it must make its intention to do so 'unmistakably clear in the language of the statute.'" (citation omitted)).

In the 140 years since *Ex parte Virginia*, the Supreme Court has not directly confronted the question whether principles of judicial immunity apply in a criminal case.[5]  But even without

---

[5] In *Mireles*, the Supreme Court stated in a footnote that it had "recognized that a judge is not absolutely immune from criminal liability."  502 U.S. at 10 n.1.  But this statement was plainly dicta: The question whether judicial immunity attaches in criminal proceedings had no bearing on the resolution of the case and was not briefed or argued.  *See Tyler v. Cain*, 533 U.S. 656, 663 n.4 (2001) (explaining that binding precedent includes only the final disposition of a case and the determinations "necessary to that result").

a broad statement of that kind, courts have carefully followed the principles underlying *Virginia*.

Some courts have concluded that judicial immunity principles do not apply in cases that involve

allegations of fraud, bribery, or—as in *Virginia*—the deprivation of civil rights in violation of a

statute enacted pursuant to Section 5.  *See, e.g.*, *United States v. Hastings*, 681 F.2d 706, 710-711

(11th Cir. 1982) (bribery); *Braatelien v. United States*, 147 F.2d 888, 895 (8th Cir. 1945)

(corruption).  By contrast, in a recent case, Judge Roth of the Third Circuit explained in a lengthy

concurring opinion that "absent corruption or bribery, [judicial immunity] should also reach

criminal liability for judicial actions within the judge's jurisdiction."  *In re Kendall*, 712 F.3d

814, 833-834 (3d Cir. 2013) (Roth, J., concurring).  Judge Roth's position is correct: Judges may

be subject to state disciplinary proceedings or impeachment, but not to criminal prosecution—

unless their conduct is corrupt, unless they abuse their office for personal gain, or unless they

violate statutes expressly aimed at their conduct and passed pursuant to Section 5.

    In each case, the judicial immunity inquiry looks to the nature of the act in question to

determine whether the conduct—irrespective of motive—is judicial.  Here, the statute in question

does not follow from Congress's Section 5 power.  There are no allegations of bribery or

corruption on the part of Judge Joseph, no claim that her judicial acts masqueraded to cover

private gain.  The actions of Judge Joseph charged in the indictment are exactly the type of

actions that have been recognized as judicial acts by the Supreme Court and lower courts.  *See*

*supra* pp. 10-12.  They were related to a pending case; they were part and parcel of her power to

manage her own courtroom; they involved the kind of judgments judicial officers typically make

in criminal cases.

    Absent corruption or bribery, or the special jurisdiction of the federal civil rights law, the

same reasons that justified the application of judicial-immunity principles in the civil context

warrant their application here: "Exposing judges to criminal liability for judicial acts performed within their jurisdiction poses the same type of threat to judicial independence as does exposing them to civil suit for money damages." *Kendall*, 712 F.3d at 835 (Roth, J., concurring).  Other courts have reached similar conclusions. *See, e.g.*, *In re Petition of Dwyer*, 486 Pa. 585, 597 (1979) ("Judges made timid because of fear of criminal prosecutions for errors in their decisions make poor public servants."); *United States v. Chaplin*, 54 F. Supp. 926, 934 (S.D. Cal. 1944) ("If judges are protected against civil actions for judicial acts, the reasons are more weighty that they should be protected against criminal actions.").

The concerns expressed in these decisions apply with special force here.  The charges against Judge Joseph serve no purpose other than to intimidate her and other state judges into assisting the federal government in enforcing federal immigration law, contrary to the federal design.  *Cf. Younger v. Harris*, 401 U.S. 37, 44 (1971) ("[T]he National Government will fare best if the States and their institutions are left free to perform their separate functions in their separate ways.").  They run the risk of bleeding over into the countless other decisions a judge must make that may affect federal policies.  Judicial immunity bars this prosecution.

## II.     THE INDICTMENT DOES NOT STATE AN OFFENSE UNDER SECTION 1505 OR SECTION 1512

It should be no surprise that the federal obstruction of justice statutes have never before been asserted against a state judge who allegedly declines to facilitate the federal government's desire to make an immigration arrest.  Even setting aside the constitutional concerns raised by such a prosecution, *see infra*, the text of the statutes plainly does not criminalize such conduct. The statute excludes such conduct in three ways: First, § 1505 and § 1512(c)(2) each criminalize only "corrupt" behavior, and the indictment does not allege any corrupt intent on the part of Judge Joseph, nor could it.  Second, the two statutes apply only where a defendant's conduct

obstructs a "proceeding," and the execution of a civil immigration warrant does not qualify as a "proceeding." Finally, § 1512(c)(2) does not apply here at all, as it is limited to crimes relating to acts of evidence impairment. The indictment thus fails to state an offense under both 18 U.S.C. §§ 1505 and 1512(c)(2).[6]

## A. Judge Joseph Did Not Act "Corruptly" For The Purposes Of Sections 1505 and 1512(c)(2)

First, both obstruction statutes that Judge Joseph is charged with violating apply only to those who act "corruptly." 18 U.S.C. §§ 1505, 1512(c)(2). But the indictment does not allege— beyond a bare recitation of the statute—that Judge Joseph acted corruptly, nor could it. Absent an allegation of fraud or self-interest, a state court judge who acts within the scope of her lawful authority on matters before her cannot act "corruptly" within the meaning of the statutes. Any broader construction of that word would encroach on the principles of judicial immunity that protect judges from interference in the performance of their role.

Both obstruction statutes limit their sweep to persons who act "corruptly." *See* 18 U.S.C. §§ 1505, 1512(c)(2).[7] The statutes define that term to mean "acting with an improper purpose, … including making a false or misleading statement, or withholding, concealing, altering, or destroying a document or other information." *Id.* § 1515(b). Although this definition applies only to § 1505, courts have read the term "corruptly" in § 1512(c)(2) to take essentially the same

---

[6] Because the indictment fails to state an offense under §§ 1505 and 1512(c)(2)—the substantive crimes with which Judge Joseph is charged—it necessarily fails to state an offense under § 1512(k) and § 2, which allege, respectively, a conspiracy to commit the substantive offenses and that Judge Joseph aided and abetted the commission of those offenses. *See Gebardi v. United States*, 287 U.S. 112, 121-123 (1932) (where a substantive criminal statute excludes individuals from liability, those individuals cannot be charged with conspiring to violate that statute).

[7] Section 1505 also makes it a crime to obstruct justice "by threats or force, or by any threatening letter or communication." 18 U.S.C. § 1505. The indictment does not allege any such acts on the part of Judge Joseph.

meaning: motivated by an "improper purpose."  *See, e.g.*, *United States v. Gordon*, 710 F.3d

1124, 1151 (10th Cir. 2013); *United States v. Mintmire*, 507 F.3d 1273, 1289 (11th Cir. 2007).

And, as the First Circuit has explained, such a purpose will generally be a *self-interested* one:

"The *mens rea* implicated by 'corruptly' concerns the intention to obtain ill-gotten gain." *Roma*

*Constr. Co. v. aRusso*, 96 F. 3d 566, 574 (1st Cir. 1996); *see also id.* at 573-574 ("'[A]n act is

done corruptly if it's done voluntarily and intentionally to bring about either an unlawful result

or a lawful result by some unlawful method, with a hope or expectation of ***either financial gain***

***or other benefit to oneself or a benefit of another person***.'" (quoting *United States v. Aguilar*,

515 U.S. 593, 616-617 (1995) (Scalia, J., concurring in part and dissenting in part) (emphasis

added))).  These definitions impose a high bar: As the Supreme Court has explained, the words

"'[c]orrupt' and 'corruptly' are normally associated with wrongful, immoral, depraved, or evil."

*Arthur Andersen LLP v. United States*, 544 U.S. 696, 705 (2005).  That these statutes reach only

those who act "corruptly" limits their application to those who are "conscious of their

wrongdoing." *Id.* at 706.

The indictment entirely fails to allege that Judge Joseph acted "corruptly."  Setting aside

the bare recitation of the statutory elements, *see* Ind. ¶¶ 38, 40, 42; *United States v. Murphy*, 762

F.2d 1151, 1153 (1st Cir. 1985) (indictment must do more than "parrot[] the statute"), the only

reference made to motive in the indictment is in Paragraph 25, which alleges that "[i]t was the

object of the conspiracy to corruptly attempt to obstruct" an immigration removal proceeding.

Ind. ¶ 25.  But this allegation likewise fails to shed light on *how* Judge Joseph is alleged to have

acted "corruptly" on April 2, 2018.  The government does not allege (nor could it) that Judge

Joseph was "corrupted" by self-interest or bribery.  *See Roma Constr. Co.*, 96 F. 3d at 574.  Its

theory appears to be that Judge Joseph acted "corruptly" merely by *knowingly* "preventing the

17

ICE Officer from taking custody of A.S." (at least, from doing so inside the courtroom).  Ind. ¶ 25. But the term "corruptly" cannot be defined so broadly.  *See Arthur Andersen*, 544 U.S. at 705 (contrasting the term "knowingly" with the term "corruptly"); *United States v. Brady*, 168 F.3d 574, 578 (1st Cir. 1999) ("[T]o make any sense out of the statute, 'corruptly' needs to have some content beyond mere knowledge of consequence.").  The term "corruptly" imposes a meaningful limitation on the government, especially where it seeks to impose criminal liability on a public official engaged in the discharge of her duties.  The indictment is devoid of any allegation of fraud or self-interest, instead alleging only that the actions of a state court judge within the scope of her lawful authority on matters before her in her judicial role violate the statute.  This is not acting "corruptly" within the meaning of the federal obstruction statutes, and the indictment therefore fails to state an offense under these statutes.

**B.     Judge Joseph's Alleged Actions Did Not Obstruct Or Interfere With A "Proceeding" For The Purposes Of Sections 1505 and 1512(c)(2)**

The indictment fails to state an offense in a second way: It does not sufficiently allege that Judge Joseph obstructed a "proceeding"—a required element of both statutes.

i.     Section 1505 applies only to a person who "corruptly … obstructs, or impedes or endeavors to influence … [a] *pending proceeding* … before any department or agency of the United States."  18 U.S.C. § 1505 (emphasis added).  The indictment specifies the "proceeding" that Judge Joseph is alleged to have obstructed: "a federal immigration removal proceeding before the … Department of Homeland Security."  Ind. ¶ 42.  But as the indictment's own allegations make clear, there was no removal proceeding "pending" at the time of Judge Joseph's alleged conduct.

Under the Immigration & Nationality Act, the term "removal proceeding" has a specific meaning: a proceeding held before "[a]n immigration judge"—a Justice Department employee—

"for deciding the inadmissibility or deportability of an alien."  8 U.S.C. § 1229a(a)(1).  The

statute likewise specifies when a removal proceeding is "[i]nitiat[ed]": it is when "written

notice" (known as a "notice to appear") is "given in person to [an] alien" informing him or her of

various aspects of the proceeding, including "[t]he nature of the proceedings" and "[t]he legal

authority under which the proceedings are conducted."  *Id.* § 1229(a)(1); *see Pereira v. Sessions*,

138 S. Ct. 2105, 2110-2111 (2018); 8 C.F.R. § 1003.14(a).  Removal proceedings are thus

analogous to court proceedings, and they are triggered by the issuance of the "notice to

appear"—itself analogous to a charging document.  But the allegations in the indictment make

plain that, on the morning of April 2, 2018, no such proceeding was extant.  The indictment

reflects that as of April 2, 2018 ICE had issued only a federal immigration detainer and a civil

immigration warrant for A.S.'s arrest—not a notice to appear.  Ind. ¶ 8.  No "removal

proceeding" was "pending."[8]

 The government cannot escape that conclusion by attempting to recast the ICE agent's

actions on April 2 as part and parcel of some broader, more nebulous "proceeding."  For one, and

contrary to the indictment, DHS does not conduct "federal immigration removal proceedings";

the Justice Department does.  *See* 8 U.S.C. § 1229a(a)(1).  And even if the statutory scheme did

permit the government to recast the events of April 2, 2018—in essence, the execution of an

arrest warrant—as a "proceeding," the caselaw would not.  As multiple courts have held in the

context of both § 1505 and § 1512 charges, the word "proceeding"—at least as it is used in the

---

[8] The indictment implies that A.S. may have been eligible for an expedited form of
proceedings in which the government simply *reinstates* a previously issued removal order.  *See*
Ind. ¶ 8; *see also* 8 U.S.C. § 1231(a)(5).  Even if true, the fact that ICE could have removed A.S.
from the United States *without* instituting removal proceedings hardly helps the government now
establish that Judge Joseph obstructed a pending "federal immigration removal proceeding."
Ind. ¶¶ 38, 40, 42.  If no such proceeding would ever have occurred, Judge Joseph cannot
possibly have obstructed one.

federal obstruction statutes—implies a formal, court-like proceeding, in the sense of "formal appearances before a tribunal." *United States v. Ermoian*, 752 F.3d 1165, 1170 (9th Cir. 2013); *accord United States v. Ramos*, 537 F.3d 439, 462-463 (5th Cir. 2008). These courts have correctly looked to the structure of the statute, and the context in which the word "proceeding" appears, to conclude that Congress did not use the word in its "general sense," but rather "as a legal term." *Ermoian*, 752 F.3d at 1169; *see also United States v. Higgins*, 511 F. Supp. 453, 455-456 (W.D. Ky. 1981) (consulting the legislative history of § 1505 to reach the same conclusion). Thus understood, the word "proceeding" does not encompass "a mere criminal investigation," *Ermoian*, 752 F.3d at 1170, and neither does it include the execution of a civil ICE arrest warrant. *Accord United States v. Kelley*, 36 F.3d 1118, 1127 (D.C. Cir. 1994) ("For an investigation to be considered a proceeding … it must be more than a 'mere police investigation.'").

ii.     For similar reasons, the indictment fails to state an offense under § 1512(c)(2). That statute makes it a crime to "obstruct[], influence[], or impede[] any official proceeding." 18 U.S.C. § 1512(c)(2). The term "official proceeding" is defined elsewhere to include, as relevant here, "a proceeding before a Federal Government agency," *id.* § 1515(a)(1)(C), and again the indictment specifies the "proceeding" that Judge Joseph is alleged to have obstructed: "a federal immigration removal proceeding before the United States Department of Homeland Security." Ind. ¶¶ 40, 42. The scope of Section 1512(c)(2) is limited to "official proceedings," and the execution of an arrest warrant does not qualify as an official proceeding. *See Ermoian*, 752 F.3d at 1170; *Ramos*, 537 F.3d at 462-463.

Judge Ponsor's decision interpreting § 1512(c) in *United States v. Binette*, 828 F. Supp. 2d 402 (D. Mass. 2011), is instructive. In *Binette*, the Securities and Exchange Commission

began an investigation into the defendant's purchase of stock options. *Id.* at 403.  When the

defendant lied to the SEC investigators, they charged him with violating § 1512(c)(2).  *Id.* at 402.

The defendant moved to dismiss the charge on the grounds that the investigation did not qualify

as an "official proceeding" under § 1512(c)(2), and Judge Ponsor agreed and dismissed the

charge.  *Id.* at 403-404.  Relying on the Fifth Circuit's decision in *Ramos*, the court reasoned that

the statutory definition "indicates that it 'involves some formal convocation of the agency in

which parties are directed to appear'" and was used throughout the statute "in 'a manner that

contemplates a formal environment in which persons are called to appear or produce

documents.'"  *Id.* (quoting *Ramos*, 537 F.3d at 462-63).  The investigation at issue, the court

explained, "was not an official proceeding as contemplated by the statute," especially in light of

its informal nature: In the kind of investigation at issue in *Binette*, the SEC could not "compel the

production of documents and witnesses through subpoenas," as could a court.  *Id.* at 403-04.  The

same is self-evidently true of an ICE officer who is executing a civil immigration warrant; such

an officer does not have the power to compel process.  The allegations in the indictment make

clear that the "proceeding" that Judge Joseph is alleged to have obstructed was not a formal

convocation but a law-enforcement-style effort to apprehend and detain someone whom ICE

suspected to be undocumented.  That process does not qualify as a "proceeding" under the

statute.

**C.     Section 1512(c)(2) Is Limited To Crimes Relating To Acts of Evidence Impairment**

Finally, and wholly independently, the § 1512(c)(2) charge should be dismissed on the

ground that that section was never meant to reach conduct like that charged in the indictment; it

was intended to reach only crimes relating to acts of evidence impairment.

Unlike § 1505, which generally prohibits the obstruction of justice during a pending proceeding before a federal agency, § 1512, by its text, criminalizes a number of specific acts that center on (as the title of the provision indicates) "[t]ampering with a witness, victim, or … informant."  The statute criminalizes, for instance, the killing of a witness, 18 U.S.C. § 1512(a); the destruction or alteration of documentary or physical evidence, *id.* § 1512(c)(1); and the harassing of a witness in order to hinder his or her testimony, *id.* § 1512(b).  Section 1512(c) was added to the statute in 2002 as part of the Sarbanes-Oxley Act.  *See* Pub. L. No. 107-204, § 1102, 116 Stat. 745, 807.  Its legislative history indicates that it was intended to close a perceived loophole with respect to "document shredding."  148 Cong. Rec. S6545 (daily ed. July 10, 2002) (statement of Sen. Lott); *see also id.* at S6549-S6550 (statement of Sen. Hatch).  And the first subsection of § 1512(c), as indicated above, reflects that purpose:  It makes it a crime to "alter[], destroy[], multilate[], or conceal[] a record, document, or other object … with the intent to impair the object's integrity or availability for use in an official proceeding."  18 U.S.C. § 1512(c)(1).

Section 1512(c)(2)—the subsection which Judge Joseph is charged with violating—is drafted more expansively.  That section makes it a crime to "otherwise obstruct[], influence[], or impede[] any official proceeding."  *Id.* § 1512(c)(2).  But, as the Supreme Court has instructed, when Congress sets out a list of specific acts that constitute a crime, and then follows that enumeration with a "residual" clause (like § 1512(c)(2)), the residual clause should be read through the lens of the enumerated examples.  *See Yates v. United States*, 135 S. Ct. 1074, 1085-1087 (2015); *Begay v. United States*, 553 U.S. 137, 142-143 (2008).  As the Court has emphasized, if Congress meant the residual clause to wholly subsume the enumerated examples, "it is hard to see why it would have needed to include the examples at all."  *Id.* at 142.  The same

is true of § 1512(c)(2): If that section applies to *all* "otherwise" obstructive acts, there would be no need for the remainder of the statute.  Thus, § 1512(c)(2) is limited—like the surrounding examples—to acts involving the destruction or impairment of evidence.  Indeed, the current Attorney General of the United States has articulated exactly this position.  *See* Memorandum from Bill Barr to Deputy Att'y Gen. Rod Rosenstein et al. at 2 (July 8, 2018), *available at* https://bit.ly/2TQIWNq (warning that the government should not give § 1512(c)(2) an "unbounded interpretation" by applying it outside the evidence-impairment context and "to facially-lawful acts taken by public officials exercising … their discretionary powers").

* * *

In short, the plain language of the statute makes clear that Congress did not intend that the conduct alleged in the indictment falls within the sweep of either § 1505 or § 1512(c)(2), and certainly did not intend that these statutes could be used to prosecute a state judge for actions taken in her judicial capacity.  The indictment should be dismissed for failing to state an offense under either statute.

## III.    THE APPLICATION OF THE FEDERAL OBSTRUCTION STATUTES TO JUDGE JOSEPH WOULD VIOLATE THE CONSTITUTION

### A.    Multiple Canons of Statutory Construction Require The Court To Construe The Obstruction Statutes In A Manner Consistent With The Constitution

To the extent there is any ambiguity as to whether the obstruction statutes encompass alleged interference with a federal immigration arrest—and there is not—longstanding canons of statutory interpretation dictate the same result: The statutes do not apply to the crimes that Judge Joseph is alleged to have committed.

First, under the canon of constitutional avoidance, if there are "competing plausible interpretations of a statutory text," courts are required to apply "the reasonable presumption that Congress did not intend the alternative which raises serious constitutional doubts."  *Clark v.*

23

*Martinez*, 543 U.S. 371, 381 (2005).  Here, the significant constitutional questions raised by the prosecution of a sitting state judge arising out of her discretionary and lawful decision not to assist the federal government in enforcing federal immigration law in her courtroom call out for the application of this canon.  As described below, interpreting the obstruction statutes to apply in such a case would violate the Tenth Amendment's prohibition against the commandeering of state officials and the Fifth Amendment's protection against vague criminal laws.  *See infra* pp. 25-30; *see also United States v. Davis*, 139 S. Ct. 2319, 2332 n.6 (2019) (explaining that "courts should, if possible, interpret ambiguous statutes to avoid rendering them unconstitutional").

Second, application of the obstruction statutes to the conduct alleged in the indictment treads on the Commonwealth's sovereignty and the independence of its judicial officers, providing all the more reason for the Court to construe those statutes narrowly.  As the Supreme Court has explained, "[i]f Congress intends to alter the 'usual constitutional balance between the States and the Federal Government,' it must make its intention to do so 'unmistakably clear in the language of the statute.'"  *Gregory*, 501 U.S. at 460 (citation omitted).  But nothing about the obstruction of justice statutes suggest *any* intent on Congress's part that they should be applied to sitting state-court judges making decisions about how to manage their courtrooms.[9]  A reading of those statutes that would encompass such a decision would have sweeping consequences— effectively allowing the federal government to turn a state courtroom into a federal immigration "proceeding" at the mere request of an ICE officer, and permitting the government to imprison a

---

[9] By contrast, the statute at issue in *Ex parte Virginia*—passed pursuant to Congress's Section 5 authority—*did* directly regulate state officers with responsibility for supervising jury selection.  *See Virginia*, 100 U.S. at 344 ("[A]ny officer or other person charged with any duty in the selection or summoning of jurors who shall exclude or fail to summon any citizen [on the basis of race] shall, on conviction thereof, be deemed guilty of a misdemeanor…." (quoting Act of Mar. 1, 1875, ch. 114, § 4)).

state court judge exercising her authority under state law on the theory that she is acting "corruptly" in doing so.  Such a reading runs deeply contrary to the "proper respect for state functions" that the Supreme Court has admonished federal courts to apply, *Younger*, 401 U.S. at 44, and would make it impossible for states to adopt policies that diverge from those of federal government in all manner of contexts.

Finally, to the extent any doubt remains about the meaning of the statute, as the Supreme Court emphasized earlier this year, the rule of lenity instructs that "ambiguities about the breadth of a criminal statute should be resolved in the defendant's favor"—a rule "'perhaps not much less old than' the task of statutory 'construction itself.'"  *Davis*, 139 S. Ct. at 2333 (quoting *United States v. Wiltberger*, 18 U.S. (5 Wheat.) 76, 95 (1820)).  That principle carries additional force in the context of the obstruction-of-justice statutes, as the Supreme Court has emphasized. *See, e.g.*, *Arthur Andersen*, 544 U.S. at 703-704 ("restraint in assessing the reach of a federal criminal statute" is "particularly appropriate" in the obstruction context given the possibility that the underlying conduct might be innocuous); *see also Marinello v. United States*, 138 S. Ct. 1101, 1106 (2018); *Ramos*, 537 F.3d at 463-464 (applying the rule of lenity in § 1512 case); *Binette*, 828 F. Supp. 2d at 404 (same).   Here, construing the federal obstruction statutes not to reach a state court judge's exercise of her statutory and constitutional authorities comports with the fundamental purpose of that rule—the right of individuals "to fair notice of the law."  *Davis*, 139 S. Ct. at 2333.

### B.  The Prosecution of Judge Joseph Violates The Tenth Amendment

To construe the federal obstruction-of-justice statutes to apply to a sitting state judge's failure to assist the federal government in enforcing federal immigration law would also plainly violate the Tenth Amendment.  That Amendment provides that "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States

respectively, or to the people." U.S. Const. amend. X. The Amendment operates both to limit Congress's powers to those enumerated in the Constitution and to preserve the autonomy and independence of the states. In recognition of this basic principle, the Supreme Court has held that the federal government may not "command the States' officers, or those of their political subdivisions, to administer or enforce a federal regulatory program," *Printz v. United States*, 521 U.S. 898, 935 (1997)—thus guaranteeing the States the "critical alternative" of "declin[ing] to administer" those programs, *New York v. United States*, 505 U.S. 144, 176-177 (1992). Even if the government were able to prove the facts alleged in the indictment at trial, the prosecution of Judge Joseph would amount to an attempt to punish her for her alleged decision to exercise just that prerogative—and to coerce her fellow judges into making the opposite decision.

It is indisputable that the federal government cannot *command* Judge Joseph—or any state judge—to assist it in enforcing federal immigration law. The basic teaching of *Printz* and *New York* is that the federal government may not "command the States' officers" to assist in the administration of a federal regulatory program. *Printz*, 521 U.S. at 935. As the federal government has conceded in many contexts, the "anti-commandeering" principle prohibits it from directing state officers—including state judicial officers—to assist in the enforcement of federal immigration law. *See Lunn*, 477 Mass. at 526-27; Defs.' Opp. to Pls.' Mot. For Prelim. Injunction at 18, *Ryan v. ICE*, 382 F. Supp. 3d 142 (D. Mass. 2019) (ECF No. 28) (explaining that "ICE courthouse arrests do not require *any* action by state officers" and federal policies do not "compel[] employees of the state criminal justice or judiciary systems to take action or refrain from taking action at all"). The federal government thus could not have *commanded* Judge Joseph to release A.S. into its custody on April 2, 2018.

It is likewise clear that the federal government cannot achieve the same result by casting a command as a prohibition. That is the express holding of the Supreme Court's most recent anti-commandeering decision in *Murphy*. The question in that case was whether a federal statute that *prohibited* states from authorizing certain forms of gambling violated the anti-commandeering doctrine. *See Murphy v. NCAA*, 138 S. Ct. 1461, 1472-1473 (2018). The Supreme Court held that it did, describing the difference between a *command* and a *prohibition* as an "empty" one. *Id.* at 1478. In the Supreme Court's view, the anticommandeering rule means only that the federal government may not "dictate[]" what a state "may and may not do." *Id.* After *Murphy*, then—if not before—it is clear that Congress could not enact a statute making it a federal crime to decline to assist ICE in enforcing federal immigration law. That would amount to an end run around the principle of *New York* and *Printz*: Congress would be seeking to achieve via a prohibition what it could not do via a direct command.

But that is *exactly* the purpose and effect of Judge Joseph's prosecution: to punish her for doing something that the federal government cannot force her to do—assist it in enforcing the federal immigration laws. According to the government's allegations, Judge Joseph exercised what the Supreme Court has described as the "critical alternative" guaranteed to state and local officers by the Tenth Amendment: the option of "declin[ing] to administer" a federal program. *New York*, 505 U.S. at 176-77. The Court has repeatedly explained that the federal government may not strip states and localities of that prerogative. *See Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 587 (2012) (Tenth Amendment ensures that states "may choose not to participate" in a federal program); *Printz*, 521 U.S. at 909-910 (the states may "refuse[] to comply with [a] request" to help administer federal laws). The indictment here not only flies in the face of this settled precedent—it goes much further. Under the government's theory of this case, a state

officer may be *imprisoned* for exercising that right. Such a theory poses a profound threat to the constitutional balance, "strip[ping] local policy makers of the power to decide for themselves" whether to cooperate with the federal government on an issue of national importance, *City & Cty. of San Francisco v. Sessions*, 349 F. Supp. 3d 924, 951 (N.D. Cal. 2018); *accord City of Chicago v. Sessions*, 321 F. Supp. 3d 855, 869-872 (N.D. Ill. 2019)—and on pain of substantial prison time.

The government cannot reasonably argue that Judge Joseph's prosecution rests on an allegation or theory that she actively obstructed the ICE investigation, rather than merely remaining neutral, for multiple reasons. For one, as discussed above, the Tenth Amendment does not merely require that states be allowed to *remain neutral* with respect to a federal scheme; it requires that states and their officers may "decline to administer" that scheme altogether. *New York*, 505 U.S. at 176-77; *accord Printz*, 521 U.S. at 909-910. And, as the government's own allegations illustrate, the line between neutrality with respect to the federal scheme and frustration of that scheme can be difficult to draw. According to those allegations, Judge Joseph faced a choice: She could either follow court security policies and send A.S. to the lockup to meet with his attorney and interpreter—an area where, the indictment alleges, she knew no ICE agent was waiting—or she could release A.S. out the front door of her courtroom to the halls of the courthouse, where she supposedly knew he would be arrested by an ICE agent. Ind. ¶¶ 14-24. In such a circumstance—again, accepting the facts as alleged in the indictment—the only way for a state officer like Judge Joseph to exercise her right to "decline to administer" federal immigration law, *New York*, 505 U.S. at 176-77, was to allow A.S. to exit the courthouse in a way that did not facilitate his arrest. Whether on the *public* street in the front of the courthouse, or the *public* street at the back, ICE was still able to enforce its detainer. The key difference is

that egress in one direction arguably facilitated the ICE arrest; the other direction is alleged to have not.  Nothing in federal or state law requires a judge in this situation to choose one manner of egress over another.[10]

Basic principles of federalism—principles that apply with special force to a member of the state judiciary—thus require dismissal.  Prosecuting this state court judge for failing to aid the federal government in enforcing an immigration detainer fundamentally upsets the historic "[r]espect for the independence of state courts" that federal courts have consistently expressed.  *Michigan v. Long*, 463 U.S. 1032, 1040 (1983).   Under these basic principles, the federal government may encourage, may hold out incentives to induce compliance, but it cannot compel or commandeer a state or its officials to enact or enforce federal priorities.  *New York*, 505 U.S. at 167-169.  And an expectation enforced by the criminal law is the functional equivalent of an obligation.  To permit the government to deploy federal criminal law here is to enable it to do indirectly—by imposing criminal penalties—what it cannot do directly: require state officials to fall in line with federal immigration policies.

### C.      As Applied Here, The Obstruction Statutes Are Unconstitutionally Vague

Finally, at least as applied to Judge Joseph, the obstruction of justice statutes—18 U.S.C. §§ 1505 and 1512(c)(2)—are unconstitutionally vague.  As the Supreme Court emphasized just last year, vague laws "contravene the 'first essential of due process of law' that statutes must give people 'of common intelligence' fair notice of what the law demands of them."  *Davis*, 139

---

[10] The government's suggestion that Judge Joseph somehow violated the obstruction statutes by deviating from *state* "policies and practices," *see* Ind. ¶¶ 11-13, is an extraordinary one, insofar as it would create federal criminal liability out of the daily operations of state courts and the supervision of state court employees across the Commonwealth.  If Judge Joseph violated state trial court policies, she is answerable for that violation to state authorities, not the United States government.

S. Ct. at 2325.  To satisfy the due-process concern on which the vagueness doctrine rests, "a penal statute [must] define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited." *Kolender v. Lawson*, 461 U.S. 352, 357 (1983). The violations of the obstruction statutes alleged in the indictment fail that test.  Sections 1505 and 1512(c)(2) do not by their plain terms inform a state judge that she may be prosecuted for simply failing to facilitate a person's release from the courtroom out the exit that a federal officer expected; the government's contrary reading of the statutes all but ensures that "public officials [will] be subject to prosecution, without fair notice, for the most prosaic" acts. *McDonnell v. United States*, 136 S. Ct. 2355, 2373 (2016).  Given the proposed application of the statute to the exercise of a judicial officer's authority, the indictment likewise raises "significant federalism concerns," insofar as it allows the federal government to "'set[] standards' of 'good government for local and state officials.'" *Id.* (quoting *McNally v. United States*, 483 U.S. 350, 360 (1987)). For these reasons, and all those above, the Court should decline to adopt the government's boundless reading of the obstruction statutes and dismiss the indictment against Judge Joseph.

## CONCLUSION

For the foregoing reasons, the indictment should be dismissed under Federal Rule of Criminal Procedure 12(b) for failure to state an offense.

Dated:  September 6, 2019                          Respectfully submitted,

                                                   SHELLY M. RICHMOND JOSEPH

                                                   /s/ Thomas M. Hoopes
                                                   THOMAS M. HOOPES, ESQ.
                                                   BBO No. 239340
                                                   /s/ Douglas S. Brooks
                                                   DOUGLAS S. BROOKS, ESQ.
                                                   BBO No. 636697
                                                   LibbyHoopes, P.C.
                                                   399 Boylston Street
                                                   Boston, MA 02116
                                                   (617) 338-9300
                                                   thoopes@libbyhoopes.com
                                                   dbrooks@libbyhoopes.com

                                                   /s/ Elizabeth N. Mulvey
                                                   ELIZABETH N. MULVEY
                                                   BBO No. 542091
                                                   Crowe & Mulvey LLP
                                                   77 Franklin Street, 3rd Floor
                                                   Boston, MA 02110
                                                   (617) 426-4488
                                                   emulvey@croweandmulvey.com

                                                   *Counsel for Defendant Shelley M. Richmond*
                                                   *Joseph*

## **CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the CM/ECF system will be sent

electronically to the registered participants as identified on the Notice of Electronic Filing.

/s/ Thomas M. Hoopes
THOMAS M. HOOPES