UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA

v.

CRIMINAL NO. 3:19-cr-10141-LTS

SHELLEY M. RICHMOND JOSEPH and
WELSEY MACGREGOR

## **AMICUS BRIEF OF**
## **THE MASSACHUSETTS ASSOCIATION OF CRIMINAL DEFENSE LAWYERS**

MASSACHUSETTS ASSOCIATION OF
CRIMINAL DEFENSE LAWYERS,

By their attorneys,

Howard M. Cooper (BBO# 543842)
hcooper@toddweld.com
Benjamin J. Wish (BBO# 672743)
bwish@toddweld.com
Maria T. Davis (BBO# 675447)
mdavis@toddweld.com
Todd & Weld, LLP
One Federal Street, 27th Floor
Boston, MA 02110
(617) 720-2626

September 12, 2019

### i.    Introduction

No right is more fundamental in our system of justice than the right of an individual to access the courts. In a society predicated upon the rule of law, the effective unavailability of the courthouse to any person, whether accused or aggrieved, is the denial of justice. This is especially true with respect to persons who are marginalized or disadvantaged, and who typically face far-better resourced legal opponents, often the Government itself. The right to access the courts, established within the First Amendment's right to petition, is particularly critical in the case of immigrants to the United States. Without access to the courts, immigrants have no means of vindicating their rights, including their rights secured under the United States Constitution and the Massachusetts Declaration of Rights.

The Government's indictment of Massachusetts District Court Judge Shelley M. Richmond Joseph ("Judge Joseph") and Court Officer Wesley MacGregor ("Mr. McGregor") based upon their actions in court involving an immigrant who was accessing Newton District Court in order to defend himself in a criminal proceeding, constitutes a genuine threat to the right of immigrants to access the courts. If the Government's attempt to criminalize the courtroom conduct of a sitting state court judge and a court officer in handling that immigrant's case before them is allowed to proceed, the message to immigrants in need of the justice system will be clear: not even the judge herself is safe in the courthouse when it comes to presiding over a matter involving the undocumented, so you better not show up even to defend yourself.

It is hard to think of a more egregious and unlawful means of chilling an individual immigrant's exercise of the basic right to access justice than the arrest of the judicial authority charged with presiding over their case. This Court is already familiar with the United States Immigration Customs and Enforcement agency's  ("ICE") conduct in chilling immigrants'

ability to access the courts through its January 10, 2018 Directive No. 11072.1, the Courthouse

Civil Arrest Directive. Under that directive, ICE aggressively undertook civil enforcement

actions inside Massachusetts courthouses and has been preliminarily rebuked for doing so.[1] *Ryan*

*v. U.S. Immigration & Customs Enf't*, 382 F. Supp. 3d 142, 149 (D. Mass. 2019). Just a few

months ago, this Court (Talwani, J.) preliminarily enjoined ICE, and the other defendants in that

matter, from implementing ICE's policy to conduct civil courthouse arrests because "*a privilege*

*against civil arrest remain[s] present at common law*." *Id.* at 155–57 (emphasis supplied). In so

doing, this Court catalogued the storied history of the right to seek justice in court without the

fear of civil arrest, including tracking that common law right through the jurisprudence of federal

courts. *Id.* at 18–21.[2]

Here, the Government goes even further in its quest to pursue civil courthouse arrests of

immigrants by attempting to criminalize the in court behavior of a judge and a court officer

undertaken in connection with a matter before them. The Government's indictment is, and is

transparently intended to be, a blunt instrument designed to stoke fear in immigrant

communities.

Judge Joseph's Memorandum of Law in support of her Motion to Dismiss the Indictment

("Motion to Dismiss") sets forth myriad important reasons for the dismissal of this case. The

Massachusetts Association of Criminal Defense Lawyers ("MACDL") respectfully submits this

---

[1] Rather than set out here all facts related to ICE's policy of conducting civil arrests in state
courthouses, this brief incorporates by reference this Court's decision preliminarily enjoining
ICE from enforcing that policy. *Marian Ryan, et al. v. U.S. Immigration and Customs
Enforcement, et al.*, Case 1:19-cv-11003-IT, Memorandum & Order Granting Plaintiffs' Motion
for Preliminary Injunction, ECF No. 51.

[2] Where this Court has already addressed the issue of the common law right against civil
courthouse arrest, in order to avoid unnecessary duplication this brief incorporates by reference
this Court's preliminary injunction ruling, which provides an independently sufficient basis for
dismissal of the indictment of Judge Joseph and Mr. MacGregor.

amicus brief to focus the Court's attention on the important rights Judge Joseph and Mr. MacGregor were dealing with when they undertook the actions the Government now attempts to criminalize and the inevitable and unlawful consequences of the Government's ill-advised prosecution on immigrants' right to access the courthouse. Put simply, if this Court allows the Government's prosecution to proceed, immigrants will fear that the very courts to which they are directed to turn for justice are not available to them because they must fear arrest if they enter the building. The Government's indictment here violates the First Amendment's guarantee of access to the courts as it exists within the right to petition, and Article 11 of the Massachusetts Declaration of Rights which even more broadly assures access to justice in the courts of the Commonwealth.

This Court should dismiss the indictment.

### ii.      Interest of the Amicus Curiae

MACDL is an incorporated, non-profit association representing more than 1,000 experienced trial and appellate lawyers who devote a substantial part of their practices to criminal defense. MACDL is the single largest organization of criminal defense lawyers in the Commonwealth. Literally every day, MACDL members are in the trial courts of the Commonwealth representing the accused. MACDL's mission is to preserve the adversary system of justice, including the critical independence of the judiciary, to maintain and foster independent and able criminal defense lawyers, and to ensure justice and due process for all persons accused of crimes, whether they are citizens or immigrants, and regardless of their immigration status.

MACDL is dedicated to protecting the rights of all individuals accused of crimes in the Commonwealth guaranteed by the United States Constitution and the Massachusetts Declaration of Rights. MACDL seeks to improve the criminal justice system by supporting policies and

3

procedures to ensure fairness and justice in criminal matters. MACDL devotes much of its

energy to identifying, attempting to avoid and remedying problems in the criminal justice

system. It files amicus curiae briefs in cases raising questions of importance to the administration

of justice.

MACDL respectfully submits this amicus brief because the Government's prosecution of

in this matter constitutes an unprecedented, ill-advised and unconstitutional overreach which

threatens individuals' fundamental right to petition the courts under the First Amendment of the

United States Constitution and the Massachusetts Declaration of Rights.

### iii.    Factual Allegations

On April 2, 2018, a defendant identified by the initials A.S. appeared before Judge Joseph

at the Newton District Courthouse for his arraignment, charged with being a fugitive from justice

and possession of narcotics. Indictment at ¶¶14, 16. According to the government, A.S. is a

person who had been previously deported and was prohibited from entering the country until

2027. Id. at ¶7. A federal Immigration Detainer and Warrant of Removal had issued and was

outstanding. Id. at ¶8. An ICE agent was present at the courthouse to undertake a civil arrest of

A.S. pursuant to the Warrant of Removal. Id. at ¶10. A.S.'s case was called and recalled a

number of times throughout the day as the attorneys reviewed the documents relating to his

identity and the ICE detainer. Id. at ¶¶14-20. After reviewing the documents, both the prosecutor

and defense attorney agreed that the individual the ICE agent was seeking was indeed not A.S.,

and informed Judge Joseph of their findings on the record. Id. at ¶20. As they discussed the

possibility of holding A.S. for an additional day to further investigate the issue, Judge Joseph

asked the clerk if they could go off the record. Id. Less than a minute later the court was back on

record, the prosecutor declined to ask the Court to set bail, and A.S. was released. Id. at ¶¶21-22.

4

The indictment alleges that during the time the court went off record, Judge Joseph and A.S.'s defense attorney conspired to help A.S. evade civil ICE arrest by allowing him to use the exit in the rear of the courthouse; meanwhile, the ICE agent was waiting in the lobby outside of the courtroom. Id. at ¶¶24-26. Notably, the indictment alleges solely that the clerk, not Judge Joseph or Mr. MacGregor, misled the ICE agent by allegedly stating that A.S. would exit to the lobby. Id. at ¶19. The indictment further alleges that Mr. MacGregor escorted A.S. to the rear entrance of the courthouse and used his access key to open the door to allow A.S. to exit the courthouse. Id. at ¶¶24-26

The effort to arrest A.S. was not a singular or isolated incident, but instead was part of an escalating pattern by ICE of undertaking courthouse arrests in and around courthouses in the Commonwealth. Specifically, ICE has been patrolling Massachusetts courthouses since the Spring of 2017 seeking to make civil immigration arrests. Affidavit of Jennifer Klein,[3] attached as Exhibit A, ¶3. Between that time and March 2018, defense counsel in Massachusetts reported that at least 84 ICE arrests had taken place in and around state courthouses (a number likely much lower than the actual number of arrests given that the reporting of arrests was voluntary). See id. These arrests have included arrests of individuals with lawful permanent resident status, individuals in the process of applying for legal status, and undocumented individuals. See id. ¶¶7-11. At times, these arrests have prevented criminal defendants from attending court proceedings, thus forcing them to default on their criminal matters, to the detriment of both the defendants and the court system as a whole. See id. ¶12. ICE's practice of conducting immigration arrests in and around the Commonwealth's courthouses logically impacts all

---

[3] The affidavits of Jennifer Klein and Nancy Kelly were submitted in the Massachusetts Supreme Judicial Court matter entitled *In the Matter of C. Doe, D. Doe, F. Doe, K.. Doe, O. Doe, T. Doe, Y. Doe, and J. Doe.*, Supreme Judicial Docket No. SJ-2018-119.

noncitizen immigrants, who have become increasingly concerned with appearing in any state

court for criminal or civil proceedings. *See* Affidavit of Nancy Kelly, attached s Exhibit B, ¶5.

iv. <b>Argument</b>

I.  **The Government's Indictment of Judge Joseph Violates the First Amendment Right of Persons to Access the Courts.**

The indictment attempts to impose a Hobson's choice upon immigrants who seek redress

from the courts, whether as the accused in a criminal action or otherwise: to seek justice in the

courts or to risk civil arrest just by entering the courthouse. The law is clear, however, that the

First Amendment guarantees the right of individuals including immigrants to access the courts.

Thus, the Government's effort to leverage the state courts to pursue civil immigration arrests

(which this Court has already enjoined) violates the First Amendment by chilling beyond repair

immigrants' ability to exercise their First Amendment right to seek justice in the courts.

The First Amendment provides that "Congress shall make no law . . . abridging . . . the

right of the people. . . to petition the Government for a redress of grievances." The Supreme

Court has been explicit that the right to petition is one of "the most precious of the liberties

safeguarded by the Bill of Rights." *Mine Workers v. Illinois Bar Assn.*, 389 U.S. 217, 222 (1967).

"Both speech and petition are integral to the democratic process, [as] . . . . [t]he right to petition

allows citizens to express their ideas, hopes, and concerns to their government and their elected

representatives . . . ." *Borough of Duryea, Pa. v. Guarnieri*, 564 U.S. 379, 388 (2011). Indeed,

the right to petition is implied by "[t]he very idea of a government, republican in form." *BE & K*

*Const. Co. v. N.L.R.B.*, 536 U.S. 516, 524–25 (2002) (quoting *United States v. Cruikshank*, 92

U.S. 542, 552 (1876)).[4]

---

[4] It is beyond dispute that the individuals impacted here include persons afforded the protection of the First Amendment. In *United States v. Verdugo-Urquidez,* the United States Supreme Court

6

It is similarly clear that "the right of access to the courts is an aspect of the First Amendment right to petition the Government for redress of grievances." *Bill Johnson's Restaurants, Inc. v. NLRB*, 461 U.S. 731, 741 (1983); *see e.g. United Transp. Union v. State Bar of Mich.*, 401 U.S. 576, 585 (1971) ("[C]ollective activity undertaken to obtain meaningful access to the courts is a fundamental right within the protection of the First Amendment."); *see also Monsky v. Moraghan*, 127 F.3d 243, 246 (2d Cir. 1997) ("It is well established that all persons enjoy a constitutional right of access to the courts, although the source of this right has been variously located in the First Amendment right to petition for redress, the Privileges and Immunities Clause... and the Due Process Clauses[.]"). The central importance of petition reaches back historically to beyond the founding, as "[r]obust petitioning was also a central feature of political life in the American colonies," including back to the time of the first British settler in Jamestown." Michael J. Wishnie, "Immigrants and the Right to Petition," Yale Law School

---

determined that immigrants with "substantial connections" to the United States enjoy constitutional protections, including First Amendment protection, and that this applies to both lawful residents and undocumented immigrants. *See* 494 U.S. 259, 270–71 (1990). Indeed, once an alien lawfully enters and resides in this country, he becomes invested with the rights guaranteed by the Constitution to all people within our borders. Such rights include those protected by the First and the Fifth Amendments and by the due process clause of the Fourteenth Amendment. None of these provisions draw any distinction between citizens and resident aliens. To the contrary, they extend their protection to all 'persons' and guard against any encroachment on the rights they afford by federal or state authority. *See Hellenic Lines Ltd.v.Rhoditis*, 398 U.S. 306, 310 (1970) (quoting and citing *Bridges v. Wixon*, 326 U.S. 135, 161 (1945)) (concurring opinion). As the Ninth Circuit has recognized, undocumented persons in the United States are protected by the First Amendment's speech and association clauses. *Am.-Arab Anti-Discrimination Comm. v. Reno*, 70 F.3d 1045, 1064 (9th Cir. 1995). As the Ninth Circuit stated, "[a]liens, who often have different cultures and languages, have been subjected to intolerant and harassing conduct in our past, particularly in times of crises. It is thus especially appropriate that the First Amendment principle of tolerance for different voices restrain our decisions to expel a participant in that community from our midst." *Id.* (internal citations omitted). This Court too has affirmed that "the people" who enjoy the rights set forth in the Constitution and Bill of Rights are not limited to the political community, but rather extends to immigrants with "sufficient connection" to the United States to be part of the "national community." *Fletcher v. Haas*, 851 F. Supp. 2d 287, 295 (D. Mass. 2012) (Woodlock, J.).

7

Legal Scholarship Repository, at 686 (2003). The right to access the court does not simply mean

an individuals' right to appear in court, but also to meaningfully access the courts and the

practical opportunity for people "to vindicate their legal rights." *Brotherhood of Railroad*

*Trainmen v. Virginia ex rel. Virginia State Bar*, 377 U.S. 1 (1964) (holding that unions have a

First Amendment right to recommend attorneys to their members and focusing on the importance

of competent counsel to individuals' right to petition the courts).

      The essence of any claim challenging a barrier to access to the courts "is that official

action is presently denying an opportunity to litigate." *Christopher*, 536 U.S. at 413. Critically,

"[e]ven slight burdens on petitioning implicate the right, for like other First Amendment

freedoms, courts must safeguard sufficient 'breathing space' to permit petition rights to flourish."

Michael J. Wishnie, "Immigrants and the Right to Petition," Yale Law School Legal Scholarship

Repository, at 686 (2003) (quoting *BE & K Constr. Co. v. NLRB*, 536 U.S. 516 (2002)). The

Government violates individuals' First Amendment right to access the courts whenever it

"effectively bar[s] . . . access to the agencies and courts." *California Motor Transp. Co. v.*

*Trucking Unlimited*, 404 U.S. 508, 513 (1972).

      Thus, the right to petition prohibits "systemic official action [that] frustrates a plaintiff or

plaintiff class in preparing and filing suits." *Christopher v. Harbury*, 536 U.S. 403, 413, 415 &

n.12 (2002); *see, e.g., Cruz v. Beto,* 405 U.S. 319, 321 (1972) ("[P]ersons in prison, like other

individuals, have the right to petition the Government for redress of grievances which, of course,

includes access of prisoners to the courts for the purpose of presenting their complaints.")

(internal quotations omitted); *see also Bounds v. Smith*, 430 U.S. 817, 828 (1977) ("the

fundamental constitutional right of access to the courts requires prison authorities to assist

inmates in the preparation and filing of meaningful legal papers by providing prisoners with

adequate law libraries or adequate assistance from persons trained in the law."). The Government

may also violate the right of access to the courts within the right to petition by "den[ying]

access" which "may allegedly have caused the loss or inadequate settlement of a meritorious

case." *Id.* (citing *Bell v. Milwaukee,* 746 F.2d 1205, 1261 (7th Cir. 1984) ("[T]he cover-up and

resistance of the investigating police officers rendered hollow [the plaintiff's] right to seek

redress"), *Swekel v. River Rouge,* 119 F.3d 1259, 1261 (6th Cir. 1997) (loss of opportunity to sue

where police cover-up extended throughout "time to file suit . . . under . . . statute of

limitations").

As set forth above, there is no more draconian instrument to deprive immigrants of their

right to access the courts than turning the courthouse into a tool for civilly arresting them.[5] In

turn, there is no blunter instrument to reinforce that tool than to make it clear that judges and

court officers will feel the weight of federal criminal law enforcement if they do anything which

might interfere with that tool. One need not ask what immigrant, thinking rationally, will come to

court under such circumstances even when it means that they will default on their case, or that

they are unable to seek an abuse prevention disorder, or a hundred other scenarios where they

cannot vindicate their rights because of the fear generated just by having to appear at the

courthouse. [6]

---

[5] ICE agents have the authority to make arrests with or without warrants. 8 U.S.C. § 1226(s). ICE
instructs its agents on enforcement and arrest policies through a series of memoranda. The First
Circuit has held that these arrests are civil in nature. *U.S. v. Encarnacion,* 239 F.3d 395, 398 (1st
Cir. 2001).

[6] MACDL does not address here the potential violation of an accused's Sixth Amendment right
to the effective assistance of counsel where the accused is effectively blocked even from
appearing in court. *See Strickland v. Washington,* 466 U.S. 668, 686 (1984) (failure to provide
competent representation that is adequate to ensure a fair trial, or, more broadly, a just outcome
violates the 6th Amendment's guarantee to effective assistance of counsel).

9

## II.     The Massachusetts Declaration of Rights Affords Even Broader Protection.

Article 11 of the Massachusetts Declaration of Rights makes clear that individuals in the

Commonwealth are entitled to "obtain right and justice freely . . . completely, and without any

denial." Massachusetts Declaration of Rights, Art. 11.[7] Drafted in 1780, Article 11 is one of the

bedrock principles of the Declaration of Rights. As the Court is aware, the Declaration of Rights

was created at a time of political upheaval in this country and was intended to ensure that within

the Commonwealth, "[a]ll men are born free and equal, and have certain natural, essential, and

unalienable rights." *See* Declaration of Rights, Article 1.[8] ICE's campaign of civil arrests of

persons seeking to access the courts and exercise their Article 11 rights threatens this protection

for immigrants as does the instant prosecution.

This is no small matter given the importance of this long-held right. Indeed, the

Commonwealth's recognition of the right to access its courts was not unprecedented when

created, and dates back centuries to the early English common law privilege from arrest on civil

---

[7] As discussed above, *see infra* footnote 4, it is indisputable that those impacted by ICE's
courthouse arrests are protected by the Massachusetts Declaration of Rights. Although MACDL
can find no reported decision determining the applicability of Article 11 itself to undocumented
individuals, courts have generally found that the Declaration of Rights applies to citizens and
non-citizens alike. *See., e.g., Com. v. Sylvain*, 466 Mass. 422, 424 (2013) (noncitizen is protected
by Article 12 of the Declaration of Rights); *Pimentel v. City of Methuen*, 323 F. Supp.3d 255
(2018) (allowing a noncitizen's claim brought under the Massachusetts Civil Rights Act, for
violation of the Declaration of Rights, to proceed).

[8] Article 11 is particularly relevant here where under the Tenth Amendment to the U.S.
Constitution "[t]he powers not delegated to the United States by the Constitution, nor prohibited
by it to the States, are reserved to the States respectively, or to the people." U.S. Const. amend.
X. Among other things, that Amendment ensures the autonomy and independence of the states,
including states courts. Indeed, the Supreme Court has held that the federal government may not
"command the States' officers" to administer or enforce federal programs. *Printz v. United
States*, 521 U.S. 898, 935 (1997) (it is beyond the powers of the federal government to require
state law enforcement offcer to enforce the Brady Bill). The Tenth Amendment thus guarantees
that the federal government cannot "commandeer" the states but rather leaves to them the
"critical alternative" of "declin[ing] to administer" at-issue programs. *New York v. United States*,
505 U.S. 144, 176-177 (1992).

process. *See* Christopher N. Lasch, "A Common-Law Privilege to Protect State and Local Courts

During the Immigration Crisis," 127 Yale L.J. Forum 410, 423 (2017). By the 18th century,

courts commonly recognized what was by then a well-engrained principle that individuals

appearing before court were protected from civil arrest while attending court proceedings and for

a reasonable period of time while going to and leaving those proceedings. *See, e.g., Meekins v.*

*Smith*, 126 Eng. Rep. 363, 364 (1791)  (holding "that all persons who had relation to a suit which

called for their attendance, whether they were compelled to attend by process or not, . . . were

intitled to privilege from arrest eundo et redeundo [going and returning], provided they came

bonâ fide").

   Unsurprisingly, courts in the United States adopted this concept shortly afterwards and it

has remained in effect since that time. *See, e.g., In re Thompson*, 122 Mass. 428, 429 (1877)

(holding that "[p]arties and witnesses, attending in good faith any legal tribunal, whether a court

of record or not, having power to pass upon the rights of the persons attending, are privileged

from arrest on civil process during their attendance, and for a reasonable time in going and

returning, whether they are residents of this state or come from abroad, whether they attend on

summons or voluntarily, and whether they have or have not obtained a writ of protection");

*Wood v. Neale*, 71 Mass. 538, 538 (1855) (extending protection from civil arrest to "all legal

tribunals of a judicial character," and discharging a prisoner who had been arrested in violation

of the privilege); *Ex parte McNeil*, 6 Mass. 245, 246 (1810) (applying the privilege when a party

was arrested in Court while appearing at a hearing at which his presence was not necessary);

*Diamond v. Earle*, 217 Mass. 499, 500 (1914) (same).

   Further, the United States Supreme Court has recognized that a federal court may not

recognize service made upon a party or witness while that individual is in state court, regardless

11

of the courts' separate jurisdiction. Specifically, in *Page Co. v. MacDonald*, the plaintiff in a federal lawsuit attempted to serve the defendant in that lawsuit as the defendant appeared before a special master appointed by the Massachusetts Superior Court. 261 US 446, 447 (1923). The federal plaintiff held that such service was proper since the Massachusetts Superior Court amounted to a "different sovereignty" than the federal District Court. *See id.* The Supreme Court disagreed, holding that "[a] federal court in a state is not foreign and antagonistic to a court of the state within the principle[,]" and therefore that "'[s]uitors as well as witnesses, coming from another state or jurisdiction, are exempt from the service of civil process while in attendance upon court, and during a reasonable time in coming and going.'" *Id.* at 448 (quoting *Stewart v. Ramsay*, 242 U.S. 128, 129 (1916)).

Courts have steadfastly adhered to this common law principal, both at its inception and today, based on their recognition that without such protection, individuals would not in fact have free access to the courts. *See, e.g., Walpole v. Alexander*, 99 Eng.Rep. 530, 531 (K.B. 1782) (holding that "in order to encourage witnesses to come forward voluntarily they are privileged from arrest", and recognizing the protection for both residents and non-residents); *Lamb v. Schmitt*, 285 U.S. 222, 225 (1932) (recognizing that "the due administration of justice requires that a court shall not permit interference with the progress of a cause pending before it, by the service of process in other suits, which would prevent, or the fear of which might tend to discourage, the voluntary attendance of those whose presence is necessary or convenient to the judicial administration in the pending litigation"). Moreover, as the Supreme Court has acknowledged, the privilege is necessary to ensure the proper functioning of the courts themselves. *Stewart*, 242 U.S. at 130 (stating that the privilege "is founded in the necessities of the judicial administration, which would be often embarrassed, and sometimes interrupted, if the

12

suitor might be vexed with process while attending upon the court for the protection of his rights, or the witness while attending to testify").

Here, ICE's arrests of undocumented individuals during legal proceedings or on the courthouse steps – arrests which are indisputably civil in nature, *see U.S. v. Encarnacion*, 239 F.3d 395, 398 (1st Cir. 2001) – blatantly violate the long-standing protection of individuals attending court proceedings. In turn, these arrests have effectively precluded an entire group of society from exercising their Article 11 right to access courts in Massachusetts, to the detriment of both those individuals and the court system as a whole. The Government's prosecution of a judge and court officer for actions in a proceeding before them constitutes an unlawful further effort to chill the right of immigrants to access the courts.

### iv.    **Conclusion**

For all of the reasons set forth above, MACDL respectfully requests that the Court grant Judge Joseph's Motion to Dismiss.

Respectfully Submitted,

MASSACHUSETTS ASSOCIATION OF
CRIMINAL DEFENSE LAWYERS,

By their attorneys,


  /s/ Benjamin J. Wish
Howard M. Cooper (BBO# 543842)
hcooper@toddweld.com
Benjamin J. Wish (BBO# 672743)
bwish@toddweld.com
Maria T. Davis (BBO# 675447)
mdavis@toddweld.com
Todd & Weld, LLP
One Federal Street, 27th Floor
Boston, MA 02110
(617) 720-2626

September 12, 2019


### CERTIFICATE OF SERVICE

I, Benjamin J. Wish, hereby certify that on this date, I caused a copy of the foregoing to be served via hand-delivery and electronic mail to counsel of record as identified on the Notice of Electronic Filing (NEF) system.


  /s/ Benjamin J. Wish
Benjamin J. Wish