UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | CRIMINAL NO. 1:19-cr-10141-LTS |
| | ) | |
| (1) SHELLEY M. RICHMOND JOSEPH and | ) | |
| (2) WESLEY MACGREGOR, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**BRIEF *AMICI CURIAE* OF LEGAL SCHOLARS IN SUPPORT OF DEFENDANTS'
MOTION TO DISMISS COUNTS 1-3 OF THE INDICTMENT**

By their attorneys,

Sabin Willett
BBO #542519
sabin.willett@morganlewis.com
Vanessa M. Brown
BBO #697097
vanessa.m.brown@morganlewis.com
**MORGAN, LEWIS & BOCKIUS LLP**
One Federal Street
Boston, MA  02110-1726
+1.617.341.7700

Dated:  September 17, 2019

# TABLE OF CONTENTS

**Page**

STATEMENT OF INTEREST ................................................................................ 1

SUMMARY OF ARGUMENT ............................................................................... 1

ARGUMENT ......................................................................................................... 3

I.      THE INDICTMENT ESCALATES REPEATED EXECUTIVE BRANCH ATTEMPTS TO CONSCRIPT STATE AND LOCAL GOVERNMENT OFFICIALS IN FEDERAL IMMIGRATION ENFORCEMENT ................................... 3

II.     BOTH THE CONSTITUTION AND A COMMON LAW PRIVILEGE CONSTRAIN FEDERAL POWER TO INDICT STATE JUDICIAL OFFICERS FOR REFUSING TO COOPERATE WITH IMMIGRATION ENFORCEMENT ........ 10

      A.     The Tenth Amendment and Principles of Constitutional Federalism Constrain Federal Prosecutions of State Officials For Non-Cooperation with Federal Immigration Enforcement Efforts .......................................................... 10

            1.     The Constitution protects state judicial officers from federal commandeering of the management of state courthouses, a power reserved to the States by the Tenth Amendment ................................... 10

            2.     Roots of the Anti-Commandeering and Anti-Coercion Doctrines .......... 15

            3.     Development of the Doctrine in the Modern Era ..................................... 16

      B.     Counts 1-3 of the Indictment are Barred by the Tenth Amendment ................... 18

CONCLUSION ................................................................................................... 24

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Arizona v. United States*,
    567 U.S. 387 (2012) ........................................................................................................6

*Blight v. Fisher*,
    3 F. Cas. 704 (C.C.D.N.J. 1809) ..................................................................................14

*Bond v. United States*,
    564 U.S. 211 (2011) ......................................................................................................10

*Bramwell v. Owen*,
    276 F. 36 (D. Or. 1921) .................................................................................................13

*Bridges v. Sheldon*,
    7 F. 17 (D. Vt. 1880) .....................................................................................................14

*Chief Admin. Justice of the Trial Court v. Labor Relations Comm'n*,
    404 Mass. 53, 533 N.E.2d 1313 (1989) ..................................................................11, 19

*City of Chicago v. Sessions*,
    321 F. Supp. 3d 855 (N.D. Ill. 2018) ........................................................................8, 17

*City of Chicago v. Sessions*,
    888 F.3d 272 (7th Cir. 2018) ...........................................................................................8

*City of Philadelphia v. Sessions*,
    309 F. Supp. 3d 289 (E.D. Pa. 2018) ............................................................................17

*Cty. of Santa Clara v. Trump*,
    250 F. Supp. 3d 497 (N.D. Cal. 2017) .........................................................................7, 8

*Feister v. Hulick*,
    228 F. 821 (E.D. Pa. 1916) ...........................................................................................14

*First Justice of Bristol v. Clerk-Magistrate*,
    438 Mass. 387, 780 N.E.2d 908 (2003) ..................................................................11, 19

*Galarza v. Szalczyk*,
    745 F.3d 634 (3d Cir. 2014) ........................................................................................7, 8

*Gregory v. Ashcroft*,
    501 U.S. 452 (1991) ........................................................................................................1

*Kelley v. Johnson*,
   425 U.S. 238 (1976) ........................................................................................4

*Larned v. Griffin*,
   12 F. 590 (D. Mass. 1880) ..........................................................................14

*Lunn v. Commonwealth*,
   477 Mass. 517, 78 N.E. 3d 1143 (2017) ....................................................21

*McDonnell v. United States*,
   136 S. Ct. 2355 (2016) ................................................................11, 15, 18

*Moreno v. Napolitano*,
   213 F. Supp. 3d 999 (N.D. Ill. 2016) ..........................................................7

*Murphy v. Nat'l Collegiate Athletic Ass'n*,
   138 S. Ct. 1461 (2018) ........................................................................ passim

*New York v. United States*,
   505 U.S. 144 (1992) ....................................................................10, 18, 23

*NFIB v. Sebelius*,
   567 U.S. 519 (2012) ..............................................................................14, 17

*Op. of the Justices*,
   372 Mass. 883, 363 N.E. 2d 652 (1977) ....................................................11

*Page Co. v. MacDonald*,
   261 U.S. 446 (1923) ....................................................................12, 13, 23

*Parker v. Marco*,
   32 N.E. 989 (N.Y. 1893) ............................................................................14

*Pennhurst State Sch. & Hosp. v. Halderman*,
   465 U.S. 89 (1984) ......................................................................................20

*Prigg v. Pennsylvania*,
   41 U.S. 539 (1842) ................................................................................15, 16

*Printz v. United States*,
   521 U.S. 898 (1997) ............................................................................ passim

*Ryan v. Immigration and Customs Enf3t*,
   382 F. Supp. 3d 142 (D. Mass. 2019) ..........................................12, 13, 14, 21

*State of New York v. Dep't of Justice*,
   343 F. Supp. 3d 213 (S.D.N.Y. 2018) ..........................................................8

*Testa v. Katt*,
　330 U.S. 386 (1947) .................................................................................11

*United States v. California*,
　921 F. 3d 865 (9th Cir. 2019) ..........................................................8, 9, 20

*United States v. Lewis*,
　514 F. Supp. 169 (M.D. Pa. 1981) ...............................................15, 18

*United States v. Lopez*,
　514 U.S. 549 (1995) .................................................................................15

*United States v. Tavares*,
　844 F.3d 46 (1st Cir. 2016) ....................................................................15

*United States v. Walker*,
　490 F.3d 1282 (11th Cir. 2007) ......................................................14, 20

*Vargas v. Swan*,
　854 F.2d 1028 (7th Cir. 1988) ..................................................................7

## CONSTITUTIONAL PROVISIONS

Mass. Const. Pt. III, art. 1 ...............................................................................11

U.S. Const. Am. X ........................................................................................10

U.S. Const. Art. VI, cl. 2 .........................................................................11, 12

## STATUTES AND RULES

8 U.S.C. § 1103 .................................................................................................5

8 U.S.C. § 1252 .................................................................................................5

8 U.S.C. § 1357 .................................................................................................5

8 U.S.C. § 1373 ...........................................................................................8, 17

18 U.S.C. § 1505 .................................................................................................2

18 U.S.C. § 1512 .................................................................................................2

18 U.S.C. § 1623 .................................................................................................2

Act of Feb. 12, 1793, ch. VII, 1 Stat. 302 (1793) .........................................15

Anti-Drug Abuse Act of 1986, Pub. L. No. 99-570, § 1751, 100 Stat. 3207 (Oct.
　27, 1986) ...................................................................................................4, 5

Anti-Drug Abuse Act of 1988, Pub. L. No. 100-690, §§ 7342-43, 102 Stat. 4469-70 (Nov. 18, 1988) ...................................................................................................5

Dist./Mun. Cts. Supp. R. Civ. P. Rule 112 ...................................................................14

S.J.C. Rule 2:14 ............................................................................................................14

Superior Court Rule 16 .................................................................................................14

**OTHER AUTHORITIES**

William Blackstone, Commentaries of the Laws of England (1877) ...........................13

Memorandum for the Att'y Gen., from Jay S. Bybee, Ass't Att'y Gen'l, Office of Legal Counsel, Non-preemption of the authority of state and local law enforcement officials to arrest aliens for immigration violations (April 3, 2002) ...........................................................................................................................6

Letter from Tani G. Cantil-Sakauye, Chief Justice, Cal. Supreme Court, to Jeff Sessions, U.S. Attorney Gen. (Mar. 16, 2017) .......................................................9

Jennifer M. Chacón, *Unsecured Borders: Immigration Restrictions, Crime Control, and National Security*, 39 CONN. L. REV. 1827 (2007) ...........................5

Alina Das, *Inclusive Immigrant Justice: Racial Animus and the Origins of Crime-Based Deportation,* 52 U.C. Davis L. Rev. 171 (2018)...............................................6

Memorandum for Joseph R. Davis, Ass't Director, FBI, from Douglas W. Kmiec, Ass't Att'y Gen'l, Office of Legal Counsel, Re: Handling of INS Warrants of Deportation in Relation to NCIC Wanted Person File (Apr. 11, 1989).....................6

R. Seth Davis, *Conditional Preemption, Commandeering, and the Values of Cooperative Federalism*, 108 Colum. L. Rev. 404 (2008) ................................17, 18

Dep't of Homeland Sec., Form I-247A (Mar. 2017) .......................................................7

Exec. Order No. 13768, 82 Fed. Reg. 8799 (Jan. 25, 2017)............................................7

Sally E. Hadden, *Slave Patrols: Law and Violence in Virginia and the Carolinas* (Harv. Univ. P. 2001)............................................................................................15

Ian F. Haney-López, *Post-Racial Racism: Racial Stratification and Mass Incarceration in the Age of Obama*, 98 Calif. L. Rev. 1023 (2010).........................6

César Cuauhtémoc García Hernández, *Creating Crimmigration*, 2013 BYU L. REV. 1457 (2013) ....................................................................................................5

Samuel Howe, *Practice in Civil Actions and Proceedings at Law in Massachusetts* (1834)...............................................................................................14

ICE Policy No. 10074.2 (Mar. 24, 2017)..........................................................................................7

Christopher N. Lasch, *A Common-Law Privilege to Protect State and Local Courts During the Crimmigration Crisis*, 127 YALE L.J. FORUM 410 (2017) ...................12, 13

Christopher N. Lasch, R. Linus Chan, Ingrid V. Eagly, Dina Francesca Haynes, Annie Lai, Elizabeth M. McCormick & Juliet P. Stumpf, *Understanding "Sanctuary Cities,"* 59 B.C. L. REV. 1703 (2018) ..............................................................4, 7

Christopher N. Lasch, *Rendition Resistance*, 92 N.C. L. REV. 149 (2013).........................7, 15, 16

Teresa A. Miller, *Citizenship & Severity: Recent Immigration Reforms and the New Penology*, 17 GEO. IMMIGR. L.J. 611 (2003) ..................................................................4

Karthick Ramakrishnan & Pratheepan Gulasekaram, *The Importance of the Political in Immigration Federalism*, 44 ARIZ. ST. L.J. 1431 (2012)....................................6

Memorandum for Ass't U.S. Att'y, S.D. Cal., from Teresa Wynn Roseborough, Dep. Ass't Att'y Gen'l, Office of Legal Counsel, Re: Assistance by State and Local Police in Apprehending Illegal Aliens (Feb. 5, 1996) ......................................6

Letter from Jefferson B. Sessions III, Att'y Gen., & John F. Kelly, Sec'y, Dep't of Homeland Sec., to Tani G. Cantil-Sakauye, Chief Justice, Cal. Supreme Court (Mar. 29, 2017) ...............................................................................................................9

Ilya Somin, *Making Federalism Great Again: How the Trump Administration's Attack on Sanctuary Cities Unintentionally Strengthened Judicial Protection for State Autonomy,* 97 Tex. L. Rev. 1247 (2019) ......................................................8

Juliet Stumpf, *The Crimmigration Crisis: Immigrants, Crime, and Sovereign Power*, 56 AM. U. L. REV. 367 (2006) ...................................................................................4

Transactional Records Access Clearinghouse, *Latest Data: Immigration and Customs Enforcement Detainers*.........................................................................................7

Yolanda Vázquez, *Constructing Crimmigration: Latino Subordination in a "Post-Racial" World*, 76 OHIO ST. L.J. 599 (2015)............................................................................5

Michael J. Wishnie, *State and Local Police Enforcement of Immigration Laws*, 6 U. Pa. J. Const. L. 1084 (2004)..................................................................................5

## STATEMENT OF INTEREST

*Amici,* Professors Jennifer M. Chacón, Linus Chan, Erwin Chemerinsky, Alina Das, Seth Davis, Ingrid Eagly, César Cuauhtémoc García Hernández, Dina Francesca Haynes, Anne Lai, Christopher N. Lasch, Elizabeth McCormick, Ilya Somin, Yolanda Vázquez, and Michael J. Wishnie (whose appointments are listed in the Appendix), are scholars of constitutional, immigration and criminal law, and in particular of the relationship between state and federal powers under our federal system. They have a professional interest in the development of the law in this area, and respectively suggest that their historical perspective will assist the Court's review of the significant constitutional questions presented by this case.[1]

## SUMMARY OF ARGUMENT

"A "healthy balance of power between States and the Federal Government [reduces] the risk of tyranny and abuse from either front," wrote the Supreme Court in *Gregory v. Ashcroft*, 501 U.S. 452, 458 (1991).  This remarkable prosecution shatters that balance by seeking to commandeer the management of state courthouses.

Counts 1-3 of the Indictment [Dkt. No. 1] charge the Hon. Shelley Richmond Joseph and Court Officer Wesley MacGregor with three crimes, based on alleged acts that occurred during a hearing involving one A.S.  *See* Indictment ¶6.  According to the government, almost all of the relevant acts occurred *after* a Massachusetts prosecutor dropped the only charge that might have warranted pre-trial detention (under state law) of A.S., and at a point when Judge Joseph was advised that the Commonwealth did not seek to detain A.S. in connection with the remaining

---

[1] No counsel for a party authored this brief in whole or in part and no person or entity, other than *amici curiae* and their counsel, has contributed money that was intended to fund preparing or submitting the brief.

charge. *Id*. ¶¶17, 22.  At this point, the Indictment charges, the judge conversed with the prosecutor and defense counsel from the bench.  *See id*. ¶20.  The government's theory appears to be that she was party to an arrangement pursuant to which A.S. would leave the courtroom and the courthouse via a rear door following the hearing.  *Id*. ¶¶22-23, 27.  The government suggests as well that Judge Joseph and Officer MacGregor knew that this means of egress was contrary to the expectation of a federal agent in the courthouse lobby (whom the judge had previously excused from the courtroom, *see* Indictment ¶¶19-22),[2] but the Indictment does not allege that either defendant affirmatively misrepresented anything to the agent.  It alleges that Judge Joseph deactivated the official recording device during a portion of that proceeding, *id*. ¶¶21, 29, and that Officer MacGregor assisted A.S. in exiting the building.  *Id*. ¶¶20-21.  There is no allegation that either defendant impeded any federal effort to detain A.S. outside the courthouse or otherwise pursue its removal powers under federal law.  In short, Counts 1-3 rest entirely on allegedly uncooperative conduct of a Massachusetts judge in administering a Massachusetts criminal case from the bench of her Massachusetts courtroom, and of a court officer related to that case administration – conduct that lies at the center of the exercise of the sovereign "Judiciary Power" of the Commonwealth.[3]

In Section I of the Argument, Amici show that efforts by the federal executive branch to conscript state and local officials in executing immigration enforcement have accelerated in recent

---

[2] Defendants point out that in doing so she was following an established Newton District Court policy.  *See* Brief in Support of Motion to Dismiss at 5.

[3] See Indictment (Docket Entry # 1) at ¶¶3-4, 38, 40, 42, Count I, charging Obstruction of Justice under 18 U.S.C. § 1512(k), Count II, charging Obstruction of Justice under 18 U.S.C. §§ 1512(c)(2), and Count III, charging Obstruction of a Federal Proceeding under 18 U.S.C. §§ 1505.

The grand jury also indicted Officer MacGregor on one count of Perjury, 18 U.S.C. § 1623 (Count IV), for statements allegedly made to the grand jury on July 12, 2018.  *Id*. ¶36.  Amici do not address Count IV.

years.  As courts have enjoined earlier attempts to commandeer state and local executive officials, the government has turned to bolder and more overt intimidation: now deploying criminal indictments as a tool of coercion.

Section II of the Argument traces the development of the anticommandeering doctrine, showing that this latest and perhaps most flagrant attempt to commandeer states and localities violates the Constitution.  Counts 1-3 violate the constitutional ban on commandeering state and local officials, which applies with particular force here, where a common-law privilege has long protected those who have business before the courts, and courts themselves in the administration of that business.  The executive branch can no more commandeer this exercise of state judicial power through criminal prosecution than the federal government could commandeer state and local law enforcement officials in *Printz v. United States,* 521 U.S. 898, 935 (1997), where the Supreme Court held that "the Federal Government" may not "command the States' officers, or those of their political subdivisions, to administer or enforce a federal regulatory program."  A pre-enforcement challenge of statutory criminal penalties imposed on officials who did not comply with a federal command to conduct background checks on gun purchasers, *Printz* made clear that the anticommandeering ban prohibits the federal government from using even the *threat* of criminal prosecution to coerce state and local officials into implementing federal law.  *See id*. at 904-05.  *A fortiori*, the Constitution prohibits the federal executive branch from coercing state judicial officers through *actual* criminal prosecution for their courthouse management.

## ARGUMENT

### I.   THE INDICTMENT ESCALATES REPEATED EXECUTIVE BRANCH ATTEMPTS TO CONSCRIPT STATE AND LOCAL GOVERNMENT OFFICIALS IN FEDERAL IMMIGRATION ENFORCEMENT.

While extraordinary, these prosecutions did not arise in a vacuum.  With increasing aggression, the federal government has sought in recent years to harness state and local criminal

justice systems in service of federal immigration enforcement.  The latest chapter — indicting judicial officers of the Commonwealth for their alleged non-cooperation with federal efforts to conduct an arrest in a state courthouse — escalates a pattern of federal overreach that has been underway for some years.

State and local entanglement in immigration enforcement is a recent phenomenon.[4]  For more than a century, a clear line sharply separated the spheres of responsibility of state and local law enforcement agencies and federal immigration enforcement authorities.  While state and local officials bear much of the responsibility for the administration of criminal laws, *see Kelley v. Johnson*, 425 U.S. 238, 247 (1976) ("The promotion of safety of persons and property [has been] unquestionably at the core of [the states'] police power [reserved by the Tenth Amendment.]"), immigration enforcement had long been the exclusive province of federal officials.

The line began to blur in the 1980s and 1990s.  Pressing a narrative of immigrant criminality, Congress began to bring immigration enforcement within the ambit of broadened federal criminal drug laws.[5] In 1986, Congress enacted the Narcotics Traffickers Deportation Act, expanding the categories of individuals who could be removed for controlled substance convictions.  *See* Anti-Drug Abuse Act of 1986, Pub. L. No. 99-570, § 1751, 100 Stat. 3207 (Oct. 27, 1986).  Two years later, Congress made the commission of newly created "aggravated felonies" grounds for removal.  *See* Anti-Drug Abuse Act of 1988, Pub. L. No. 100-690, §§ 7342-43, 102 Stat. 4469-70 (Nov. 18, 1988).  Around this time, Congress also introduced the first statutory

---

[4] *See generally,* Christopher N. Lasch, R. Linus Chan, Ingrid V. Eagly, Dina Francesca Haynes, Annie Lai, Elizabeth M. McCormick & Juliet P. Stumpf, *Understanding "Sanctuary Cities,"* 59 B.C. L. REV. 1703 (2018) (describing rise of a regime entangling criminal systems with immigration enforcement).

[5] *See generally,* Teresa A. Miller, *Citizenship & Severity: Recent Immigration Reforms and the New Penology*, 17 GEO. IMMIGR. L.J. 611 (2003); Juliet Stumpf, *The Crimmigration Crisis: Immigrants, Crime, and Sovereign Power*, 56 AM. U. L. REV. 367 (2006).

reference to an immigration detainer.  *See* Anti-Drug Abuse Act of 1986, *supra*, § 1751(d) (creating 8 U.S.C. § 1357(d)).

The federal enactments were at first directed at federal authorities, with no attempt to enlist state and local governments in immigration enforcement.  That changed in 1996, when Congress added Section 287(g) to the Immigration and Naturalization Act ("INA"), allowing the Attorney General to enter into agreements with states or localities *choosing* to allow their officers to carry out the "function of an immigration officer."  8 U.S.C. § 1357(g).  Congress also authorized state and localities to permit their officers to make civil immigration arrests in certain narrow instances, *see* 8 U.S.C. §§ 1252c; 1103(a)(10).  The 1996 enactments did not *require* the assistance of states and localities in immigration enforcement, however.

The 9/11 attacks ushered in a view of unlawful immigration not simply as a criminal, but also a national security threat.[6]  The Executive began to discern in state and local law enforcement agencies a potential "force multiplier," and pushed more insistently to involve state actors in enforcement.[7]  The narrative linking immigration and crime suggested that "states and cities could and should be part of the solution," and propped up the notion that local police should enforce the immigration laws.[8]

---

[6] The introduction of immigration provisions in anti-crime legislation was made possible by "reimagin[ing] noncitizens as criminal deviants and security risks," and policymakers struggle even today to untangle immigration enforcement from the narrative of crime. César Cuauhtémoc García Hernández, *Creating Crimmigration*, 2013 BYU L. REV. 1457, 1458 (2013); Jennifer M. Chacón, *Unsecured Borders: Immigration Restrictions, Crime Control, and National Security*, 39 CONN. L. REV. 1827 (2007); Yolanda Vázquez, *Constructing Crimmigration: Latino Subordination in a "Post-Racial" World*, 76 OHIO ST. L.J. 599, 637-642 (2015).

[7] *See, e.g.,* Michael J. Wishnie, *State and Local Police Enforcement of Immigration Laws,* 6 U. PA. J. CONST. L. 1084, 1084-88 (2004) (describing the "federal effort to enlist, or even conscript, state and local police in routine immigration enforcement").

[8] Karthick Ramakrishnan & Pratheepan Gulasekaram, *The Importance of the Political in Immigration Federalism,* 44 ARIZ. ST. L.J. 1431, 1475 (2012); *see also* Ian F. Haney-López, *Post-Racial Racism: Racial Stratification and Mass Incarceration in the Age of Obama*, 98 CALIF. L.

But the conflation of crime and immigration control has chronically resulted in constitutional infringement. Time and again the courts have checked Executive efforts to enlist state and local officers in the immigration enterprise. In 2002, contradicting previous Office of Legal Counsel positions,[9] the OLC opined that state and local officers have "inherent authority" to enforce civil immigration laws, even where not explicitly authorized by Congress.[10] This supposed "inherent authority" was discredited by the Supreme Court in *Arizona v. United States*, 567 U.S. 387, 400 (2012). Pointing to the "limited circumstances" in which Congress had allowed state and local officers to make civil immigration arrests, the Court held that Arizona's attempt (premised on the "inherent authority" argument) to authorize state and local participation beyond the "system Congress created" violated the Supremacy Clause. *Id.* at 408-10 (citations omitted).

Executive overreach has also been manifest in the exponential growth in the use of federal immigration detainers as an enforcement mechanism.[11] Detainers were once rarely used, but after

---

REV. 1023, 1037 & n.62 (2010) (noting that criminal enforcement became "a seemingly 'obvious' framework for responding to social problems" including immigration). *See also* Alina Das, *Inclusive Immigrant Justice: Racial Animus and the Origins of Crime-Based Deportation,* 52 U.C. Davis L. Rev. 171 (2018) (noting the dramatic criminalizing impact of the legislative enactments of the 1980s and 1990s and the expanded role envisioned for state and local law enforcement officers in immigration enforcement, and situating these developments as part of a consistent thread of racializing immigration enforcement through criminalization).

[9] Memorandum for Joseph R. Davis, Ass't Director, FBI, from Douglas W. Kmiec, Ass't Att'y Gen'l, Office of Legal Counsel, *Re: Handling of INS Warrants of Deportation in Relation to NCIC Wanted Person File* (Apr. 11, 1989) ("1989 OLC memo"), https://www.scribd.com/document/24732201/DOJ-Memo-on-INS-Warrants-of-Deportation-in-Relation-to-NCIC-Wanted-Person-File-4-11-89; Memorandum for Ass't U.S. Att'y, S.D. Cal., from Teresa Wynn Roseborough, Dep. Ass't Att'y Gen'l, Office of Legal Counsel, *Re: Assistance by State and Local Police in Apprehending Illegal Aliens* (Feb. 5, 1996) ("1996 OLC memo"), https://www.justice.gov/file/20111/download.

[10] Memorandum for the Att'y Gen., from Jay S. Bybee, Ass't Att'y Gen'l, Office of Legal Counsel, *Non-preemption of the authority of state and local law enforcement officials to arrest aliens for immigration violations* 8 (April 3, 2002) ("2002 OLC memo").

[11] An immigration detainer is a form sent by immigration officials purporting to command or request receiving jail officials to prolong the detention of a person otherwise entitled to release

9/11 and particularly after the launch of the "Secure Communities" immigration enforcement program in 2008, federal immigration officials flooded state and local officials with detainers.  *See* TRANSACTIONAL RECORDS ACCESS CLEARINGHOUSE, LATEST DATA: IMMIGRATION AND CUSTOMS ENFORCEMENT DETAINERS (data tool available online at https://trac.syr.edu/phptools/immigration/detain/) (reporting fewer than 10,000 detainers issued per year prior to FY 2006, rising to over 300,000 detainers issued in FY 2011).  Hundreds of thousands of detainers commanding detention were issued until 2014, when the Third Circuit Court of Appeals held that mandatory detainer compliance was not authorized by the INA and would violate the Tenth Amendment's anti-commandeering doctrine.[12]

Executive zeal to coopt state criminal systems in immigration enforcement has continued unabated.  Early in 2017, the President issued an executive order aimed at "ending" so-called "sanctuary cities" by starving them of federal funds.  Exec. Order No. 13768, 82 Fed. Reg. 8799 (Jan. 25, 2017).  The order was promptly enjoined on Tenth Amendment and Spending Clause grounds.  *Cty. of Santa Clara v. Trump,* 250 F. Supp. 3d 497, 530-33 (N.D. Cal.

---

on the basis of a suspected immigration violation.  *See* Christopher N. Lasch, *Rendition Resistance*, 92 N.C. L. REV. 149, 205–09 (2013) (describing the use of detainers in the Secure Communities program and the evolution of the detainer form over time).  Prior to April 1997, the form detainer in use by federal immigration officials did not even request detention.  *See Vargas v. Swan*, 854 F.2d 1028, 1035 (7th Cir. 1988) (appendix showing Form I-247 in use from March 1983 to April 1997).

[12] *Galarza v. Szalczyk*, 745 F.3d 634, 641-45 (3d Cir. 2014). In 2016, a second federal court held that the Executive branch's detainer practices had regularly exceeded immigration officers' authority under the INA by requesting detention without either a warrant or a determination of likelihood of escape. *Moreno v. Napolitano,* 213 F. Supp. 3d 999 (N.D. Ill. 2016). In November 2014 the Executive announced the end of the Secure Communities program and the practice of requesting detention through detainers, *see* Lasch, et al., 59 B.C. L. REV. at 1730-33, but under the current administration, Secure Communities has been revived and detention is regularly requested. ICE Policy No. 10074.2, ¶2.4 (Mar. 24, 2017, eff. Apr. 2, 2017), https://www.ice.gov/sites/default/files/documents/Document/2017/10074-2.pdf; Dep't of Homeland Sec., Form I-247A (March 2017), https://www.ice.gov/sites/default/files/documents/Document/2017/I-247A.pdf.

2017), *reconsideration denied,* 267 F. Supp. 3d 1201 (N.D. Cal. 2017), *appeal dismissed as moot sub nom. City & Cty. of San Francisco v. Trump,* 17-16886, 2018 WL 1401847 (9th Cir. Jan. 4, 2018).

Undeterred, the Executive sought to impose funding conditions through certification requirements on certain law enforcement grants. These conditions were promptly enjoined too. *City of Chicago v. Sessions,* 888 F.3d 272 (7th Cir. 2018). Some courts held that one of the certification requirements—that non-federal jurisdictions certify that they have not limited their officials from sharing immigration-status-related information with federal officials, *see* 8 U.S.C. § 1373—violated the Tenth Amendment's anti-commandeering principle by "impermissibly direct[ing] the functioning of local government." *City of Chicago v. Sessions,* 321 F. Supp. 3d 855, 872 (N.D. Ill. 2018); *see also, e.g., State of New York v. Dep't of Justice,* 343 F. Supp. 3d 213, 237 (S.D.N.Y. 2018).[13]

The Executive then sued to enjoin parts of California's Senate Bill 54, challenging provisions that prohibited disclosure to federal authorities of certain inmate release and transfer information, and the transfer of inmates absent a judicial warrant or probable cause determination.[14] The Ninth Circuit denied an injunction, holding that California was likely to succeed on both challenges based on Tenth Amendment anti-commandeering principles. *United States v. California,* 921 F. 3d 865 (9th Cir. 2019). The court held that while California's

---

[13] For a thorough review of the Executive's numerous failed attempts to enlist state and local officers in immigration enforcement by means of grant conditions, *see* Ilya Somin, *Making Federalism Great Again: How the Trump Administration's Attack on Sanctuary Cities Unintentionally Strengthened Judicial Protection for State Autonomy,* 97 Tex. L. Rev. 1247 (2019).

[14] Notably, the government did not challenge a provision of SB54 prohibiting detainer-based detention, tacitly acknowledging the Tenth Amendment would prevent such a challenge. *See Galarza, supra* n.12.

limitations on disclosure might frustrate the United States, "that frustration is permissible, because California has the right, pursuant to the anticommandeering rule, to refrain from assisting with federal efforts." *Id.* at 890-91.  So too with the restriction on inmate transfer.  Granting injunctive relief, the Court observed, "Federal law provides states and localities the *option,* not the *requirement,* of assisting federal immigration authorities," and to require such assistance would violate the Tenth Amendment.  *Id.* at 886-90.

Counts 1-3 of the Indictment arise from this historical context, and sharply advance its trend.  When state-court judges expressed their concern with the growth of federal immigration enforcement arrests in state courthouses in early 2017, noting the deleterious impact those arrests had on access to justice,[15] the administration responded with evident frustration, claiming that the arrests were necessitated by "[state and local] statutes and ordinances designed to specifically prohibit or hinder ICE from enforcing immigration law by prohibiting communication with ICE, and denying requests by ICE officers and agents to enter prisons and jails to make arrests."[16]  The indictments of Judge Joseph and Officer MacGregor ultimately followed.  After so many legislative efforts to control state and local criminal systems have failed, the Executive now deploys a more dangerous tool: its power to indict.

---

[15] *E.g.,* Letter from Tani G. Cantil-Sakauye, Chief Justice, Cal. Supreme Court, to Jeff Sessions, U.S. Attorney Gen. (Mar. 16, 2017), http://newsroom.courts.ca.gov/news/chief-justice-cantil-sakauye-objects-to-immigration-enforcement-tactics-at-california-courthouses.

[16] Letter from Jefferson B. Sessions III, Att'y Gen., & John F. Kelly, Sec'y, Dep't of Homeland Sec., to Tani G. Cantil-Sakauye, Chief Justice, Cal. Supreme Court at 2 (Mar. 29, 2017), http://assets.documentcloud.org/documents/3533530/Attorney-General-and-Homeland-Security-Secretary.pdf.

## II. BOTH THE CONSTITUTION AND A COMMON LAW PRIVILEGE CONSTRAIN FEDERAL POWER TO INDICT STATE JUDICIAL OFFICERS FOR REFUSING TO COOPERATE WITH IMMIGRATION ENFORCEMENT.

"The federal system rests on what might at first seem a counterintuitive insight, that 'freedom is enhanced by the creation of two governments, not one.'" *Bond v. United States*, 564 U.S. 211, 220-21 (2011) (quoting *Alden v. Maine*, 527 U.S. 706, 758 (1999)). The Tenth Amendment expressly limits federal power, providing that "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U.S. Const. Am. X. The ban on federal commandeering of state and local officials flows from this express reservation of powers to the states, as well as from the constitutional structure of federalism. *See Printz,* 521 U.S. at 919. This anticommandeering ban enhances freedom by preserving the States as "independent political entities" and ensuring a "healthy balance of power between the States and the Federal Government." *Id.* at 919, 921 (internal quotation marks omitted).

The Indictments of Judge Joseph and Officer McGregor are the latest attempt by the Administration to upset this balance of power in matters of local criminal justice, and run afoul of the rule that federal government may not, by bringing coercive criminal power to bear on state officials, commandeer them (and thereby the States) into implementing federal law. *See New York v. United States,* 505 U.S. 144, 166 (1992) (noting that "the Framers explicitly chose a Constitution that confers upon Congress the power to regulate individuals, not States").

### A. *The Tenth Amendment and Principles of Constitutional Federalism Constrain Federal Prosecutions of State Officials For Non-Cooperation with Federal Immigration Enforcement Efforts.*

1.  *The Constitution protects state judicial officers from federal commandeering of the management of state courthouses, a power reserved to the States by the Tenth Amendment.*

"A State defines itself as a sovereign through 'the structure of its government, and the character of those who exercise government authority.' *McDonnell v. United States*, 136 S. Ct. 2355, 2373 (2016), *quoting Gregory v. Ashcroft*, 501 U. S. 452, 460 (1991).  Massachusetts has long defined its sovereign powers to include a "Judiciary Power." *See* Mass. Const. Pt. III, art. 1. In Massachusetts, a core attribute of the reserved "Judiciary Power" is the power of judicial officers, in cases in which they have jurisdiction, to manage the courtroom.  *Chief Admin. Justice of the Trial Court v. Labor Relations Comm'n*, 404 Mass. 53, 57, 533 N.E.2d 1313, 1317 (1989); *see First Justice of Bristol v. Clerk-Magistrate*, 438 Mass. 387, 397, 780 N.E.2d 908, 916 (2003) (internal quotation marks omitted).  This power is "'absolutely necessary for a court to function effectively.'" *Labor Relations Comm'n*, 404 Mass. at 37 (quoting *State v. LaFrance*, 471 A.2d 340, 345 (N.H. 1983)).  The "least controversial" of judicial powers, *see First Justice*, 438 Mass. at 397, 780 N.E.2d at 916, this power to control the courthouse "must be vested in the judiciary if the courts are to provide justice, and the people are to be secure in their rights." *Op. of the Justices*, 372 Mass. 883, 893, 363 N.E. 2d 652, 659 (1977) (*quoting O'Coin's Inc*., 362 Mass. at 510, 287 N.E. 2d at 612).  In short, to the extent not delegated to the federal government by the Constitution, nor subordinated to federal power by the Supremacy Clause,[17] judicial power to manage state courtrooms in ordinary state prosecutions is reserved to Massachusetts and the other States, and exercised by their judicial officers.

---

[17] U.S. Const. Art. VI, cl. 2. While a state judge must apply binding federal law when deciding a case before her, *see Printz,* 521 U.S. at 943-44; *Testa v. Katt*, 330 U.S. 386, 394 (1947), there was no such case before Judge Joseph.  Of course, the Supremacy Clause applies only to the Constitution (which includes the safeguard of the Tenth Amendment), and federal laws and treaties enacted pursuant thereto.  U.S. Const. Art. VI, cl. 2.  An exercise of power by the federal government that *offends* the Tenth Amendment can enjoy no "supremacy."

The federal courts have long recognized a privilege animated by the same proposition – that in administering and delivering justice to the people, courts must necessarily have power to control the courthouse, to the extent of protecting persons doing business there from arrest or service of process. *See Ryan v. Immigration and Customs Enf't*, 382 F. Supp. 3d 142, 156 (D. Mass. 2019) (enjoining federal immigration officials from making certain arrests in courthouses of the Commonwealth of Massachusetts)[18]; *Page Co. v. MacDonald,* 261 U.S. 446, 448 (1923) (noting that the privilege is "founded in the necessities of the judicial administration'") (citation omitted); *see also* Christopher N. Lasch, *A Common-Law Privilege to Protect State and Local Courts During the Crimmigration Crisis*, 127 Yale L.J. Forum 410, 433 (2017) (describing the privilege as justified by the need to preserve the dignity and decorum of the courts). For example, in *Page Co*., the Supreme Court made clear that federal courts should respect the privilege from arrest, as it arises from the "necessities of the judicial administration." 261 U.S. at 448. A litigant had been served with federal process while attending state-court proceedings in Massachusetts. *Id.* at 447. The Supreme Court concluded the federal courts were bound to respect the privilege of the state court, holding: "A federal court in a state is not foreign and antagonistic to a court of the state …" *Id.*

---

[18] In *Ryan*, the Court excluded from its order criminal arrests and "civil arrests of individuals who are brought to Massachusetts courthouses while in state or federal custody." 382 F. Supp. 3d at 146. As the question was not raised by the case, the Court noted that the parties had not briefed "the proposition that this privilege extends to individuals who are brought to the courthouse in federal or state custody." *See id*. at 156-57 n.5. The Indictment alleges that A.S. was brought to the Newton District Court in custody, but that the alleged conspiracy was formed after the Commonwealth no longer sought custody. Indictment ¶¶6-8; 17-22. While *Ryan* did not reach the question whether the privilege would be implicated by the allegations of the Indictment, the privilege applies not only to persons, but to the place of the courthouse itself. *See infra* at 13. Thus, whether A.S. enjoyed a privilege from arrest is distinct from the question whether management of courthouse arrests is a necessary and inherent power of the court (and the judges and judicial officers through whom the court acts).

The privilege has regularly been described as belonging not only to those persons protected by it, but, given its connection to the administration of justice, *to the court itself.* *See, e.g., Page Co.,* 261 U.S. at 448 (describing the privilege as a "'privilege of the court … founded in the necessities of the judicial administration'") (citation omitted); *Bramwell v. Owen,* 276 F. 36, 41 (D. Or. 1921) (describing the privilege as "a privilege of the court as affecting its dignity and authority") (citation omitted).  The privilege protects from arrest not only persons coming and going from court for the purpose of judicial business, as the Court discussed in *Ryan,* but also all persons in the courthouse.  *See* Lasch, 127 YALE L.J. FORUM at 428-31 (addressing the privilege as applied to the courthouse and its environs).  As Blackstone put it, "[n]o arrest can be made in the king's presence, nor within the verge of his royal palace, *nor in any place where the king's justices are actually sitting.*" WILLIAM BLACKSTONE, COMMENTARIES OF THE LAWS OF ENGLAND 766 (1877) (emphasis added).  The special dignity and decorum to be accorded the *place* of the court produced a heightened privilege at or near the court, extending not only to arrests but also to service of process.  *See* Lasch, 127 YALE L.J. FORUM at 429-31.

Just last summer, Judge Talawani acknowledged that the privilege is "absolutely indispensable," and "so fundamental to the functioning of both federal and state judiciary, [that it] cannot be assumed to have disappeared simply with the passage of time." *Ryan*, 382 F. Supp. 3d at 156 (citations omitted).  On the basis of the privilege, the Court concluded that the plaintiffs had shown a strong likelihood that ICE's policy permitting civil immigration arrests in courthouses "exceeds the authority granted to ICE by the Congress," *Ryan*, 382 F. Supp. 3d at 159, and enjoined ICE from "from civilly arresting parties, witnesses, and others attending Massachusetts

courthouses on official business while they are going to, attending, or leaving the courthouse." *Id.* at 146.[19]

Deployed by courts themselves, proceeding from a recognition of the "necessities of the judicial administration," *see id.* at 156, and clothed with significant remedial power, the privilege shows that the power to manage and control a courtroom is central to the judicial power reserved by the Constitution to state judicial officers.

The Tenth Amendment and the structural principle of constitutional federalism that it reflects bar the federal government from intruding upon this reserved power. *See Printz*, 521 U.S. at 931-32 (anticommandeering rule); *NFIB v. Sebelius*, 567 U.S. 519, 585 (2012) (anticoercion rule). The amendment constrains federal criminal prosecutions of state judicial officers in various ways. In *United States v. Walker*, 490 F.3d 1282, 1299 (11th Cir. 2007), the Eleventh Circuit held that federal prosecutions may not aim to "instruct state officials on how to conform their conduct

---

[19] So important is the privilege that courts have applied it both prospectively and retrospectively. Courts could activate it prospectively, issuing an injunction in *Ryan*, and a writ of protection to a person fearing courthouse arrest. *See Bridges v. Sheldon,* 7 F. 17, 44 (D. Vt. 1880) (noting the propriety of a court issuing a writ of protection in order to provide "convenient and authentic notice to those about to do what would be a violation of the privilege"). *See also*, SAMUEL HOWE, PRACTICE IN CIVIL ACTIONS AND PROCEEDINGS AT LAW IN MASSACHUSETTS 144-46 (1834) (setting forth Massachusetts procedure for obtaining a writ of protection from a court). Massachusetts court rules still prescribe procedures for courts to issue writs of protection. *E.g.,* S.J.C. Rule 2:14; Dist./Mun. Cts. Supp. R. Civ. P. Rule 112; Superior Court Rule 16. Courts also protected the privilege retrospectively, by punishing violations through contempt proceedings. *E.g.*, *Larned v. Griffin*, 12 F. 590, 594 (D. Mass. 1880) (stating that the "offender may be punishable for contempt if the arrest is made in the actual or constructive presence of the court . . . ."); *Blight v. Fisher,* 3 F. Cas. 704, 704-05 (C.C.D.N.J. 1809) (No. 1,542) (noting that "service of process  .  .  .  in the actual or constructive presence of the court, is a contempt, for which the officer may be punished"). Federal and state courts alike recognize the privilege and share an interest in protecting it. "Every court will aid every other court by permitting attendance upon one free from the danger of service of process by another. All courts recognize this principle of immunity involved." *Feister v. Hulick,* 228 F. 821, 823 (E.D. Pa. 1916); *see also Parker v. Marco,* 32 N.E. 989, 989 (N.Y. 1893) (noting that a writ of protection "would be respected by all other courts").

to state law, because this power is reserved to the states." The federal government may not prosecute an individual for conduct that Congress lacks authority to regulate. *See United States v. Lopez*, 514 U.S. 549, 567-68 (1995). Nor may the federal government use prosecution to commandeer or coerce a state official in carrying out federal law. *Printz*.

In light of these constitutional constraints, a federal criminal statute "must not be construed to permit unwarranted federal intervention into the affairs of state government." *United States v. Lewis*, 514 F. Supp. 169, 176 (M.D. Pa. 1981); *see McDonnell*, 136 S. Ct. at 2373 (declining "to construe [a] statute in a manner that leaves its outer boundaries ambiguous and involves the Federal Government in setting standards of good government for local and state officials"); *United States v. Tavares*, 844 F.3d 46, 54 (1st Cir. 2016) (citing federalism concerns in concluding that "Government has not in fact demonstrated that the conduct satisfies the appropriate criminal statutes").

> 2.    *Roots of the Anti-Commandeering and Anti-Coercion Doctrines.*

From the first days of the republic, Art. IV, §3 of the Constitution and a federal enabling statute[20] set up a tension between federal and state power. These provisions authorized the seizure, in states where slavery was illegal and abhorrent, of persons who had escaped slavery, and enforced their return to servitude in the states from which they had escaped. *See generally*, Lasch, *Rendition Resistance*, *supra* n. 10; Sally E. Hadden, *Slave Patrols: Law and Violence in Virginia and the Carolinas* (Harv. Univ. P. 2001). The states resisted; seeking to protect their new citizens, many states enacted criminal sanctions on so-called "slave catchers." Matters came to a head in *Prigg v. Pennsylvania*, 41 U.S. 539 (1842), when Edward Prigg was indicted in Pennsylvania for

---

[20]Act of Feb. 12, 1793, ch. VII, 1 Stat. 302 (1793). The act addressed both fugitives from justice and fugitives from slavery.

kidnapping Margaret Morgan and transporting her to slavery in Maryland, five years after her escape to freedom.[21]  Prigg was convicted in Pennsylvania under a state kidnapping statute, and his conviction was affirmed by the highest court in Pennsylvania.  *Id.*

The Supreme Court of the United States reversed, holding that Pennsylvania had no power to obstruct an arrest carried out in aid of a federal statute squarely within Constitutional boundaries. Still, Justice Story drew a careful line between federal and state power.  "It might well be deemed an unconstitutional exercise of the power of interpretation [of the Constitution]," Justice Story wrote, "to insist that the states are bound to provide means to carry into effect the duties of the national government, nowhere delegated or intrusted to them by the constitution."  *Prigg*, 41 U.S. at 541.  "Thus, the prevailing view in *Prigg* was that even if Congress could legislate on the subject, it could not compel the performance of a duty by state officials."  Lasch, 92 N.C. L. REV. at 177.

    *3.*     *Development of the Doctrine in the Modern Era.*

The broader proposition advanced in *Prigg,* that absent express recognition in the Constitution, the federal government may not impose duties on a state officer, has regularly been reaffirmed.  In recent cases, the Supreme Court has described this limitation on federal power as a "fundamental structural decision incorporated into the Constitution, *i.e.*, the decision to withhold from Congress the power to issue orders directly to the States."  *Murphy v. Nat'l Collegiate Athletic Ass'n*, 138 S. Ct. 1461, 1475 (2018).  States have the prerogative ''not [to] yield[ ] to federal

---

[21] In 1832, Morgan moved from Maryland to Pennsylvania – apparently without hindrance. Her owner John Ashmore granted her virtually full freedom.  Because Morgan was never formally emancipated, Ashmore's heir Margaret Ashmore claimed ownership, and hired Prigg to recapture her.  Morgan was then living in York County, Pennsylvania, with her Pennsylvania-born children. Prigg seized Morgan and the children in 1837, and returned them to Maryland.  *See* Lasch, 92 N.C. L. REV. at 174-75.

blandishments when they do not want to embrace the federal policies as their own.'' *Sebelius*, 567 U.S. at 579.

This anticommandeering rule protects state officials from commands to execute federal law. In *Printz*, for example, states challenged the Brady Handgun Violence Prevention Act, which, under threat of criminal sanction, required local municipal officials to conduct background checks on handgun purchasers, and imposed a criminal sanction for violations. 521 U.S. at 904. The Court held that portion of the statute violated the Tenth Amendment because the federal government could not "conscript[] the State's officers directly." *Id.* at 935. Courts have recently applied the anti-commandeering doctrine in the immigration context in both *City of Chicago*, 321 F. Supp. 3d 855, and *City of Philadelphia v. Sessions*, 309 F. Supp. 3d 289 (E.D. Pa. 2018), *aff'd in part, vacated in part sub nom. City of Philadelphia v. Attorney Gen. of United States*, 916 F.3d 276 (3d Cir. 2019). These decisions enjoined enforcement of portions of sections 1373(a) and 1373(b) of the INA, which barred states from restricting state officials from providing information to INS and sharing information among state and federal law enforcement. The district courts held that these provisions violated the anti-commandeering doctrine by interfering with a state's sovereign power to enact legislation. *See City of Phila.*, 309 F. Supp. 3d. at 329. Even though section 1373 was phrased as a prohibition, rather than a command, it was struck down as an attempt to control the conduct of state officials. *Id.* at 328-29 (quoting *Murphy,* 138 S.Ct. at 1478) (likening section 1373 to the provision struck down in *Murphy* as "unequivocally dictat[ing] what a state legislature may and may not do").

The anticommandeering ban is not limited to direct commands; it also bars indirect commands that deny state officials the option of refusing to participate in a federal scheme. *See* R. Seth Davis, *Conditional Preemption, Commandeering, and the Values of Cooperative*

*Federalism*, 108 Colum. L. Rev. 404, 417-19 (2008).  In *New York v. United States*, a federal statute gave states an "election" between accepting radioactive waste from producers or implementing regulations outlined by Congress.  This, the Court held, was a Hobson's choice, functionally a direct command that the states implement federal regulations.  505 U.S. at 176, 188. In *Murphy*, the Court found no distinction between laws that direct states to act, as was the case in *Printz*, and laws that prohibit them from acting.  In short, just as federal authorities may not constitutionally order a state officer to cooperate in an immigration arrest, so too are they barred from punishing an officer for failing to cooperate.  Each approach is "unconstitutionally coercive," *see New York*, 505 U.S. at 176, and the exercise of *criminal* indictment powers the more so.  Each approach "unequivocally dictates" what a State, acting through its officials, "may and may not do." *Murphy*, 138 S.Ct. at 1478.  Each is an attempt to regulate the States, through coercion applied to state officials.  *See New York*, 505 U.S. at 166 (noting that "the Framers explicitly chose a Constitution that confers upon Congress the power to regulate individuals, not States").

### B.  Counts 1-3 of the Indictment are Barred by the Tenth Amendment.

While the Constitution does not bar federal criminal prosecution of state officers, *see Lewis*, 514 F. Supp. at 176 n.11 (*citing United States v. Gillock*, 445 U.S. 360, 373 n.11 (1980)), even without a Tenth Amendment violation, such a prosecution may "raise[] significant federalism concerns."  *McDonnell*, 136 S. Ct. at 2373.  Where, as here, the Indictment seeks to impose criminal liability on mere non-cooperation with federal enforcement, those concerns mature into a Constitutional bar.

First is the question of context.  The coercion here arises here from the alleged exercise by Massachusetts judicial officers of the Judiciary Power.  All of the acts charged in Counts 1-3 of the Indictment are alleged to have taken place in a courthouse erected by the Commonwealth, at its own expense, for the purpose of administering Massachusetts cases, and to have been carried

out by judicial officers who were, at the time, administering a criminal case arising under Massachusetts law.  The acts charged were squarely within a sphere long understood to be protected from arrest by the common-law privilege, deemed a necessary aspect of judicial administration that preserves access to justice and protects the dignity and decorum of the courthouse.  And each act, if it occurred as alleged, fell squarely within powers reserved to Massachusetts by the Constitution itself.  Each involved the "conduct of participants" in a state court process, *see First Justice,* 438 Mass. at 398, 780 N.E.2d at 916, the "actions of officers of the court," *id.*, and the "environment of the court[room]."  *Id.*  Counts 1-3 not only involve, but charge as criminal a judge's "physical control" of that environment.  *Chief Admin. Justice*, 404 Mass. at 57, 533 N.E.2d at 1317.  By seeking to regulate the judicial actions of Judge Joseph, these counts seek to bring the federal government's coercive power to bear on the State itself.

Arising within a context so central to the reserved judicial powers of Massachusetts, Counts 1-3 of the Indictment represent an overt effort to coerce, commandeer, and indeed intimidate Massachusetts, through its judicial officers, into cooperation with federal immigration enforcement by severely punishing Judge Joseph and Officer MacGregor for noncooperation.  The government charges that the unlawful object of the alleged conspiracy was "to attempt to obstruct, influence, and impede the official ICE federal removal proceeding, by preventing the ICE Officer from taking custody of A.S. *at the Newton District Court Courthouse*."  Indictment ¶25 (emphasis added).  But a federal arrest could be "obstructed" by a rear-door departure to a public parking lot only if the federal government had a legally-enforceable right to use Massachusetts court proceedings as a venue for immigration arrests in the first place.  As *Murphy*, *Printz*, and *New York* all show, the government's premise, that it can commandeer state facilities and coerce state

actors in order to make immigration arrests, is precisely what the Tenth Amendment forbids.[22] The Ninth Circuit's decision upholding California Senate Bill 54's transfer-of-prisoners provisions is instructive. *California,* 921 F.3d at 886-90. The Tenth Amendment prevents the federal Executive from transforming the "*option ...* of assisting federal immigration authorities" into a requirement. *Id*. at 889. Just as ICE has no expectation to be permitted to make arrests inside California jails, it has no expectation to make arrests inside Massachusetts courthouses.

The United States alleges that Judge Joseph's conduct violated various *Massachusetts* standards, including standards set out in an administrative memorandum, and rules relating to the recording of proceedings. Indictment ¶¶12–13. Whether that is so may warrant review by the appropriate agencies of Massachusetts, but the Tenth Amendment makes such concerns no business of the federal government.[23] Federal prosecutions may not aim to "instruct state officials on how to conform their conduct to state law, because this power is reserved to the states." *United States v. Walker*, 490 F.3d 1282, 1299 (11th Cir. 2007) (explaining that federal prosecution may not be predicated on a non-criminal state ethics provision). The Supreme Court has put the basic principle plainly: "it is difficult to think of a greater intrusion on state sovereignty than when a federal court instructs state officials on how to conform their conduct to state law." *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 106 (1984).

---

[22] The government's effort upends a core rationale of the Tenth Amendment, that the federal government cannot shift the cost of policy enforcement on the states. The effect of this prosecution is to commandeer courthouses built and maintained by Massachusetts as centers for its enforcement policy, and to force the judicial officers whom Massachusetts appoints to assist in effectuating that policy. A key policy objective of the Tenth Amendment is to force the federal government to finance its own initiatives, rather than shifting that cost to the States. *See Murphy*, 138 S.Ct. at 1477.

[23] There is no suggestion that the failure to tape-record proceedings impeded the federal government from making an arrest. Neither federal agents nor anyone else would have had access to tape recordings prior to A.S.'s departure.

Once the assistant district attorney dropped the fugitive charge, Indictment ¶¶17, 22, there was no basis in Massachusetts law upon which Judge Joseph might have held A.S.  In *Lunn v. Commonwealth*, 477 Mass. 517, 78 N.E. 3d 1143 (2017), which involved a court officer who arrested an alleged alien after dismissal of his state case, and briefly held him for federal ICE officers, the SJC held that arrest unlawful.  Notwithstanding the pendency of a detainer, once the criminal case was resolved, the fact that the federal government was requesting that the defendant be held conferred on state officers no power *even of brief arrest*.  As a Massachusetts judicial officer, Judge Joseph was bound to comply with *Lunn*.  Given that she both exercised the Judiciary Power of the Commonwealth over her courtroom, and was privileged (in her capacity as a judicial officer) to protect participants in judicial proceedings from arrest, she plainly had power to *permit* egress from any of the courthouse's exits.  Forcing the defendant through the public entrance would raise an arguable violation of the ruling and a tension with the courthouse privilege.  That the government's theory raises concerns under operative state law highlights the constitutional problem at the center of the case: that the United States seeks to supplant state power with federal objectives.

In reality, Defendants are charged with acting neutrally.  Consistent with the policy of the Tenth Amendment, Defendants neither permitted the judicial proceeding to become a tool of federal enforcement, nor in any way restricted the federal government in its efforts to enforce the immigration laws outside the courthouse.  That neutrality was faithful both to the Tenth Amendment and to the privilege protecting persons having business in the Newton District Court from arrest.  The policy backing the "absolutely indispensable" privilege against courthouse arrest, *see Ryan*, 382 F. Supp. 3d at 156-57, is that the ICE officers had no right to expect to make an arrest or even serve process in the Newton District Courthouse.  The contrary – but equally

indispensable – premise of Counts 1-3 is that ICE officers had not only that expectation, but the power to enforce it with criminal sanction.

When, during a hearing, a judge permits a defendant's ingress or egress from the courtroom or directs the operation of a recording device, she engages in a quintessentially judicial function. So too does she exercise judicial power in the adjudication of his case.  If the allegation that the former acts were carried out wrongfully can be the basis for federal criminal charges, then an allegedly wrongful directed judgment of acquittal, or vacatur of the conviction of a noncitizen, might be challenged as "obstruction" by the government if it rendered the noncitizen no longer subject to removal.  For example, on April 17, 2019, the Office of the Administrative Judge for the Unified Court System of the State of New York issued a directive to uniformed personnel within New York.  New York Office of the Chief Administrative Judge, Directive No. 1-2019, "Protocol Governing Activities in Courthouses by Government Agencies".  The directive provides for limited voluntary cooperation with federal immigration authorities, but limits what state personnel may do, providing that "no law enforcement action may be taken by a [federal] law enforcement agency in a courtroom."  *Id.*  The protocol also directs a court officer to inform the judge "if a law enforcement agent covered by this protocol is present in the courthouse with the intent of arresting or otherwise taking into custody a party or other participant in a case before the judge," and prohibits arrests within a courthouse absent a warrant or order issued by a federal or magistrate judge.  It would be a small step from Counts 1-3 of the Indictment to future prosecutions alleging that a state judge's compliance with New York's protocol, or with similar protocols in other states also constitutes obstruction of justice.

The typical means of commandeering is through legislating control.  The commandeering deployed here is more potent and more cynical: intimidation by indictment.  Certainly the threat

of prosecution casts a coercive a shadow over the exercise of state judicial power (to determine the scope of the privilege in order to protect the dignity and decorum of the Massachusetts courts, to make judicial administration "fully available to all," and otherwise). *See Page Co.,* 261 U.S. at 448.  The mere pendency of this prosecution chills judicial officers in this Commonwealth and in other States, and raises a significant concern that the United States will engage in further acts of overreach.  The "choice" here (cooperate with federal expectations or incur a federal criminal charge) is not a "choice," *see New York*, 505 U.S. at 176, 188, but rather, submission to the exercise of profound federal coercion.  *Murphy*, 138 S. Ct. at 1477-78.  Absent dismissal, Counts 1-3 will announce to every judge in a State court that she must manage her courthouse in a manner that facilitates federal arrest, or risk professional humiliation, financial ruin, and prison.

## CONCLUSION

Because Counts 1-3 of the Indictment constitute an effort by the Federal Government to regulate the Commonwealth directly, by subjecting its judicial officers to criminal prosecution for failing, in their official acts, to assist the federal government in the removal of aliens, those counts of the Indictment violate the Tenth Amendment, and the Defendants' Motion to Dismiss should be granted.

By their attorneys,

*/s/ Vanessa M. Brown*
Sabin Willett
BBO #542519
sabin.willett@morganlewis.com
Vanessa M. Brown
BBO #697097
vanessa.m.brown@morganlewis.com
**MORGAN, LEWIS & BOCKIUS LLP**
One Federal Street
Boston, MA  02110-1726
+1.617.341.7700

Dated:  September 13, 2019

## CERTIFICATE OF SERVICE

I, Vanessa M. Brown, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on September 17, 2019.

*/s/ Vanessa M. Brown*
Vanessa M. Brown

**Appendix**

Jennifer M. Chacón
Professor of Law
UCLA School of Law

Linus Chan
Associate Clinical Professor of Law
University of Minnesota

Erwin Chemerinsky
Dean and Jesse H. Choper Distinguished
Professor of Law
University of California, Berkeley School of
Law

Alina Das
Professor of Clinical Law
Co-Director, Immigrant Rights Clinic
New York University School of Law

Seth Davis
Professor of Law
University of California, Berkeley School of
Law

Ingrid Eagly
Professor of Law
UCLA School of Law

César Cuauhtémoc García Hernández
Associate Professor of Law
University of Denver

Dina Francesca Haynes
Professor of Law
Director Human Rights and Immigration
Law Project
New England Law School

Annie Lai
Co-Director, Immigrant Rights Clinic
Clinical Professor of Law
UC Irvine School of Law

Christopher N. Lasch
Co-Director, Immigration Law and Policy
Clinic
Professor of Law
University of Denver

Elizabeth McCormick
Associate Dean for Experiential Learning
Associate Clinical Professor of Law
University of Tulsa College of Law

Ilya Somin
Professor of Law
George Mason University Antonin Scalia
Law School

Juliet P. Stumpf
Robert E. Jones Professor of Advocacy and
Ethics
Lewis & Clark Law School

Yolanda Vázquez
Professor of Law
University of Cincinnati College of Law

Michael J. Wishnie
William O. Douglas Clinical Professor of
Law
Yale Law School