**CRIMINAL NO. 1:19-cr-10141-LTS**

**IN THE UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS**

---

**UNITED STATES OF AMERICA,**

Plaintiff,

**v.**

**SHELLEY M. RICHMOND JOSEPH** and
**WESLEY MACGREGOR,**

Defendants.

---

**Amicus Brief of the American Immigration
Lawyers Association and Justice at Work**

*(Leave to file granted on October 17, 2019)*

Kirsten V. Mayer
Joshua S. Levy
ROPES & GRAY LLP
800 Boylston Street
Boston, MA 02199-3600
Telephone: (617) 951-7000
kirsten.mayer@ropesgray.com
joshua.levy@ropesgray.com

Sabrineh Ardalan
Philip L. Torrey
HARVARD IMMIGRATION AND REFUGEE CLINICAL PROGRAM
6 Everett Street, Suite 3105
Cambridge, Massachusetts 02138
Telephone: (617) 495-0638
sardalan@law.harvard.edu
ptorrey@law.harvard.edu

*Counsel for AILA and Justice at Work*

-i-

# **TABLE OF CONTENTS**

Page

INTEREST OF AMICUS CURIAE ................................................................................................ 1

SUMMARY OF ARGUMENT ...................................................................................................... 1

ARGUMENT .................................................................................................................................. 2

    I.    This Prosecution Creates a Chilling Effect on Noncitizens'
        Willingness to Come to Court to Exercise Their Right to Access Justice .......................... 2

        A.    Recent Developments in ICE Enforcement in Courthouses .......................................... 4

        B.    The Impact of the Recent Escalation of ICE Enforcement in Courthouses.................... 6

CONCLUSION............................................................................................................................. 12

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Diamond v. Earle*,
   217 Mass. 499, 105 N.E. 363 (1914) ............................................................................... 3

*Lunn v. Commonwealth*,
   477 Mass. 517, 78 N.E.3d 1143 (2017) ........................................................................... 2

*Meekins v. Smith*,
   126 Eng. Rep. 363 (1791) ............................................................................................... 3

*Ryan v. U.S. Immigration & Customs Enforcement*,
   382 F. Supp. 3d 142 (D. Mass. 2019) .......................................................................... 1, 3

*Stewart v. Ramsay*,
   242 U.S. 128 (1962) ........................................................................................................ 1

*The King v. Holy Trinity in Wareham*,
   99 Eng. Rep. 531 (1782) ................................................................................................. 3

**Statutes**

Violence Against Women Act of 2005 ................................................................................... 8

**Other Authorities**

Immigration Defense Project, *Safeguarding the Integrity of Our Courts: The
   Impact of ICE Courthouse Operations in New York State* .................................... passim

Memorandum from Chief Justice Paula M. Carey, *Policy and Procedures
   Regarding Interactions with the Department of Homeland Security* (Nov. 10,
   2017) ............................................................................................................................... 3

*Obstructing Justice – The Chilling Effect of ICE's Arrests of Immigrants at
   Pennsylvania Courthouses*, Temple University Beasley School of Law,
   Center for Social Justice (Jan. 2019), 6,
   https://www.ncsc.org/~/media/Files/PDF/Topics/ICE/ Obstructing-
   Justice013019.ashx (last visited Oct. 8, 2019) ........................................................... 5, 6

*Promoting Access to Justice for Immigrant and Limited English Proficient Crime Victims in an Age of Increased Immigration Enforcement: Initial Report from a 2017 National Survey*, National Immigration Women's Advocacy Project, American University Washington College of Law (May 3, 2018), http://library.niwap.org/wp-content/uploads/Immigrant-Access-to-Justice-National-Report.pdf (last visited Oct. 8, 2019).................................................................6, 7, 8

*The Courthouse Trap: How ICE Operations Impacted New York's Courts in 2018*, Immigrant Def. Project, 6 (Jan. 2019), http://www.immigrantdefenseproject.org/ wp-content/uploads/TheCourthouseTrap.pdf (last visited Oct. 8, 2019)....................................4, 5

U.S. Immigration and Customs Enforcement, Directive No. 11072.1, Civil Immigration Enforcement Actions Inside Courthouses (Jan. 10, 2018), https://www.ice.gov/sites/default/files/documents/Document/2018/ciEnforcementActionsCourthouses.pdf (last visited Oct. 8, 2019) ..........................................................4, 5

## INTEREST OF AMICUS CURIAE

*Amicus* American Immigration Lawyers Association is a national association of immigration lawyers established to promote justice, advocate for quality immigration and nationality law and practice, and enhance the professional development of its members.

*Amicus* Justice at Work is a Boston-based legal organization centered on supporting immigrant worker centers and workplace-related legal support.  Justice at Work provides legal services to workers, including noncitizen workers facing wage theft, injury on the job, sexual harassment, discrimination, retaliation, and more.

The Indictment in this action raises important questions that concern each of the *amici*'s interests in noncitizens' continued access to justice, a right protected by both the United States and Massachusetts Constitutions.

## SUMMARY OF ARGUMENT

The common law privilege against civil arrest at a courthouse has been recognized in the United States for more than a century.  *See*, *e.g.*, *Stewart v. Ramsay*, 242 U.S. 128 (1962) (reviewing history); *Ryan v. U.S. Immigration & Customs Enforcement*, 382 F. Supp. 3d 142 (D. Mass. 2019) (reviewing history; preliminarily enjoining U.S. Immigration and Customs Enforcement ("ICE") from civilly arresting those not in state custody who are appearing in court on official business).  This privilege is fundamental to the exercise of all other legal rights, because it is in courthouses that those rights may be vindicated through fair process.  All participants in that process must have access to it, or its integrity and reliability quickly erodes.  Where courthouses are fertile ground for civil arrests, participants in court proceedings stay away, and communities suffer.  Judges and court officers are at the front lines of ensuring access to justice.

This brief summarizes empirical reports, firsthand accounts, and data compilations that show that courthouse arrests erode participation in court proceedings by all types of participants.

As set forth in greater detail below, as a result of increased ICE enforcement in courthouses, noncitizens across the country have been discouraged from exercising their Constitutional right to avail themselves of the remedies provided by the judicial system. Moreover, these individuals are not the only victims of this conduct—prosecutors, law enforcement officials, and victim advocates have reported that the pervasive fear among immigrant populations fueled by increased ICE enforcement in courthouses has diminished their ability to effectuate justice and keep our communities safe. Finally, the practice of courthouse arrests puts state court judges, like Judge Joseph, in the unenviable position of trying to follow federal law while also fulfilling their duty, as state-law judges, to ensure that everyone in the Commonwealth—regardless of immigration status—can exercise his or her constitutional right to access the courts. As set forth in the motion to dismiss advanced by Judge Joseph, judicial immunity exists to ensure that judges can balance these responsibilities free of the fear of federal prosecution. *Amici* respectfully submit that this brief provides important context for the court's consideration of the motions to dismiss advanced by Judge Joseph and Wesley MacGregor, and of the briefs of the other *amici* in this matter.

## ARGUMENT

### I. This Prosecution Creates a Chilling Effect on Noncitizens' Willingness to Come to Court to Exercise Their Right to Access Justice

Both state and federal courts in Massachusetts have recognized that access to justice is critical to noncitizens, and that ensuring noncitizen access to justice is critical to the civil and criminal justice system as a whole.

In 2017, the Massachusetts Supreme Judicial Court held that state judicial officers do not have authority to arrest an individual based on an order from ICE. *Lunn v. Commonwealth*, 477 Mass. 517, 78 N.E.3d 1143 (2017). Following *Lunn*, and in accordance with its long-standing principles, the Massachusetts state courts adopted a policy generally declining to assist the federal

government in enforcing federal immigration law. *See* Memorandum from Chief Justice Paula M. Carey, *Policy and Procedures Regarding Interactions with the Department of Homeland Security* (Nov. 10, 2017), attached hereto as Exhibit A.

On the federal level, in *Ryan v. U.S. Immigration & Customs Enforcement*, the District Court for the District of Massachusetts granted a preliminary injunction prohibiting ICE officials from conducting civil immigration arrests inside state courthouses in Massachusetts. 382 F. Supp. 3d 142, 160 (D. Mass. 2019) (appeal filed). The court explained that, since colonial times, common-law courts have recognized that permitting arrests at courthouses of those attending court on other matters could chill attendance at those other proceedings. *See The King v. Holy Trinity in Wareham*, 99 Eng. Rep. 531 (1782) (noting that "for the purposes of justice" those attending court proceedings were privileged from being arrested on civil process); *Meekins v. Smith*, 126 Eng. Rep. 363 (1791) (same). Finally, the *Ryan* court recognized that, "justice requires the attendance of witnesses cognizant of material facts, and hence that no unreasonable obstacles ought to be thrown in the way of their freely coming into court to give oral testimony." *Diamond v. Earle*, 217 Mass. 499, 501, 105 N.E. 363 (1914). Given the weight of this precedent, the court held that ICE should be enjoined from civilly arresting parties, witnesses, and others attending Massachusetts courthouses. *Ryan*, 82 F. Supp. 3d at 160.

In the present case, the prosecution of Judge Joseph sends a deliberate message to citizens and noncitizens alike that they come to court at their peril, and that even state judges may feel pressure—or, indeed, may feel obligated by threat of federal criminal prosecution—to facilitate noncitizens' arrest by federal officials. Allowing ICE agents to co-opt public spaces and state officers, and particularly state courthouses and judges, to exercise executive administrative warrants would have a ripple effect beyond this prosecution. Protecting access to justice is critical

not only to the integrity of our Constitution and justice system, and well-being of our country's immigrant populations, but also for the safety of our communities.

### A. Recent Developments in ICE Enforcement in Courthouses

For noncitizens, the state courthouse has recently transformed from a place where justice may be sought to a site of intimidation, particularly for people seeking to defend themselves against criminal charges and to enforce their civil, labor, and housing rights, or to protect themselves or their children from domestic abuse. The fear and intimidation reported by those directly participating in court proceedings extends to noncitizen courthouse personnel employed to secure the building, answer phones, file papers, and engage in the various other occupations that take place within courthouse walls, and that are critical to the continued, efficient operation of our judicial system.

Enforcement efforts in courthouses have increased dramatically over the past few years. Compared to 2016, there was a 1700% increase in ICE arrests and sightings in 2018 in New York State courthouses alone. *See The Courthouse Trap: How ICE Operations Impacted New York's Courts in 2018*, Immigrant Def. Project, 6 (Jan. 2019), http://www.immigrantdefenseproject.org/wp-content/uploads/TheCourthouseTrap.pdf (last visited Oct. 8, 2019) (hereinafter, the "Immigration Def. Project") (attached hereto as Exhibit B). Several state chief justices and the American Bar Association have attempted to add courthouses to the list of "sensitive locations"—which currently includes schools, hospitals, places of worship, and places of public demonstration—that are generally off-limits to ICE. However, ICE has reiterated its intent to make arrests within courthouses, with certain self-imposed limitations that they subsequently have ignored. *See* U.S. Immigration and Customs Enforcement, Directive No. 11072.1, Civil Immigration Enforcement Actions Inside Courthouses, (Jan. 10, 2018),

https://www.ice.gov/sites/default/files/documents/Document/2018/ciEnforcementActionsCourthouses.pdf (last visited Oct. 8, 2019) (emphasis added) (attached hereto as Exhibit C).

Not only have ICE arrests dramatically increased, they have been executed without regard to ICE's own guidelines: arrests have taken place in public areas of courthouses, near public entrances and exits, and, in at least one case, in a manner so alarming that a bystander called to report a kidnapping. *See* Immigrant Def. Project at 3. Findings from the Immigration Defense Project show that "ICE set no limits on who they targeted in New York's courts—arresting immigrants who appeared in a diversion court for victims of human trafficking and going after survivors of domestic violence." *Id.* at 4. The report also finds that ICE agents frequently employed violence during arrests, and in the vast majority of operations, refused to identify themselves, explain why an individual was being arrested, or offer proof that the individual being arrested was in fact deportable. *Id* at 3-4. Equally unsettling is the sweeping nature of ICE arrests in courthouses, directed at noncitizens regardless of their reason for being in court that day. For example, an immigrant in Pennsylvania was arrested when he went to court to make child support payments; a man in Queens who accompanied his brother to criminal court was arrested by ICE when he showed a Mexican ID; and a survivor of domestic abuse with no prior criminal history was arrested after her hearing. *See Obstructing Justice – The Chilling Effect of ICE's Arrests of Immigrants at Pennsylvania Courthouses*, Temple University Beasley School of Law, Center for Social Justice (Jan. 2019), 6, https://www.ncsc.org/~/media/Files/PDF/Topics/ICE/ Obstructing-Justice013019.ashx (last visited Oct. 8, 2019) (hereinafter, "Obstructing Justice") (attached hereto as Exhibit D); Immigration Def. Project at 11. In light of these trends, immigrant populations are being deterred from exercising their right to access justice.

B.     **The Impact of the Recent Escalation of ICE Enforcement in Courthouses**

In 2018, an immigrant worker in Philadelphia was killed in a workplace accident. Obstructing Justice at 1. Despite a strong case for wrongful death benefits, his wife decided not to pursue any claims against the employer because she feared that ICE would appear in court. *Id.* Another immigrant did not attend his own mother's murder trial out of fear that ICE would be present. *Id.* at 10. These tragic stories demonstrate the paralyzing fear felt by noncitizens faced with the choice of either seeking justice in courthouses or risking a possible ICE encounter. A recent study reports that this fear and insecurity is pervasive among immigrant populations. Seventy-seven percent of respondents who worked on court-related matters with immigrants either noted that clients "expressed fear of going to court or chose not to pursue a case because they may be arrested or detained by ICE." *Id.* at 2. These stories of ICE enforcement in courthouses often receive public attention and are spread throughout immigrant communities, serving as a warning and deterrent that justice comes with a cost that many noncitizens and their families cannot bear.

In 2018, the National Immigration Women's Advocacy Project in collaboration with the American Civil Liberties Union compared 2017 data with 2016 data and evaluated responses from a total of 779 individuals across a wide variety of professions and geographies. *See Promoting Access to Justice for Immigrant and Limited English Proficient Crime Victims in an Age of Increased Immigration Enforcement: Initial Report from a 2017 National Survey*, National Immigration Women's Advocacy Project, American University Washington College of Law (May 3, 2018), http://library.niwap.org/wp-content/uploads/Immigrant-Access-to-Justice-National-Report.pdf (last visited Oct. 8, 2019) (hereinafter, "NIWAP Report") (attached hereto as Exhibit E). Findings from these studies and others underscore the danger courthouse arrests pose to all stakeholders of our justice system—not only the individuals who forgo access to justice out

of fear of ICE, not only those who rely on access to the courthouse for their livelihoods, but also for the safety of our communities and the efficacy of our judicial system as a whole.

Fifty-four percent of participating judges (compared to forty-five percent in 2016) reported interruptions in their cases due to an immigrant victim's fear of coming to court. *Id.* at 15. Judges were also asked to report the number of cases where officials from the Department of Homeland Security ("DHS") were involved in immigration enforcement activities within the courthouse. Forty-seven cases were reported, which represented a forty-seven percent increase from 2016 to 2017. *Id.* at 18. This included a twenty-five percent increase in incidents in non-criminal cases, and a sixty-four percent increase in courthouse enforcement in criminal cases. *Id.*

When asked about their level of concern about the impact of immigration enforcement on immigrant and limited English proficiency ("LEP") litigants, judges overwhelmingly responded that they were either "concerned" or "very concerned." *Id.* For example, ninety-four percent of judges said that they were either concerned or very concerned about the impact on human trafficking cases, ninety-three percent reported concern for sexual assault cases, and ninety-one percent reported concern for domestic violence cases. *Id.* These numbers demonstrate the real-life impact of the "chilling effect" that ICE enforcement in courthouses can have on those most vulnerable in our society.

The NIWAP Report also received responses from 50 prosecutors across 19 states. *Id.* at 56. Findings from this portion of the study indicate an increase in the exploitation of immigration status as a strategy in prosecution as well as an overall decline in the willingness of foreign or LEP victims to work with prosecutors—surely resulting in decreased witness participation and a decrease in the willingness of litigants to appear in court out of fear that their immigration status will be used against them. More prosecutors indicated that the willingness of victims to assist in

prosecutions in all cases other than sexual assault cases has *declined rather than increased* in the past three years as opposed to prior years. *Id.* at 71. The study shows a more dramatic change in this finding within the past year alone: forty-three percent of prosecutors reported a decrease in willingness by noncitizens to assist with sexual assault and domestic violence prosecutions, thirty-nine percent reported a similar finding for child abuse prosecutions, and thirty-four percent for general violent crimes. *Id.* at 72. These findings show that immigrant populations are perceiving their cooperation with prosecutors to come at the risk of deportation, and prosecutors cannot effectively prosecute their cases.

    The NIWAP Report surveyed a total of 389 advocates and attorneys from fifty states and the District of Columbia who work with immigrant survivors of domestic violence, sexual assault, child abuse, human trafficking, and other violent crimes. *Id.* at 79. The study also sought to identify the number of ICE enforcement actions against victims, and reported on the locations where they took place. Of the 206 immigration enforcement actions against victims identified in the survey, fifty-one of them occurred in connection with their appearance at courthouses. *Id.* at 93. This is especially alarming given that the Violence Against Women Act of 2005 places courthouses on the list of protected locations where enforcement against immigrant crime victims is generally prohibited. *Id.* The study reports that courthouse enforcement was occurring when immigrant crime victims went to court in connection with protection order cases, child custody cases, domestic violence cases, and other cases seeking remedies for abuse or crime victimization. *Id.* at 94-95. Thirty-three of fifty-one enforcement actions took place inside the courtroom, and nine others took place in public areas inside the courthouse. *Id.* at 96.

    In an April 2019 report by the Immigration Defense Project, the ICE Out of Courts Coalition (the "Coalition") gathered data for over two years related to ICE enforcement in New

York state courthouses. *See* Immigration Defense Project, *Safeguarding the Integrity of Our Courts: The Impact of ICE Courthouse Operations in New York State* (attached hereto as Exhibit F). The Coalition found themselves "alarmed and appalled by [ICE's] increasing dependence on [New York] State's court system as its preferred venue for surveilling and detaining immigrant New Yorkers." *Id.* at 1. The Coalition reported devastating effects of ICE enforcement on various stakeholders including District Attorney Offices, Victims and Witnesses, Victims of Gender-Based Violence, Public Defenders, and more.

New York District Attorneys fear that ICE courthouse operations are a serious public safety issue because they discourage noncitizen crime victims from reporting crime, testifying against perpetrators of crime, and participating in community outreach efforts. *Id.* at 7. District Attorneys from Bronx, Manhattan, Brooklyn, Albany, and Nassau Counties have spoken out about the chilling effect that ICE enforcement has on victim cooperation and prosecutorial efficacy. As Madeline Singas, the Nassau District Attorney states, "New York's justice system works best when everyone has access…." *Id.* at 9.

The Coalition issued a questionnaire on crime reporting, victim and witness participation in prosecutions, frequency of writ filing, and the effect of ICE enforcement on office management. *Id.* at 10. The findings show a heightened fear among noncitizens of testifying in criminal court, cooperating with prosecutors, and participating in any aspect of the judicial system due to confusion about the authority and whereabouts of ICE. For example, the Trial Division of the Manhattan District Attorney's Office reported a heightened fear among noncitizens of testifying in criminal court since 2017. *Id.* at 11. The Bronx domestic violence department similarly reported that a previously cooperative complaining witness became reluctant to testify following news reports about ICE enforcement in courthouses. *Id.* at 11-12. The Brooklyn District Attorney, Eric

Gonzalez, stated that "[w]e now work in an atmosphere of fear and intimidation that discourages victims and witnesses, both documented and undocumented, from coming forward to report crimes." *Id.* at 12.  Gonzalez recalled several cases where victims and witnesses expressed fear of coming to criminal court because of the presence of ICE.  This chilling effect hinders not only the rights of noncitizens to access justice, but also public safety.  The Brooklyn District Attorney's Office reports several specific instances in which their ability to effectively prosecute harm was hindered by a witness's fear of coming to court: a victim robbed at gunpoint refused to testify out of fear that ICE would arrest him at the courthouse; a man robbed at knifepoint similarly refused to testify and without his testimony, the ADA was forced to reduce the charges; an eyewitness would not testify out of fear of ICE and as a result the DA was forced to dismiss charges against a violent offender; and the Special Victims Bureau struggled to prosecute a sexual abuse case where the witness, an undocumented mother of the victim, feared cooperation due to ICE presence in courthouses.  *Id.* at 12-13.

The Coalition reported a particularly debilitating effect of ICE enforcement in courthouses on victims of gender-based violence, manifested by a decreased willingness among noncitizen and foreign-born individuals to report crime.  This effect is measured by a decrease in protection orders issued against intimate partners, a drop in survivors seeking assistance at Family Justice Centers, fewer survivors seeking civil legal assistance, reduced communication with law enforcement, reluctance to pursue affirmative petitions in Family and Supreme Courts, increased fear of compliance with court orders, and a rise in ICE-related threats from abusive partners.  *Id.* at 22.  As a result, victims of domestic violence are at an increased risk of abuse with a diminishing hope of meaningful recourse.

-10-

Between 2017 and 2018, the Sanctuary for Families closed 1,350 fewer cases and assisted 226 fewer clients seeking orders of protection than in the prior year. *Id.* at 24. The organization reports that ICE courthouse operations were to blame, based on conversations with current and prospective clients. *Id.* Andrea Panjwani, a former Immigration Practice Managing Attorney, described the case of a woman who was raped and attacked by her children's father, suffering neurological damage and permanent vision loss as a result. *Id.* at 24-25. When asked why she did not report the assault, she told her attorney that she was afraid of being picked up by ICE. *Id.* Among the legal services providers and advocates who responded to the survey, sixty-seven percent stated that they have had clients who decided not to seek help from the courts, forty-eight percent worked with immigrants who failed to seek custody or visitation, and thirty-seven percent worked with someone who failed to pursue an order of protection, all due to fear of ICE. *Id.* at 27-28.

Public Defenders in New York also report that they are unable to zealously represent their clients and otherwise effectively participate in the administration of justice. They cite directly to clients' rising fears of attending court and an increased issuance of bench warrants, disappearing litigants, resource drain, and an escalating use of force and surveillance by ICE. *Id.* at 38. For example, Kathy Rodriguez, a former Arraignment Clerk and Administrative Assistant for NYCDS stated, "Clients are now calling our office to ask about the consequences of making their court dates (as opposed to missing their court dates) because they are afraid ICE is outside waiting for them. They are terrified, hysterical, and untrusting of any government employee because they feel like we were all out to get them...." *Id.* at 39. This climate of fear among noncitizen and foreign-born populations shows that ICE's presence in courthouses not only reduces noncitizens' *physical*

access to justice, but hinders their right to a zealous defense as public defenders report having to balance the best criminal defense for their clients with the risk of ICE detention.

---

The data, reports, and firsthand accounts cited here confirm what history, common sense, and established law already have taught us: when ICE officials conduct civil enforcement activities in and around state courthouses, ICE hinders access to justice for noncitizens, reduces the efficacy of our prosecutors and public defenders, and jeopardizes the public's safety. Noncitizens as well as citizens require access to the courthouse to seek protection, and defend themselves and their rights. The numbers suggest that until recently, they felt safe doing so. The courthouse should continue to be an inviting place for all individuals rather than an opportunity for ICE to target the most vulnerable: those who have come to seek justice. The findings from these studies consistently evidence the "chilling effect" that ICE enforcement in courthouses has on noncitizens' constitutionally protected right to access justice. This chilling effect not only negatively impacts these vulnerable communities, but also each and every person who relies on the functioning of these institutions.

## **CONCLUSION**

For the reasons set forth above, *Amici* respectfully submit that Defendants' motions to dismiss should be granted.

Respectfully submitted,

/s Kirsten V. Mayer
Kirsten V. Mayer
BBO # 563017
kirsten.mayer@ropesgray.com
Joshua S. Levy
BBO # 641567
joshua.levy@ropesgray.com
Hannah S. Glass
BBO # 698355
hannah.glass@ropesgray.com
**ROPES & GRAY LLP**
Prudential Tower, 800 Boylston Street
Boston, MA 02199-3600

/s Philip L. Torrey
Sabrineh Ardalan
sardalan@law.harvard.edu
Philip L. Torrey
BBO # 673506
ptorrey@law.harvard.edu
**HARVARD IMMIGRATION AND REFUGEE CLINICAL PROGRAM**
6 Everett Street, Suite 3105
Cambridge, Massachusetts  02138

*Counsel for AILA and Justice at Work*

*Of counsel:*

Evan Gourvitz
evan.gourvitz@ropesgray.com
Elizabeth Bierut
elizabeth.bierut@ropesgray.com
**ROPES & GRAY LLP**
1201 Avenue of the Americas
New York, NY 10036-8704

Dated:  October 15, 2019

-14-

**CERTIFICATE OF SERVICE**

    I, Kirsten V. Mayer, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on October 15, 2019.

/s Kirsten V. Mayer

Kirsten V. Mayer