**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

---

UNITED STATES OF AMERICA,

v.

SHELLEY M. RICHMOND JOSEPH,

Defendant.

---

Crim. No. 19-10141-LTS

*Leave To File Granted*
*October 21, 2019*

**REPLY IN SUPPORT OF**
**DEFENDANT SHELLEY M. RICHMOND JOSEPH'S MOTION TO DISMISS THE**
**INDICTMENT UNDER FEDERAL RULE OF CRIMINAL PROCEDURE 12(B)**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................................... ii

INTRODUCTION ................................................................................................................... 1

ARGUMENT ........................................................................................................................... 2

I.  JUDICIAL IMMUNITY BARS THIS PROSECUTION .................................................... 2

II.  THE INDICTMENT DOES NOT STATE AN OFFENSE ................................................ 6

    A.  The Indictment Does Not Allege A "Proceeding," Much Less One That Was "Pending" ...................................................................................................... 7

    B.  The Indictment Does Not Allege Corrupt Intent ................................................. 11

    C.  Section 1512(c)(2) Does Not Apply .................................................................... 15

III.  THE CONSTITUTION REQUIRES THE DISMISSAL OF THE INDICTMENT ........ 17

    A.  The Indictment Rests On An Interpretation Of The Obstruction Statutes That Offends Federalism Principles And Violates The Tenth Amendment ................. 17

    B.  As Applied Here, The Statutes Are Unconstitutionally Vague And Trigger The Rule Of Lenity ..................................................................................................... 19

CONCLUSION ...................................................................................................................... 20

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

Page(s)

## CASES

*Arizona v. United States,*
    567 U.S. 387 (2012)..........................................................................................17

*Arthur Andersen LLP v. United States,*
    544 U.S. 696 (2005)..............................................................................11, 12, 13

*Begay v. United States,*
    553 U.S. 137 (2008)..........................................................................................16

*Bond v. United States,*
    572 U.S. 844 (2014)..........................................................................................17

*Commonwealth v. Cauffiel,*
    79 Pa. Super. 596 (1922)....................................................................................4

*Commonwealth v. Tartar,*
    239 S.W.2d 265 (Ky. App. 1951) ......................................................................4

*CSX Transp., Inc. v. Ala. Dep't of Revenue,*
    562 U.S. 277 (2011)..........................................................................................16

*First Justice of Bristol Div. of Juvenile Court Dep't v. Clerk-Magistrate of Bristol*
    *Div. of Juvenile Court Dep't,*
    438 Mass. 387 (2003) .........................................................................................3

*Gregory v. Ashcroft,*
    501 U.S. 452 (1991)....................................................................................17, 18

*In re Kendall,*
    712 F.3d 814 (3d Cir. 2013)...........................................................................4, 5

*In re McNair,*
    187 A. 498 (Pa. 1936) ........................................................................................4

*In re Petition of Dwyer,*
    406 A.2d 1355 (Pa. 1979)...................................................................................4

*Kolender v. Lawson,*
    461 U.S. 352 (1983)..........................................................................................19

*Lattab v. Ashcroft,*
    384 F.3d 8 (1st Cir. 2004).................................................................................10

*Lunn v. Commonwealth*,
    477 Mass. 517 (2017) ...................................................................19

*Marinello v. United States*,
    138 S. Ct. 1101 (2018) ................................................................13

*McDonnell v. United States*,
    136 S. Ct. 2355 (2016) ................................................................14

*Mireles v. Waco*,
    502 U.S. 9 (1991) (per curiam) ..............................................2, 3, 5

*New York v. United States*,
    505 U.S. 144 (1992) ...............................................................18, 19

*Roma Constr. Co. v. aRusso*,
    96 F.3d 566 (1st Cir. 1996) ........................................................14

*Ryan v. U.S. Immigration & Customs Enforcement*,
    382 F. Supp. 3d 142 (D. Mass. 2019) ...........................................6

*Stump v. Sparkman*,
    435 U.S. 349 (1978) ....................................................................3

*United States v. Aguilar*,
    515 U.S. 593 (1995) ..........................................................11, 12, 13

*United States v. Batten*,
    226 F. Supp. 492 (D.D.C. 1964) ...................................................7

*United States v. Baumgartner*,
    581 F. App'x 522 (6th Cir. 2014) .................................................5

*United States v. Binette*,
    828 F. Supp. 2d 402 (D. Mass. 2011) ...........................................7

*United States v. Brenson*,
    104 F.3d 1267 (11th Cir. 1997) ..................................................16

*United States v. Chaplin*,
    54 F. Supp. 926 (S.D. Cal. 1944) ...............................................20

*United States v. Claiborne*,
    727 F.2d 842 (9th Cir. 1984) ........................................................4

*United States v. Davis*,
    717 F.3d 28 (1st Cir. 2013) ......................................................6-7

*United States v. Davis*,
139 S. Ct. 2319 (2019) ............................................................................... 19, 20

*United States v. Ermoian*,
752 F.3d 1165 (9th Cir. 2013) ............................................................................ 7

*United States v. Floyd*,
740 F.3d 22 (1st Cir. 2014) .............................................................................. 14

*United States v. Grubb*,
11 F.3d 426 (4th Cir. 1993) ............................................................................... 5

*United States v. Hastings*,
681 F.2d 706 (11th Cir. 1982) ........................................................................... 5

*United States v. Kantengwa*,
781 F.3d 545 (1st Cir. 2015) .............................................................................. 9

*United States v. Kelley*,
36 F.3d 1118 (D.C. Cir. 1994) ........................................................................... 7

*United States v. Nixon*,
816 F.2d 1022 (5th Cir. 1987) ........................................................................... 5

*United States v. Ramos*,
537 F.3d 439 (5th Cir. 2008) ............................................................... 7, 8, 9, 10

*United States v. Tzeuton*,
370 F. App'x 415 (4th Cir. 2010) ...................................................................... 9

*United States v. Young*,
916 F.3d 368 (4th Cir. 2019) ........................................................................... 13

*Yates v. United States*,
135 S. Ct. 1074 (2015) ..................................................................................... 16

*Zenon v. Guzman*,
924 F.3d 611 (1st Cir. 2019) .............................................................................. 5

## STATUTES

8 U.S.C.
§ 1231 ................................................................................................................. 8

18 U.S.C.
§ 1503 ............................................................................................................... 16
§ 1505 ............................................................................................. 6, 7, 9, 11, 20
§ 1512 ......................................................................................................... *passim*

Sarbanes-Oxley Act of 2002, Pub. L. No. 107-204, 116 Stat. 745 ................................................16

## RULES AND REGULATIONS

8 C.F.R. § 1208.31 ........................................................................................................................10

8 C.F.R. § 1241.8 ....................................................................................................................8, 10

Fed. R. Crim. P. 12(b)..................................................................................................................20

## INTRODUCTION

The government's opposition brief makes clear the staggering breadth of its view of the federal obstruction-of-justice statutes. According to the government, a person can violate these laws by taking any action at any time that arguably makes it more difficult for the government to remove people that it asserts are unlawfully in the United States. Such a broad reading of the statutes would pose serious constitutional concerns even in an ordinary case, in light of basic principles of fairness and due process. But this is hardly an ordinary case: This is a case against a duly appointed state judicial officer that is premised in its entirety on acts that she allegedly took concerning the management of her courtroom, acts that were in accordance with state law and policy.

It cannot be said enough: This is the first federal prosecution arising out of a state judge's supposed failure to assist the federal government in the enforcement of federal immigration law. If the indictment is not dismissed, it will not be the last.

Judge Joseph has explained why the prosecution cannot stand: It violates established principles of judicial immunity, the plain language of the obstruction statutes, and foundational constitutional principles on which our system of dual sovereignty rests. The government tries to portray Judge Joseph's alleged conduct as aberrational, and the case as an ordinary one, but such claims could not be further from the truth. The courts have never had to confront a case like this one, in which the federal government has tried to prosecute a state judge merely for failing to help it enforce federal law within a state courthouse, with no allegation of personal gain—and where the government can point to no decision supporting its atextual and exceptionally broad reading of those statutes.

Unable to ground this unprecedented case in the doctrine, the government retreats—repeatedly—to the argument that Judge Joseph's actions in April 2018 violated a state policy that

governs the interaction between state judicial officers and federal immigration agents.  But such a contention misreads both the law and the policy.  The actions Judge Joseph is alleged to have taken—allegations that, again, she categorically denies—would not have violated state policy.  And even if they had, the federal government cannot justify a *federal* criminal prosecution by reference to its own untenably broad construction of *state* judicial policy.  Judges are not above the law.  But it is surely not the role of the federal government to wield the cudgel of federal criminal law to enforce its view of state policies—especially given the constitutional issues inherent in such an encroachment.

The Court should dismiss the indictment.

## ARGUMENT

## I.      JUDICIAL IMMUNITY BARS THIS PROSECUTION

The government's essential theory is that Judge Joseph violated federal obstruction of justice statutes by permitting a defendant to exit her courtroom by one door rather than another. *See* U.S. Opp. to Def. Joseph's Mot. to Dismiss 2-7 (ECF No. 98) ("Opp.").  As Judge Joseph explained in her motion to dismiss, the actions alleged in the indictment—even if true—fall comfortably within the scope of her authority as a judicial officer of the Commonwealth of Massachusetts, and so judicial immunity bars this prosecution.  *See* Mem. of Law In Supp. of Def. Joseph's Mot. to Dismiss 10-12 (ECF No. 60) ("Joseph Br.").  The government responds by arguing both that the acts alleged are not judicial in character and that judicial immunity does not apply in a criminal case.  Neither response is persuasive.

*First*, the government briefly contends (at 8-9) that "the crime Judge Joseph allegedly committed … was not a judicial act," because "[a] judge does not engage in a judicial act when she participates in a scheme to obstruct a federal proceeding."  But this tautological reasoning is precisely what the Supreme Court rejected in *Mireles v. Waco*, 502 U.S. 9 (1991) (per curiam): It

2

conflates the "the 'nature' and 'function' of the act" in question—that is, the *kind* of action that

the judge allegedly took—with the "particular act in question."  *Id.* at 12-13.  In *Mireles*, the

plaintiff argued that the conduct in question—the judge's alleged instruction to bring an attorney

to a courtroom in an unusually rough manner—was not a judicial act because "a judge's

direction to police officers to carry out a judicial order with excessive force [wa]s not a 'function

normally performed by a judge.'"  *Id.* at 12 (quoting *Stump v. Sparkman*, 435 U.S. 349, 362

(1978)).  But the *Mireles* court rejected this framing of the inquiry, explaining that the question

was whether the "general function" the judge was performing at the time was "normally

performed by a judge," noting that "if only the particular act in question were to be scrutinized,"

judicial immunity would never apply "because an improper or erroneous act cannot be said to be

normally performed by a judge."  *Id.* at 12-13.

So too here: The government argues that Judge Joseph's actions alleged in the indictment

cannot have been judicial in nature because they gave rise to criminal charges—another

tautology.  But that is not the relevant question.  The relevant question is whether the acts that

constitute the charged offense are judicial acts, and they unquestionably are: conducting an

arraignment and determining bail are part of the core judicial act of managing people and cases

during pretrial proceedings.  *See* Joseph Br. 10-11; *see First Justice of Bristol Div. of Juvenile

Court Dep't v. Clerk-Magistrate of Bristol Div. of Juvenile Court Dep't*, 438 Mass. 387, 397-398

(2003) ("judge's power 'to control' [her] own proceedings, the conduct of participants, the

actions of officers of the court and the environment of the court" are part of her "inherent judicial

authority").   It is the nature of the *act*, not the nature of the *charges*, that determines whether

judicial immunity applies.

*Second*, the government contends (at 9-16) that principles of judicial immunity do not

apply in a criminal prosecution.  As the government agrees, *see* Opp. 9, the Supreme Court has never considered whether judicial immunity applies in a criminal case.  And as the government also concedes, *see id.* at 9 n.6, other courts—federal and state—have concluded that immunity *does* apply in criminal cases.[1]  The government does not even meaningfully dispute that courts have rejected judges' efforts to invoke immunity only in criminal cases involving fraud, bribery, and the enforcement of civil-rights statutes.  *Cf.* Joseph Br. 12-13.  It cites a long string of cases for the proposition that "judges have been prosecuted for other types of crimes."  Opp. 11-12. But the government cannot hide behind this string cite, which does it little use.  In only *two* of the eighteen cases the government cites did the defendant actually invoke judicial immunity: the Third Circuit's decision in *In re Kendall*, 712 F.3d 814 (3d Cir. 2013), which the government agrees considered the question only in "dictum," Opp. 16, and *United States v. Claiborne*, 727 F.2d 842 (9th Cir. 1984), in which a federal judge solicited and received tens of thousands of dollars from third parties to influence pending cases—plainly the type of bribery case in which both parties agree judicial immunity does not apply.  *Id.* at 845.  If a defendant has not claimed judicial immunity, it would be surprising indeed for a court to have concluded that it applies.

    In any event, the bulk of the other cases cited by the government, in which judicial

---

[1] The government attempts to downplay this fact, arguing that *In re McNair*, 187 A. 498 (Pa. 1936), *Commonwealth v. Tartar*, 239 S.W.2d 265 (Ky. App. 1951), and *In re Petition of Dwyer*, 406 A.2d 1355 (Pa. 1979), are all distinguishable.  *See* Opp. 9 n.6 & 16.  But the government's proposed distinctions are unpersuasive.  *McNair*'s statement that state judges in Pennsylvania are immune from criminal charges was not "dictum," as the government suggests, *id.* at 9 n.6, but rather reflected the settled law of that state, *see McNair*, 187 A. at 502 (citing *Commonwealth v. Cauffiel*, 79 Pa. Super. 596 (1922)); *see also Cauffiel*, 79 Pa. at 600 ("It is well settled that a judicial officer … is not liable criminally for any error which he commits provided he acts in good faith…").  And neither the fact that the defendant in *Tartar* "was indicted for a judicial act," Opp. 9 n.6, nor the fact that the defendant in *Dwyer* was charged with gross negligence, Opp. 16, have any bearing on whether judicial immunity applies in a criminal case in the first place.

immunity was never raised, *do*—contrary to the government's assertion (at 11)—involve fraud, bribery, or the enforcement of civil-rights statutes. *See, e.g.*, *United States v. Grubb*, 11 F.3d 426, 431 (4th Cir. 1993) (facilitation of bribery conspiracy); *United States v. Nixon*, 816 F.2d 1022, 1024 (5th Cir. 1987) (attempt to improperly influence the criminal prosecution of patron's son); *United States v. Baumgartner*, 581 F. App'x 522, 537 (6th Cir. 2014) (judge accepted bribes, in the form of controlled substances, from defendant whom he sentenced).

In the end, it does not matter how many courts have applied principles of judicial immunity in a criminal context and how many have not—although the government, for its part, identifies only *one* court that has rejected such an argument on the merits, *see* Opp. 9-10 (citing *United States v. Hastings*, 681 F.2d 706 (11th Cir. 1982))—but whether those principles *should* apply in such a case. As Judge Joseph has explained, Mot. 12-15, the justification for the application of judicial immunity in a civil case—the need to safeguard judicial independence, *see Zenon v. Guzman*, 924 F.3d 611, 616 (1st Cir. 2019)—applies equally to a criminal prosecution. *See Kendall*, 712 F.3d at 835 (Roth, J., concurring) ("Exposing judges to criminal liability for judicial acts performed within their jurisdiction poses the same type of threat to judicial independence as does exposing them to civil suit for money damages.").[2] And that rationale has particular force here: As the Commonwealth explains, "[t]here is an especially compelling need for judicial immunity in this case, given the grave danger the prosecution poses to federalism and judicial independence." *Amicus Curiae* Br. of Commonwealth of Mass. 20 (ECF No. 71) ("Mass. Amicus Br."). The government's attempt to downplay the suggestion that judges in the

---

[2] Indeed, the same acts that gave rise to the damages claim in *Mireles* could easily have given rise to criminal charges—for instance, conspiracy to commit assault and battery. There is no reason why judicial immunity should have shielded Judge Mireles from the civil claim in that suit but not to a functionally identical criminal charge.

Commonwealth will increasingly find themselves at odds with the policy goals of the federal government in the area of immigration—an observation made by Judge Joseph and underscored not only by the Commonwealth's own amicus brief but by the briefs of the Ad Hoc Committee for Judicial Independence and a group of legal scholars—is as ostrich-like as it is inaccurate. *See, e.g.*, Letter from Ralph D. Gants, Chief Justice, Mass. Supreme Judicial Court, and Paula M. Carey, Chief Justice, Mass. Trial Court, to Marcos Charles, Acting Field Office Director, U.S. Immigration & Customs Enforcement at 1 (Oct. 23, 2019) (calling upon ICE to cease removal of criminal defendants facing charges in Commonwealth and noting "[r]emoval of state criminal defendants pending trial severely, and often irreparably, interferes with the state criminal process") (attached as Ex. A); *see Ryan v. U.S. Immigration & Customs Enf't*, 382 F. Supp. 3d 142, 148-150 (D. Mass. 2019). For all the reasons stated in Judge Joseph's opening brief, judicial immunity bars this prosecution.

## II.  THE INDICTMENT DOES NOT STATE AN OFFENSE

As explained in Judge Joseph's opening brief, the indictment fails to state an offense under 18 U.S.C. §§ 1505 and 1512(c)(2) for three separate reasons: (1) the indictment does not allege that Judge Joseph obstructed a "proceeding," much less one that was "pending"; (2) it does not allege that Judge Joseph acted "corruptly"; and (3) it does not state an offense under § 1512(c)(2) because that statue encompasses only crimes of evidence impairment. Mot. 15-23. The government argues that the indictment states an offense under both statutes, but its arguments not only fail to persuade—they reveal the staggering breadth of the government's view of the federal obstruction statutes and their application to state officials.[3]

---

[3] Because the indictment fails to state an offense under these statutes, it necessarily fails to state an offense under 18 U.S.C. §§ 1512(k) and 2. *See United States v. Davis*, 717 F.3d 28,

### A.    The Indictment Does Not Allege A "Proceeding," Much Less One That Was "Pending"

The government agrees that, in order to state an offense under the obstruction statutes, it

must establish that Judge Joseph's alleged acts obstructed a "proceeding"—a statutory term that,

at least in the context of a federal administrative agency (the only "proceeding" alleged here),

"implies 'some formal convocation of the agency in which parties are directed to appear, instead

of any informal investigation conducted by any member of the agency.'" Opp. 22 (quoting

*United States v. Ramos*, 537 F.3d 439, 462-463 (5th Cir. 2008)); *see United States v. Ermoian*,

752 F.3d 1165, 1170 (9th Cir. 2013).[4]   And the government also concedes that to convict Judge

Joseph of violating § 1505 it must show not only that the alleged acts obstructed a "proceeding,"

but that that proceeding was "pending" at the time of the alleged conduct.   Opp. 22.   It cannot

---

33 (1st Cir. 2013) (derivative offenses require proof that "the substantive offense was actually committed").   The government does not make any argument to the contrary.

[4] The government does not formally accept the *Ramos* test, observing that "the First Circuit has never addressed the issue." Opp. 22.   But by declining to offer any argument as to why the standard adopted by the Fifth and Ninth Circuits is wrong, the government implicitly concedes that it is correct.

The government *does* claim—briefly—that this standard is limited to § 1512(c)(2), and that "[p]roceedings that are less formal" may "still qualify [as 'proceedings'] under [§] 1505." Opp. 23.   But none of the decisions the government cites for this proposition announces such a rule.   Each of these cases merely affirms a conviction under § 1505 on facts that the government apparently views as too "informal" to satisfy § 1512(c)(2).   And the § 1505 caselaw is fully consistent with the standard set out in *Ramos*, *Ermoian*, and progeny.   Although cases applying § 1505 tend to emphasize the question whether an agency is exercising "adjudicative power," *United States v. Kelley*, 36 F.3d 1118, 1127 (D.C. Cir. 1994), the central question in each case is—as it is with § 1512—whether the investigation is sufficiently *formal* to qualify as a "proceeding" for the purposes of the statute.   *Compare, e.g.*, *United States v. Batten*, 226 F. Supp. 492, 493 (D.D.C. 1964) (concluding that a formal SEC investigation qualified as a "proceeding" under § 1505 because the agency issued subpoenas and administered oaths), *with United States v. Binette*, 828 F. Supp. 2d 402, 403-404 (D. Mass. 2011) (concluding that an informal SEC investigation did *not* qualify as a "proceeding" under § 1512 because the agency did not exercise such authority).

make either showing—at least not without stretching the meaning of these terms past the breaking point.

As Judge Joseph explained (Joseph Br. 18-21), the indictment wholly fails to establish the existence of a "proceeding" that the acts she is alleged to have taken could have obstructed. The indictment alleges that, on April 2, 2018, an Immigration & Customs Enforcement ("ICE") agent entered the Newton courthouse with a civil immigration detainer and arrest warrant for a noncitizen known here as A.S.—and that Judge Joseph, by allegedly agreeing to allow A.S. to exit the courtroom to the holding cell rather than out the front door, obstructed a "federal immigration removal proceeding" by allowing A.S. to evade arrest. Ind. ¶¶ 10, 26, 40, 42. But *no* aspect of the indictment—or the government's efforts to bolster it through attorney argument in its opposition—establishes the existence of a "proceeding" within the meaning of the statute. An ICE enforcement activity does not qualify as a "proceeding." And although the government invokes the term "removal proceeding," both the federal statutory scheme that authorizes such proceedings and the indictment itself make clear that no such proceeding was extant on April 2, 2018. Indeed, the indictment implies that no such proceeding was even *contemplated*: A.S., the indictment alleges, was subject to an expedited process known as "reinstatement of removal," under which a noncitizen who has previously been removed from the United States may be summarily removed again without appearing before an immigration judge. Ind. ¶ 8; 8 U.S.C. § 1231(a)(5); *see* Joseph Br. 18-19 & n.8; Mass. Amicus Br. 10-11. Reinstatement of removal is plainly not the kind of "proceeding" contemplated by *Ramos* and *Ermoian*: A noncitizen may be removed summarily by a single ICE agent on the basis of no more than the agent's signature on a piece of paper, with "no right to a hearing." 8 C.F.R. § 241.8(a). This is a far cry from the "formal convocation of [an] agency," *Ramos*, 537 F.3d at 462, required under settled law.

8

The indictment thus makes clear not only that no formal removal proceeding had begun, no such proceeding was likely to occur.  It is impossible for Judge Joseph to have obstructed a "proceeding" in such a circumstance.

The government attempts to evade this conclusion, but its efforts fall short.  First, the government cites a string of cases for the proposition that "[a]n immigration proceeding concerning an alien's removability qualifies as a 'proceeding' under both Sections 1512(c)(2) and 1505."  Opp. 23-24.  But once again, the government erects a truism that does not aid it.  All five cited cases affirmed convictions in cases in which the defendant lied or otherwise obstructed an *actual* "proceeding"—that is, a formal hearing before an immigration agency at which the noncitizen was "directed to appear."  *Ramos*, 537 F.3d at 462-463.  *E.g.*, *United States v. Kantengwa*, 781 F.3d 545, 552 (1st Cir. 2015) (noncitizen provided "false answers" at three separate removal hearings before immigration judge); *United States v. Tzeuton*, 370 F. App'x 415, 418 (4th Cir. 2010) (defendant told noncitizens to lie during "interviews with asylum officers and immigration court proceedings").  These cases simply hold that some immigration processes qualify as "proceedings" under the statute and that some conduct can obstruct them.  Nobody disagrees with that proposition—it simply has no bearing on whether there was any qualifying proceeding here, let alone whether the conduct alleged here could have obstructed it.

The government also attempts to argue that the reinstatement process described above *would* qualify as a "proceeding" under the statute.  Opp. 24-25.  It argues that to institute this process, an ICE agent must first take certain procedural steps—he or she must "obtain the person's alien file," "locate the prior order of removal," and "confirm that the person" in fact was removed from the United States and re-entered.  *Id.* at 24.  But the fact that ICE agents must comply with rudimentary administrative prerequisites before summarily removing a person from

the United States hardly turns such a process into a "formal convocation of the agency." *Ramos*, 537 F.3d at 462-463.  Indeed, the entire purpose of the expedited process is that it does *not* require the agency to invest the same resources in the removal of a noncitizen as would be required in the type of formal "proceeding" encompassed by the statute.  *See Lattab v. Ashcroft*, 384 F.3d 8, 20 (1st Cir. 2004) (reinstatement intended to "make the removal of illegal reentrants more expeditious").  And the fact that the regulations implementing this process permit a noncitizen to raise an asylum claim—in order to initiate a formal proceeding with procedural protections, *see* 8 C.F.R. §§ 1208.31, 1241.8—does not change any aspect of the operation of the summary removal process itself.

Finally, the government attempts to recast the term "immigration proceeding," giving it a meaning so broad as to be unrecognizable.  Judge Joseph obstructed an immigration proceeding, the government argues, that "began in 2003, the first time [A.S.] was encountered in the United States and deported"; that "was renewed/continued in 2007, when ICE discovered that he had reentered the country illegally and removed him again"; that "was renewed/continued again on March 30, 2018, when ICE discovered that A.S. had reentered the country illegally again"; and that "was pending" "[a]s of April 2, 2018," when the ICE agent entered the Newton courthouse.  Opp. 25-26.  In other words, the government argues—without citation or justification—that an "immigration proceeding" commences with respect to a noncitizen as of the moment he or she encounters an ICE agent for the first time and continues *forever*, such that any act that in any way impairs the government's ability to apprehend and deport such a person constitutes the obstruction of justice.  No aspect of the immigration laws or the federal criminal code can support such an extreme and all-encompassing view.

**B.      The Indictment Does Not Allege Corrupt Intent**

The government also agrees that the federal obstruction statutes require Judge Joseph to have acted "corruptly" in (allegedly) permitting A.S. to return to the holding cell area rather than exiting her courtroom through the front door.  Opp. 16.  But rather than articulating how the indictment alleges any "corrupt" activity within the meaning that term is given in the federal criminal statutes, the government contends that the "nexus" requirement set out in *United States v. Aguilar*, 515 U.S. 593 (1995), subsumes the statute's *mens rea* requirement ("corruptly") altogether.  Opp.  17-19.  This argument is incorrect.  The nexus requirement does not define what it means to act "corruptly," and the indictment does not sufficiently allege such a nexus in any event.

First, the government is wrong to suggest that courts rely on the "nexus" requirement from *Aguilar* to determine whether "a person acted corruptly in violation" of the obstruction-of-justice statutes.  Opp. 17.[5]  That much is clear from *Aguilar* itself; the question in *Aguilar* was whether a person who lied to an FBI investigator had obstructed a federal grand jury investigation in doing so.  515 U.S. at 596-597.  Before the Supreme Court, the defendant made several arguments as to why his conviction should not be sustained, including that the term "corruptly" was unconstitutionally vague.  *Id.* at 600 & n.1.  The Court found it "unnecessary to address" the meaning of the term "corruptly," instead adopting a "nexus" requirement pursuant to which a defendant's obstructive acts "must have the 'natural and probable effect' of

---

[5] The government points to a range of cases in which courts "ha[ve] extended the nexus requirement from *Aguilar* and *Arthur Andersen* to prosecutions under Section 1512(c)(2)" and Section 1505.  Opp. 18-19.  Judge Joseph does not dispute that the nexus requirement *applies* here, insofar as such a showing is necessary to obtain a conviction on the charged offenses.  She disputes only that such a showing is *sufficient* to show that the indictment alleges that she acted "corruptly."

interfering with" the proceeding, *id.* at 599-600.  Although the Court in *Aguilar* emphasized that

its construction of the statute reflected its longstanding "restraint in assessing the reach of a

federal criminal statute," *id.* at 600, it nowhere indicated that the nexus rule it adopted flowed

from—much less interpreted—the meaning of the statutory term "corruptly."  Indeed, Justice

Scalia—who dissented in relevant part, and who *did* reach the question whether the mens rea

requirement was unconstitutionally vague, *see id.* at 615 (Scalia, J., concurring in part and

dissenting in part)—went on to define that term, explaining that it had "a longstanding and well-

accepted meaning," under which a person acts corruptly if he or she acts "with an intent to give

some advantage inconsistent with official duty and the rights of others."  *Id.* at 616.  *Aguilar* thus

engrafted a "nexus" requirement onto the obstruction statutes, but that requirement simply adds

an *additional* layer of protection in obstruction cases, it does not *replace* the statutory *mens rea*

requirement—that the defendant act "corruptly."

The Supreme Court's subsequent treatment of *Aguilar* confirms that the "nexus" rule set

out there was not meant to replace the question whether the defendant in an obstruction case

acted "corruptly."  In *Arthur Andersen LLP v. United States*, 544 U.S. 696 (2005), for instance,

Supreme Court reversed a § 1512 conviction on the ground that the lower court had "failed to

convey properly the elements" of the statute's *mens rea* requirement.  *Id.* at 698.  The Supreme

Court identified two separate errors in the jury instructions at issue.  First, the Court explained,

the instructions "failed to convey the requisite consciousness of wrongdoing"—and specifically

the meaning of the word "corruptly."  *Id.* at 706-707; *cf. id.* at 705 ("'Corrupt' and 'corruptly'

are normally associated with wrongful, immoral, depraved, or evil.").  But the Court went on to

explain that the instructions "were infirm for another reason": "They led the jury to believe that it

did not have to find *any* nexus" between the obstructive acts and "any particular proceeding."

12

*Id.*at 707.  That is, the Court in *Arthur Andersen* treated the question whether the defendant had acted with a corrupt intent as *separate* from the question whether there was a nexus between the alleged obstructive acts and the proceeding—not as coterminous with each other.  The Court likewise treated these requirements as separate ones in *Marinello v. United States*, 138 S. Ct. 1101 (2018), where it applied the "nexus" requirement from *Aguilar* to a tax statute precisely *because* it did not view "the [government's] need to show the defendant's obstructive conduct was done 'corruptly'" as a sufficient constraint on the statute's breadth.  *Id.* at 1108-1109.[6]

In any event, even if the government *could* show a "corrupt" motive merely by alleging that there was a "nexus" between Judge Joseph's alleged acts and the proceedings those acts are alleged to have obstructed, the government has failed to do so here, for the simple reason that it has not shown that there was—or would have been—any "proceeding" to obstruct.  *See supra* pp. 7-10; *see also* Mass. Amicus Br. 12-13.  To satisfy the *Aguilar* nexus requirement, "[i]t is not enough for the Government to claim" that Judge Joseph knew that A.S. would be put into a proceeding "eventually."  *Marinello*, 138 S. Ct. at 1110.  "[T]he proceeding must at least be in the offing."  *Id.*; *see also United States v. Young*, 916 F.3d 368, 386-387 (4th Cir. 2019) (vacating conviction where defendant's conduct was not "connected to a specific official proceeding" and no such "specific" proceeding was reasonably foreseeable).  No aspect of the indictment reflects any nexus between the alleged acts and an *actual* proceeding, extant or anticipated.

---

[6] Indeed, the government in *Marinello* conceded the very point the government resists here: that the *mens rea* requirements imposed by the obstruction statutes are in addition to the nexus requirement described in *Aguilar*, not one and the same.  *See* Brief for the United States 17-21, *Marinello v. United States*, No. 16-1144 (U.S. Oct. 23, 2017) (arguing that the statutory "*mens rea* requirements" in the statute at issue in that case obviated the need for a strict construction of *Aguilar*'s nexus requirement).

Finally, as Judge Joseph has explained (Joseph Br. 16-18), the indictment fails to allege that she acted "corruptly" in the sense that she acted "with an intent to procure an unlawful benefit either for [herself] or for some other person." *United States v. Floyd*, 740 F.3d 22, 31 (1st Cir. 2014); *accord Roma Constr. Co. v. aRusso*, 96 F.3d 566, 574 (1st Cir. 1996).[7] Judge Joseph is not alleged to have accepted a bribe or to have sought to improperly influence the operation of the judicial system, and despite the liberties the government takes with its own indictment, *see, e.g.*, Opp. 20-21 (describing the "allegations" in the indictment without any citation at all), the government can point to no allegation that even implies "corruption" of this kind. The best the government can do is to criticize Judge Joseph—repeatedly, *see id.* at 2, 3 n.1, 6 & nn.3-4, 20, 21 n.12, 30, 31 n.15, 34—for what it characterizes as her violations of a Massachusetts court policy designed to permit ICE agents to apprehend and remove noncitizens in state courtrooms.

But even if a violation of such a policy were relevant to the question whether Judge Joseph acted "corruptly" (and it plainly is not), the Commonwealth has told this Court that the government "misapprehends" the policy, which was enacted "to *restrict* the involvement of trial court officials in ICE's courthouse enforcement activities," Mass. Amicus Br. 19 n.9 (emphasis added), not to require those officials to facilitate those activities. For the government to try to

---

[7] The government argues that, even if it is required to allege that Judge Joseph acted "corruptly" in this sense, it has done so here, because "Judge Joseph acted with" the intent of "benefiting another person: A.S." Opp. 20 n.11. The government also at times suggests that Judge Joseph actively suggested to the defense attorney a "ruse" under which A.S. and the defense attorney would concoct a reason to return to the holding cell and Judge Joseph would permit them to do so. Opp. 21, 30. But the government again stretches the text of the statute past its breaking point. The government cannot allege "corrupt intent" merely by stating that a public officer engaged in lawful official action that may have aided a person within his or her jurisdiction. Such a boundless reading of the law would "cast a pall of potential prosecution" over "nearly anything a public official does." *McDonnell v. United States*, 136 S. Ct. 2355, 2372 (2016); *see also Roma Constr. Co.*, 96 F.3d at 574 ("The *mens rea* implicated by 'corruptly' concerns the intention to obtain ill-gotten gain.").

appoint itself interpreter and enforcer of the Commonwealth's own policy defies common sense and our constitutional structure.[8]

### C.   Section 1512(c)(2) Does Not Apply

Finally, as Judge Joseph explained (Joseph Br. 21-23), Count Two, which charges Judge Joseph with violating 18 U.S.C. § 1512(c)(2), should be dismissed for a wholly independent reason:  That subsection, properly read, criminalizes only acts of evidence impairment.  Section 1512(c)(1)—the companion provision to § 1512(c)(2)—sets out a list of evidence-impairment acts, each of which constitutes obstruction of justice under § 1512(c).  *See id.* § 1512(c)(1) (making it a crime to "alter[], destroy[], mutilate[], or conceal[] a record, document, or other object, or attempt[] to do so").  Section 1512(c)(2) then makes it a crime—the *same* crime—to "otherwise obstruct[], influence[], or impede[] any official proceeding."  *Id.* § 1512(c)(2).  The Supreme Court has explained that, when a statute first "enumerat[es] … specific crimes" and then follows up the enumerated list with a more general term, the general term should be read "to embrace only objects similar in nature to those objects enumerated by the preceding specific

---

[8] In any event, Judge Joseph did not violate the policy.  The government contends that Judge Joseph violated the policy by (1) ordering the ICE agent to leave her courtroom (before she had even taken up A.S.'s case) and (2) "ordering that [he] … be prevented from entering the downstairs lockup to take custody of A.S."  Opp. 20.  But the second alleged violation fails on many levels.  For one, the indictment alleges no such "order[]"; it makes clear that the agent was simply not in the courtroom at the time A.S. was told to return to the holding cell.  For another, as the Commonwealth agrees, the policy requires only that ICE agents be let into the holding area if they "mak[e] such a request," and here no such request was made by an ICE agent.  Mass. Amicus Br. 19 n.9.

That leaves Judge Joseph's alleged order to the ICE agent to leave the courtroom at the outset of the session.  But it was the policy of the Newton courthouse at the time not to permit ICE agents in courtrooms.  Joseph Br. 5.  And the government points to no provision of the policy explicitly requiring judges to permit ICE agents into their courtrooms.  It interprets the policy's general acknowledgement that ICE agents may "perform their official duties" in the courthouse "provided that their conduct in no way disrupts or delays court operations" as mandate to court officers to permit such agents to enter active courtrooms.  Opp. 3 (quoting Policy at 2).  But the policy, of course, includes no such directive.

words." *Yates v. United States*, 135 S. Ct. 1074, 1086 (2015); *see also Begay v. United States*, 553 U.S. 137, 142-143 (2008).  To read the general term expansively in such a circumstance would "render" the "specific words meaningless."  *CSX Transp., Inc. v. Ala. Dep't of Revenue*, 562 U.S. 277, 295 (2011).  So too here: To read § 1512(c)(2) to apply to *all* obstructive acts, not just acts that (like § 1512(c)(1)) involve the impairment of evidence, would render § 1512(c)(1) meaningless.  The Court should thus give § 1512(c)(2) its proper meaning and dismiss Count Two.

The government strains to distinguish *Yates*, *Begay*, and similar decisions, explaining in a lengthy footnote that those cases apply only to a general term that "immediately follows specific terms *within a single statutory enumeration*," Opp. 27 n.13—that is, where the general term is part of the same *sentence* as the specific terms.  The government's position, unburdened by citation, appears to be that if § 1512(c)(1) and (2) were drafted *together*, as part of one long sentence, the *ejusdem generis* canon described in *Yates* and *Begay* would apply, but as long as the general term is set out in a separate sentence, physically distinct from the enumerated list, the canon does not apply.  The government musters no citation to support this newfound canon of statutory interpretation, because it cannot.  And it is hard to see why such a rule would make sense as a matter of logic or policy—especially where, as here, two separate provisions were enacted at the same time by the same Congress as part of the same statute.  *See* Pub. L. No. 107-204, § 1102, 116 Stat. 745, 807 (2002).  Nothing of substance should turn on whether a list of specific crimes and a subsequent general term are drafted as one sentence or as two, and the government does not make any real effort to argue that it should.[9]

---

[9] The government points to an array of cases (at 28) that have read a *different* statute, 18 U.S.C. § 1503, as a "catch-all provision," *United States v. Brenson*, 104 F.3d 1267, 1275 (11th Cir. 1997).  But by the government's own logic, courts' construction of § 1503—which is not

## III.    THE CONSTITUTION REQUIRES THE DISMISSAL OF THE INDICTMENT

The plain text of the obstruction statutes makes clear that they do not encompass the conduct alleged in the indictment.  But even if the statutes were not clear, basic constitutional principles require the same result.  The indictment seeks to radically expand the obstruction-of-justice statutes, reading them to encompass any act that is arguably inconsistent with federal immigration priorities—and to apply to state judicial officers acting in their official capacities.  Such a result runs deeply contrary to the Constitution.

### A.    The Indictment Rests On An Interpretation Of The Obstruction Statutes That Offends Federalism Principles And Violates The Tenth Amendment

Under our federal system, "both the National and State Governments have elements of sovereignty the other is bound to respect."  *Arizona v. United States*, 567 U.S. 387, 398 (2012).  Although "Congress may impose its will on the States," at least where the Constitution gives it that authority, "the States retain substantial sovereign powers under our constitutional scheme, powers with which Congress does not readily interfere."  *Gregory v. Ashcroft*, 501 U.S. 452, 460-461 (1991).  As a result, "'it is incumbent upon the federal courts to be certain of Congress' intent before finding that federal law overrides' the 'usual constitutional balance of federal and state powers.'"  *Bond v. United States*, 572 U.S. 844, 858 (2014) (quoting *Gregory*, 501 U.S. at 460).

The indictment of Judge Joseph rests on an erroneous interpretation of the federal obstruction statutes that radically alters this balance.  As the government's opposition brief reflects, the government believes that a state officer "obstructs" an immigration "proceeding" by taking any action—even an action in a state courthouse—that impairs an ICE enforcement

---

part of the same statutory provision as § 1512(c)(2), much less the same "statutory enumeration," Opp. 27 n.13—is irrelevant to the meaning of § 1512(c)(2).

activity.  *See supra* pp. 7-10.  The breadth of such a theory is deeply contrary to settled principles

of federalism.  The government explains that there is no such affront here, because it does not

seek to penalize anyone for merely "failing to enforce federal immigration law" (as opposed to

"affirmatively … impeding" a federal effort to do so).  Opp. 30.  As discussed below, *infra* pp.

18-19, that distinction fails: Judge Joseph did not "affirmatively impede" anything by taking

lawful and discretionary acts on the morning of April 2, 2018.  But even setting aside the facts of

this case, the government's theory has no logical stopping point.  If there is an immigration

"proceeding" pending at any time with respect to any noncitizen in the United States, and if one

can "obstruct" that proceeding in a "corrupt" manner simply by acting in a way that is contrary

to a federal enforcement effort, then every state judge in the United States obstructs justice

simply by declining to allow an ICE agent to enter his or her courtroom for the purpose of

making an arrest.  As the Commonwealth has explained, such an expansive reading of the

obstruction laws would "require Massachusetts judges, in running their courtrooms and

otherwise discharging their judicial responsibilities, to prioritize the interests of ICE enforcement

officers above all else or risk federal prosecution."  Mass. Amicus Br. 5.  Indeed, the

government's reading of the statutes, if accepted, would turn every state courthouse into an

immigration "proceeding" and every refusal to assist an ICE investigation into obstruction of

justice.

 That interpretation would dramatically "upset the usual constitutional balance of federal

and state powers."  *Gregory*, 501 U.S. at 460.  It also runs headlong into the Tenth Amendment,

which guarantees states and state officers the "critical alternative" of "declin[ing] to administer"

federal immigration law.  *New York v. United States*, 505 U.S. 144, 176-177 (1992); *see* Joseph

Br. 25-29.  The government does not discuss the *Gregory* clear-statement rule.  It contends that

the indictment does not violate the Tenth Amendment because it does not charge Judge Joseph

"with failing to enforce federal immigration law," but with taking *affirmative* steps to impair the

ICE agent's investigation.  Opp. 30.  But the government's argument is undermined by the facts

alleged in its own indictment: Judge Joseph is alleged to have had a choice between permitting

A.S. to return to a holding cell (where, the indictment says, she knew he would leave the

courthouse) or allowing him to leave the courtroom via the front door (where, the indictment

states, she knew the ICE agent was waiting).  If states are to retain the "alternative" of

"declin[ing] to administer" federal law, *New York*, 505 U.S. at 176-177, their officers must retain

the power not to actively facilitate federal immigration arrests—exactly what the indictment

alleges that Judge Joseph did here.[10]

### B.    As Applied Here, The Statutes Are Unconstitutionally Vague And Trigger The Rule Of Lenity

Finally, even setting aside the commandeering concerns raised by the government's

reading of the obstruction of justice statutes, that reading, at least as applied to Judge Joseph, is

unconstitutionally vague—especially when the rule of lenity is taken into consideration.  As the

Supreme Court explained just last year, vague laws "contravene the 'first essential of due process

of law' that statutes must give people 'of common intelligence' fair notice of what the law

demands of them."  *United States v. Davis*, 139 S. Ct. 2319, 2325 (2019); *accord Kolender v.

Lawson*, 461 U.S. 352, 357 (1983).  And the rule of lenity instructs that any ambiguity in a

---

[10] As discussed above, *see supra* pp. 14-15, the government argues that Judge Joseph cannot claim that she acted consistently with the Commonwealth's interests here because (in its view) she did not follow the policies established by the Massachusetts trial courts in the wake of *Lunn v. Commonwealth*, 477 Mass. 517 (2017).  But, as the Commonwealth itself explains, the "primary purpose" of the policy is "to restrict the involvement of trial court officials in ICE's courthouse enforcement activities."  Mass. Amicus Br. 19 n.9.  The acts alleged in the indictment are fully consistent with that purpose.

criminal statute "should be resolved in the defendant's favor." *Davis*, 139 S. Ct. at 2333. As the foregoing discussion reflects, the government's proposed interpretation of Sections 1505 and 1512(c)(2) fail these tests. These statutes do not effectively inform a state judge that she may be prosecuted for simply failing to facilitate a noncitizen's release from a courtroom out of the exit that a federal officer expected. Indeed, as the Commonwealth observes, "the federal government has never before sought to use the criminal law to punish state judges who do not cooperate with federal immigration activities, and there is no evidence that Congress intended federal prosecutors to use 18 U.S.C. § 1505 or § 1512(c) as tools to alter the usual balance of federal and state powers in this manner." Mass. Amicus Br. 20. "Allowing the prosecution to proceed would 'destroy the independence of the judiciary' and place 'the official action of every justice of the peace municipal or city court judges, Superior Court judges, Appellate Court judges and Supreme Court judges in our country at the mercy of a United States Attorney.'" *Id.* (quoting *United States v. Chaplin*, 54 F. Supp. 926, 934 (S.D. Cal. 1944)). The obstruction of justice statutes should not be read to permit such a result.

## CONCLUSION

For the foregoing reasons, and the reasons set out in Judge Joseph's Motion to Dismiss, the indictment should be dismissed under Federal Rule of Criminal Procedure 12(b) for failure to state an offense.

Dated:  November 8, 2019          Respectfully submitted,

SHELLEY M. RICHMOND JOSEPH

/s/ Thomas M. Hoopes
THOMAS M. HOOPES, ESQ.
BBO No. 239340
/s/ Douglas S. Brooks
DOUGLAS S. BROOKS, ESQ.
BBO No. 636697
LibbyHoopes, P.C.
399 Boylston Street
Boston, MA 02116
(617) 338-9300
dbrooks@libbyhoopes.com
thoopes@libbyhoopes.com

/s/ Elizabeth N. Mulvey
ELIZABETH N. MULVEY
BBO No. 542091
Crowe & Mulvey LLP
77 Franklin Street, 3rd Floor
Boston, MA 02110
(617) 426-4488
emulvey@croweandmulvey.com

*Counsel for Defendant Shelley M. Richmond Joseph*

21

## **CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the CM/ECF system will be sent

electronically to the registered participants as identified on the Notice of Electronic Filing.

/s/ Thomas M. Hoopes
THOMAS M. HOOPES